✓ FILED        ___ LODGED
___ RECEIVED    ___ COPY

MAR 2 8 2008

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ B  DEPUTY

U.S. District Court of the District of Arizona

The Honorable Judge James A. Teilborg

Case No. CV 07-2268-PHX-JAT

NASSER BASHIRI and
NANCY BASHIRI,
Plaintiffs,

vs.

VINCENT SADLER, individually;
RICHARD T. REIBMAN, individually; and
SCHWARTZ COOPER CHARTERED,
Defendants.

---

U.S. Bankruptcy Court, District of Arizona

The Honorable Judge Charles G. Case II

Case No. 08-00997

Vincent Sadler,
Movant

vs.

Nasser and Nancy Bashiri,
Debtors

Table of Contents

Judge James A. Teilborg

Case No. CV 07-2268-PHX-JAT

Response to Defendants' Motion to Transfer This Case to the Northern District of Illinois

EXHIBITS

Exhibit A – Arizona Lis Pendens and Memorandum of Agreement

Exhibit B – Excel Spreadsheet Statement and Mr. Bashiri's cancelled checks in relation to May 5, 2005 agreement

Exhibit C – Original and Revised May 2005 agreement

Exhibit D - Letters to Mr. Sadler Summer 2006

Exhibit E - Mr. Bashiri's cancelled checks in performance of October 5, 2006 Agreement

Exhibit F - Letters faxed to Chicago elders and Mr. Sadler requesting performance on the part of Mr. Sadler and concerns over false information agreement was based on.

Exhibit G - 48 hour notice from Mr. Bashiri to Chicago elders and Mr. Sadler regarding October 5, 2006 Agreement

Exhibit H – Email from Vivian Bishop on November 27, 2007 stating that Mr. Sadler would not sign the purchase agreement according to the 10/5/06 agreement.

Exhibit I - Letter from Mr. Sadler demanding the Mr. Bashiri go to secular arbitration and agreement.

Exhibit J - Satisfaction of Mortgage on Meravi Drive property after Mr. Sadler claimed to be on the verge of bankruptcy when Mr.

Bashiri stopped paying him in regards to the May 5, 2005 agreement.

Exhibit K - Letter from Mr. Sadler asking for purchase contract from Mr. Bashiri in regards to 28677 San Lucas

Exhibit L - Mr. Sadler's listing agreements on properties that Mr. Bashiri had paid for and not been reimbursed, nor had Mr. Sadler received Mr. Bashiri's permission to sell.

Exhibit M - Mr. Sadler's supplemental response to Mr. Bashiri's declaration, Deeds to Sadler/Aldridge property, Sadler/Aldridge Collier County lawsuit summary

Exhibit N - Bashiri's Brief and Motion to Dismiss or Transfer in Illinois lawsuit, Amended Answer and proof of delivery to mail room

Exhibit O – Letters to and from Chicago elders showing there involvement as elders

Exhibit P - Faxes and documentation requested by elders in Hot Springs, AR in defense of accusations made in the Spring of 2007 by Mr. Sadler

Exhibit Q - ARC Investments corporation standing, ARC Investment bank statements and various spreadsheets from ARC Investments to Mr. Bashiri, Ms. MacDonald's 2005 Bankruptcy Petition

Exhibit R - Original Signature page of October 5, 2006 contract showing missing signature, letter from Mr. Zarate on October 24, 2006 with attached agreement faxed October 24, 2006 with Mr. Micah's signature added.

Exhibit S (see below):
- Copy of Vincent Sadler's Response to Nasser Bashiri's Declaration in Illinois Lawsuit.
- Copy of Vincent Sadler's Supplemental Response to Nasser Bashiri's Declaration in Illinois Lawsuit
- Copy of the Declarations of Vincent Sadler's six (6) "Illinois" witnesses

Nancy and Nasser Bashiri
21911 N. 36th St.
Phoenix, AZ 85050
Phone: 501-762-2525

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

NASSER BASHIRI and
NANCY BASHIRI,
   Plaintiff,

vs.

VINCENT SADLER, individually,
RICHARD T. REIBMAN,
individually, and SCHWARTZ
COOPER CHARTERED,
   Defendants.

)
)
)
)
)
)
)
)
)
)

CASE NO. CV 07-2268-PHX-JAT

JAMES A. TEILBORG, JUDGE

## RESPONSE TO DEFENDANT'S MOTION TO TRANSFER THIS CASE TO THE NORTHERN DISTRICT OF ILLINOIS

Response to Introduction

Defendant's Counsel misrepresents the number of lis pendens in Arizona, claiming that there is only one (1) in Arizona, when there are in actuality three (3) Lis Pendens in Arizona filed by Mr. Sadler. (See Exhibit A for copies of the Lis Pendens and Memorandums of Agreement that Mr. Sadler has filed)

In Paragraph 2 of her Introduction Counsel refers to an original dispute involving Eight properties. Again, Counsel misrepresents the original dispute in which Mr. Bashiri had paid Mr. Sadler approximately $120,000, according to Mr. Sadler's own statement for properties solely

1

under Mr. Sadler's name. (See Exhibit B for copies of Mr. Bashiri's cancelled checks and Mr. Sadler's excel spreadsheet showing properties and amounts).

The dispute originated from Mr. Sadler's breach a May 5, 2005 agreement where Mr. Bashiri was not given any rights to any of the properties he was paying half of the mortgages and expenses on (See Exhibit C for a copy of the original and revised May 5, 2005 agreement). Mr. Sadler collected all rents from Lakeland Harbor, H unit, after Mr. Bashiri had furnished both units at his own expense, even though these units were solely in Mr. Sadler's name. Mr. Bashiri had pleaded with Mr. Sadler for his half of the rent and was told by Mr. Sadler that it was going to be kept in the ARC Investment account (See Exhibits A and Q). Mr. Bashiri asked for his half to be applied to the mortgages. Mr. Sadler refused. At this time Mr. Bashiri sent Mr. Sadler a letter telling him that he would not continue payments as all of the properties were in Mr. Sadler's name and he was receiving nothing for his payments. (See Exhibit D for letters during the summer of 2006).

Counsel again distorts the truth regarding Mr. Bashiri's compliance with the October 5, 2006 agreement, as Mr. Bashiri was first to perform on the agreement by paying approximately $54,000 (See Exhibit E for Mr. Bashiri's cancelled checks) directly to Mr. Sadler. Mr. Sadler did not perform a single item on the agreement even after repeated requests to him and the elders on the committee (See Exhibit F for letters faxed by Mr. Bashiri requesting performance by Mr. Sadler). Finally, Mr. Bashiri issued a 48 hour notice to the elders and Mr. Sadler (See Exhibit G) explaining that he would not consider the contract valid if Mr. Sadler did not perform on the agreement and would be expected to be compensated for all of the monies Mr. Sadler had accepted from him in relation to both agreements. Mr. Zarate and Mr. Aldridge, being described as "point men", were fully aware of the reasons that Mr. Bashiri considered the agreement

invalid and refused to accept delivery of the items they said they were "allegedly" in possession of (Refer again to Exhibits F and G). This means they were involved in attempting to extort money out of Mr. Bashiri by telling him they could not release the documents/checks until he paid another $60,000 in addition to the approximately $54,000. Both Mr. Bashiri and Mr. Sadler owed each other $60,000 which was supposed to be considered a "wash" as it was an equal amount.

Mr. Bashiri received a Certified Letter dated November 26, 2006 (six days after the 48 hour notice) reporting that Mr. Sadler had allegedly given everything to Mr. Zarate to hold, which was not in accordance with the agreement. Mr. Bashiri was never provided copies of the alleged checks or documents. On November 27, 2006 (7 days after Mr. Bashiri's 48 hour notice) Mr. Bashiri received an email from the Title Company that produced the purchase contracts for both of the lots Mr. Bashiri had agreed to purchase, saying the Mr. Sadler had refused to sign the contract (See Exhibit H). As Mr. Sadler had breached the first agreement and now had breached the second agreement, Mr. Bashiri had no reason to believe he would now or ever follow through. Mr. Bashiri had been told by Mr. Zarate that the items from Mr. Sadler would not be released to him until the elders received another $60,000 in addition to the $54,000 Mr. Bashiri had already paid. No evidence was presented that they were even in possession of the documents nor was there provision in the agreement to provide the elders with the items. Mr. Sadler and Mr. Bashiri were supposed to give the items directly to one another, which Mr. Bashiri had done in accordance with the agreement and the approximately $54,000.

Response to Background

Counsel states that the relationship became "irrevocably" broken when the parties disputed how the various properties that had been acquired should be disposed, divided or

3

otherwise treated". This is incorrect. It was irrevocably broken when Mr. Sadler did not perform according to the first agreement and then refused to return the money Mr. Bashiri had paid in reference to the properties solely under his name (Refer again to Exhibit D).

Mr. Bashiri received a letter from Mr. Sadler (See Exhibit I) demanding that Mr. Bashiri sign it and agree to go to "secular" arbitration or he would "assume that Nasser was unwilling to cooperate" with the elders. The elders were contacted regarding what to do and at that time (Mr. Zarate) instructed Mrs. Bashiri three times that they should sign the arbitration agreement.

A couple of days after the letter from Mr. Sadler, the Bashiri's received a letter from the Body of Elders in Chicago telling them to come to Chicago. Mr. Bashiri was under the impression that his issues with Mr. Sadler and the first agreement would be addressed. Mr. and Mrs. Bashiri agreed to go to Chicago for this meeting, although they had resided in Hot Springs, Arkansas for almost a year and were no longer members of that congregation, their cards having been transferred to the Hot Springs South congregation. In the month prior to their going to Chicago, Mr. Sadler had come to Hot Springs, Arkansas and accused Nasser of no longer paying him on the first agreement. Mr. Haight, an elder from Hot Springs congregation approached Mr. and Mrs. Bashiri telling them that Mr. Sadler had accused Mr. Bashiri of defrauding him and claimed he was on the verge of "bankruptcy" because Mr. Bashiri had stopped paying him. Another falsehood as several months later, Mr. Sadler paid cash for the Meravi Dr. property (Exhibit J "Satisfaction of Mortgage" on Meravi Drive property months after Mr. Sadler claimed to be on the verge of bankruptcy).

Although counsel insists that the events were contained to Illinois, Mr. Sadler had no problem going back and forth between both sets of elders regarding this dispute. A committee could just have easily been formed in Hot Springs, AR as congregation procedures direct that if

charges are brought against a member of a congregation, they are to be brought to the elders of that member's congregation to be handled. Mr. Sadler instead first brought the matter to the Body of Elders in Chicago as this was convenient for him and he was still a member of that congregation, then he came to Hot Springs congregation, then went back to the Chicago congregation and then came back to the Hot Springs congregation.

The agreement signed on October 5, 2006 was based upon information falsified by Mr. Sadler and was not according to the original negotiation discussed on October 4, 2006. The agreement on October 5, 2006 was revised many times and the decision that had been made on October 4, 2006 that Mr. Sadler purchase the 28677 San Lucas property for the original price that Mr. Bashiri paid plus an additional $40,000 (per Mr. Bullock's own statement) was changed to say that Mr. Bashiri was supposed to Quit Claim the property to Mr. Sadler and Mr. Sadler would give him $40,000. (See Exhibit K letter from Mr. Sadler informing Mr. Bashiri that his attorney had drafted a purchase contract for Mr. Sadler's San Lucas property and that he was waiting for Nasser to provide a purchase contract for 28677 San Lucas, which would not have been necessary if the property, was to be Quit Claimed). In regards to the Meravi Dr. property, at the time Mr. Sadler had requested it to be Quit Claimed, Mr. Bashiri's name was still on the mortgage. Mr. Sadler never informed Mr. Bashiri that he had "satisfied" the mortgage on that property.

In Paragraph 4, Counsel suggests that Mr. Sadler was prompted to record the lis pendens when Nasser placed his father-in-law on title to one of the properties and listed another property for sale with a broker. Counsel again distorts the truth, as Mr. Sadler had previously listed properties that were part of the partnership with Mr. Bashiri and for which Mr. Bashiri had been paying for without Mr. Bashiri's permission (See Exhibit L for listing agreements of properties

that were still part of the partnership and for which Mr. Bashiri had paid for). Apparently, Mr. Sadler has a double standard as he feels "entitled" to do whatever he wants, while others are held to a different set of rules.

Also, Mr. Sadler formed a real estate partnership with one of the "so-called" mediators, Mr. Aldridge on a property in Florida that had been involved in the partnership between himself and Mr. Bashiri without notifying Mr. Bashiri. In Mr. Sadler's response to Mr. Bashiri's declaration he perjures himself by saying that he had transferred his interest in the said property to Mr. Aldridge weeks after the agreement had been signed. This was a pre-construction property and Mr. Sadler, Mr. and Mrs. Aldridge were on the Original Deed and Mortgage dated November 2006. Interest was not transferred from Mr. Sadler to Mr. and Mrs. Aldridge. Mr. Sadler "Deeded" the property to Mr. and Mrs. Aldridge on September 16, 2007, approximately 2 weeks before he filed the lawsuit against the Bashiri's in which Mr. Aldridge is "touted" as a key witness. There is currently a pending lawsuit in Florida in which Mr. Sadler, Mr. Aldridge and Mrs. Aldridge are defendants in a lawsuit by the mortgage company for that property as Mr. Sadler was still on the mortgage, even after he deeded the property to the Aldridges. (See Exhibit M for Deeds and lawsuit summary and Mr. Sadler's Supplemental Declaration in the Illinois lawsuit).

In response the Paragraph 5, Counsel claims that the Bashiri's did not object to venue in a timely manner. This is incorrect. (See Exhibit N ).

Response to General Statements Made in Defendant's Motion to Transfer

In regards to the rest of Counsel's argument that the motion should be transferred to Illinois including the convenience of the "witnesses" and the "defendants" and the fact that the "Settlement Agreement" was signed there, please see the attached letters (Exhibit O) showing

6

that the Defendant Mr. Sadler and the five elders have perjured themselves on the Illinois complaint, answers and declarations (See Exhibit S) in regards to their denial as their involvement as elders. After the "settlement agreement" was signed and Mr. Bashiri gave 48 hour notice to Mr. Sadler, Mr. Sadler chose to come to the Hot Springs, AR congregation where Mr. and Mrs. Bashiri attended and accused Mr. Bashiri or Slander, Fraud and Treachery. Mr. Bashiri was required to drive 22 hours through the night and cancel his vacation to defend himself with documentation as shown by the faxes that Mr. Bashiri was asked to provide the elders in Hot Springs after they met with him (Exhibit P).

The headquarters of the church had asked the congregation to investigate the entire situation, as they had been contacted by Mr. Bashiri and sent evidence in regards to the situation. Both the Chicago and Hot Springs congregation worked together and the outcome was that Mr. Bashiri was completely cleared of any wrongdoing. The headquarters concurred with this decision. Mr. Sadler decided that he had not gotten what he wanted from the congregation; even though he was the party that brought the matter to the elders and therefore would have been expected to accept their counsel. Months after this decision was rendered, Mr. Sadler, after having been counseled by the elders not to take anyone to court, filed a law suit against Mr. Bashiri on September 27, 2007. Mr. Bashiri had abided by the counsel given by the elders not to take each other to court.

As the Defendant Mr. Sadler and his witnesses have chosen "under penalty to commit perjury", and there is evidence from their own hand proving this, their testimony is not evidence. It was the Defendant, Vince Sadler who chose, with full knowledge of the truth, to use these "declarations" in support of his Motion for Summary Judgment (See Exhibit S) thus committing

a fraudulent act in suing the Bashiris. The Plaintiff's have attached exhibits clearly show fraud, deceit and extortion on the part of Mr. Sadler and his witnesses.

The Committee was clearly not "impartial" and did act in the capacity of elders and judges although they certainly did not follow proper protocol (Please refer again to Exhibit O). They were appointed by the Body of Elders, as elders, not regular members of the congregation as Mr. Sadler's Complaint alleges. As elders, they would have the ultimate right to form a judicial committee, to determine guilt or innocence and to discipline in form of reproof or removal from the congregation. This was certainly not just"mediation" between Mr. Sadler, Mr. Bashiri and "general members" of the congregation. Mr. Sadler's intent in coming to the elders in Hot Springs, AR after he breached the "settlement agreement" was to falsely accuse Mr. Bashiri and attempt to commit "spiritual blackmail" by the threat of expulsion from the congregation. He had accused Mr. Bashiri of slander knowing full well that the elders in Chicago had determined that there was no slander. The elders in Hot Springs encouraged Mr. Bashiri to apologize to Mr. Sadler for talking about their situation. Mr. Bashiri again complied with the elders counsel and spent an hour on the phone trying to apologize to Mr. Sadler. Mr. Sadler told Mr. Bashiri that he would only forgive Mr. Bashiri if Mr. Bashiri performed "acts befitting repentance" by paying him. He insisted that if Mr. Bashiri did not, he could not forgive him and this would have led to possible discipline on the part of the Hot Springs elders. Fortunately, the Hot Springs elders contacted the Chicago elders and were told that they had investigated the charge of slander that Vince made and that it was not slander.

As counsel cannot even seem to decide in her motion how many lis pendens there are on properties in Arizona, at one point stating there was only one and in another part stating three, it is difficult to rely on her motion being a statement of any proven facts. It seems that in both the

case of counsel in Arizona and counsel in Illinois, from the documents presented, that although they were aware of the truth of the situation, chose to distort, manipulate, ignore and misrepresent the truth in order to continue to be billable to their respective firms by generating large amounts of money from their client(s).  As the Declarations for the witnesses are almost identical in wording, it is obvious that Mr. Reibman or his staff prepared these documents and the wording for these witnesses thus playing a part in the ensuing perjury on the part of the witnesses.

<u>In Summary</u>

Mr. Sadler was the one to choose to bring this "issue" to the church, rather than court. Mr. Sadler did not perform according the "Settlement Agreement" signed in the church, although Mr. Bashiri did according to all of the "exhibited" evidence.  Mr. Sadler did not feel that this was an "Illinios" issue as he was more than comfortable physically bringing accusations back and forth between the elders in Illinois and Arkansas depending on the answer that he received. When the final decision did not work out in his favor, then he decided that the "church" was no longer the "authority" and took it to secular court.  According to the church's own procedural guidelines, Mr. Bashiri and Mr. Sadler were encouraged not to take one another to court.  After Mr. Sadler took Mr. Bashiri to court, ignoring this counsel, then the "witnesses" chose against the principles by which the church abides to bear "false witness" against a "brother", being Mr. Bashiri, and using their "false witness" to support a Motion for Summary Judgment which was based on the deceit and perjury of both the Defendant, Mr. Sadler and his witnesses.

Counsel again misrepresents the truth when she claims that that "neither Sadler, nor Reibman, nor Schwartz Cooper ever traveled to Arizona in connection with any of the events giving rise to the suit".  Mr. Sadler has traveled several times to Arizona in regards to the

9

properties the Lis Pendens were filed against and there are witnesses other than the Bashiris to support that. In fact, the first properties that Mr. Bashiri and Mr. Sadler purchased in relation to their partnership were three (3) lots in Sedona, Arizona and subsequently a house in Phoenix, AZ. Mr. Sadler currently has one of the lots in question on the market, although Mr. Bashiri had paid money that was never reimbursed to him for that property. (Refer again to Exhibit L ).

Counsel claims that "Draining the connection to Arizona even further is that three of the six lis pendens challenged by Bashiri were recorded in Florida, leaving Arizona with virtually no connection to this lawsuit. The state connected most to this dispute is Illinois – not Arizona." (Refer again to Exhibit A for the three Lis Pendens recorded in Arizona). The Defendants contributed to their "connection" in Arizona by filing Lis Pendens in Arizona relating to properties that exist in Arizona which the Defendant, Vincent Sadler, traveled to several times. There are no properties that are in Illinois.  The Defendant's do reside in Arizona as Mrs. Bashiri has had continued employment in Arizona since October 2007.

Mr. and Mrs. Bashiri have not resided in Illinois since the end of October 2005. The dispute did not arise in Chicago as it arose in the summer of 2006, when Mr. and Mrs. Bashiri lived in Hot Springs, AR. The Bashiri's were obviously, after examining the Exhibits of the elder's communication, coerced into returning to Chicago for the "meetings" so that venue could be established at that time by Mr. Sadler, who presumably had already decided to file a lawsuit in Illinois and hoped that this would establish venue in Illinois.

Mr. Sadler has not hesitated to travel to other states in his real estate ventures (i.e. Florida, Arkansas, Arizona and Curacao). In fact, Mr. Sadler, although his real estate venture with Mr. Aldridge originated in Illinois, is currently a defendant in a mortgage foreclosure lawsuit in Florida because the property is in Florida. (Refer again to Exhibit M)

In regards to Debra MacDonald, the other "witness" that Mr. Sadler refers the bookkeeper and administrative assistant to the Nasser/Sadler real estate venture, was not Mr. Bashiri's bookkeeper or administrative assistant. Having told Mr. Bashiri that she was not being paid by Mr. Sadler and she was getting ready to move out on her own, Mr. Bashiri and Mrs. Bashiri gave Ms. MacDonald $1,000 as a gift for helping them out on a couple of occasions and because they thought it would help with her moving expenses as she did not make a lot of money at her full-time job.

They were unaware at the time they gave her the check that she and Mr. Sadler would be sharing an apartment with one of the bedrooms being used as the office for ARC Investments. Mr. Bashiri had not been informed nor his permission requested. Ms. MacDonald had a full-time position at the American Bar Association during this time. There was not an employment agreement, tax forms, payroll checks or anything else linking Ms. MacDonald as an employee of ARC Investments nor was there an Independent Contractor Agreement that outlined Ms. MacDonald's duties. Ms. MacDonald did not maintain a General Ledger which had been repeatedly requested by Mr. Bashiri. Ms. MacDonald has made it clear over the period of the partnership that her loyalty is to Mr. Sadler and Mr. Sadler only.

She has spent many years performing a variety of "duties" for Mr. Sadler that were not related to bookkeeping or administrative assistant but more as a personal assistant which included child care, phone calls, appointment making, cleaning his residence. She had complained to Mr. and Mrs. Bashiri in tears prior to the Bashiri/Sadler venture that she would never do anything for him again as he had treated her badly. In Arizona, during a visit in which he stayed with the Bashiri's to look at property in Sedona, AZ that he and Nasser would invest in, he described Ms. MacDonald as "dumb as a box of rocks" and said that every time he tried to

11

explain financial things to her she looked at him like a "deer caught in the headlights".   Mr. Sadler claimed that the reason he used her was because she is "persistent and perseverant" in getting what he wants from people.  Ms. MacDonald's testimony is worthless as she was not a witness to the signing of the "agreement" and was not involved in all of the meetings.  She does not even know what is legally required in bookkeeping for a corporation.  She did not work for Mr. Bashiri.  She has a long-standing relationship with Mr. Sadler and would only be looking for his interests.   Ms. MacDonald did not divulge her bankruptcy petition (See Exhibit Q) commencing on 5/2005 and discharging on 8/2005 (during the time she supposedly worked for Mr. Bashiri).  This was an obvious attempt to cover up her financial "ineptitude". As such, Mr. Bashiri would hardly have used Ms. MacDonald as a bookkeeper or administrative assistant when he could have his wife, who has had 27 years of administrative experience and six years of real estate experience take care of his business.   Mr. Sadler's "recommendation" of Ms. MacDonald would not have caused Mr. Bashiri to hire her.  Also, as for the ARC Investment office, it was in her apartment and Mr. Bashiri was not given free access to any of the files.  As Mr. and Mrs. Bashiri were in Hot Springs, AR since beginning of November 2005, it would hardly have been necessary or convenient for Mr. Bashiri to employ her.  The Bashiri's had their own files, fax and phones.   Over and over Mr. Bashiri had requested that Mr. Sadler and Ms. MacDonald prove that Mr. Sadler had claimed everything Mr. Bashiri paid him as "income" on his tax return.  It was never provided.

Ms. MacDonald claims in her Declaration (See Exhibit S) that she was asked to handle office responsibilities by both Mr. Sadler and Mr. Bashiri.  This is a falsehood.  Mr. Bashiri was forced to communicate and work through Ms. MacDonald by Mr. Sadler as Mr. Sadler would often not even take Mr. Bashiri's phone calls.  Ms. MacDonald was "dedicated" to Mr. Bashiri.

She also knowingly, on the spreadsheet she sent Mr. Bashiri regarding payments, listed the "Back-O-Beyond" lot as being purchased for $620,000 rather than the $570,000 that it was purchased for. Either this was an effort to extort more money on behalf of Mr. Sadler or just incompetence on her part. Ms. MacDonald was also responsible for contacting the property management company for 28677 San Lucas (solely in Mr. Bashiri's name), after Mr. Bashiri had told them not to continue to send rent to Mr. Sadler as he was not the owner. Ms. MacDonald then deposited that rent in the ARC Investments account which was only accessible by Mr. Sadler.

Ms. MacDonald, as Mr. Sadler's assistant, knew full well the $37,652.59 was not to "cure delinquent interest payments" (See Exhibits B and Q) as there was nothing Mr. Bashiri was getting in return. The other witnesses do not mention the 28677 San Lucas property in their Declarations (See Exhibit S). The payments included property mortgages held by banks and expenses of the properties as well. As a "bookkeeper" she perjures herself in this statement (See Exhibit S). Also, although there is evidence to support the fact that Mr. Sadler was well aware he was supposed to "purchase" the property from Mr. Bashiri at the original purchase price plus $40,000 in addition, per Mr. Bullock's statement, she again perjures herself regarding the negotiations she claims to have been a part of.

As to the property at 21911 N. 36th St. (Aviano), Mr. Sadler never paid any of the mortgage, expenses, etc. he agreed to according to the October 5, 2006 contract which came to approximately $85,000. Ms. MacDonald was fully aware of how much money Mr. Bashiri had paid and was owed in relation to the first agreement in May of 2005. Mr. Sadler did not sign either lot purchase contract so Mr. Bashiri was unable to purchase these lots in a timely manner

as Mr. Sadler had requested.  Mr. Sadler's actions showed that his only interest was in collecting the 14% interest he was going to charge Mr. Bashiri after 90 days.

Regarding ARC Investments (Exhibit Q), it was not even in good standing.  An annual report was not filed.  Mr. Bashiri was not provided with the articles of incorporation and there is no proof that Mr. Sadler claimed the income that he received from Mr. Bashiri, which was paid, per Mr. Sadler's assistant's direction, (Refer again to Exhibit Q) to ARC Investment, even the properties were not a part of the corporation.  After many requests, Mr. Sadler finally had Ms. MacDonald send a copy of the ARC Investment bank statements which showed a commingling of funds (Refer again to Exhibit Q).  Mr. Bashiri had also requested a 1099 and was told that Mr. Sadler had talked to his accountant and because of the type of corporation that ARC Investments was they were not required to give them.  Mr. Bashiri requested a letter stating that from the accountant but Mr. Sadler only gave a copy to the Chicago elders and it was never provided to Mr. Bashiri.

Although the "elders" were fully aware of Mrs. Bashiri's knowledge of the business events since the beginning discussions in February 2005, she was allowed only to participate in one hour of meetings with Mr. Bashiri to address the false accusations that Mr. Sadler had made as well as inform the elders of how they felt they had been treated unfairly by Mr. Sadler.  The meeting was from 7:00 – 8:00 p.m. on the evening of October 4, 2006.  The elders made it clear that Mrs. Bashiri would only be involved in that hour.  As Mr. and Mrs. Bashiri were staying at a hotel that was approximately one hour away from church, Mrs. Bashiri was required to wait for the meeting to adjourn at approximately midnight.  After religious services on October 5, 2006, which ended at approximately 9:15 p.m., Mrs. Bashiri thought she would be invited to join the

14

meetings but was not and again had to wait until almost midnight. While waiting for Mr. Bashiri, Mrs. Bashiri witnessed that Mr. Micah, one of the witnesses left the church and did not return. Mr. Sadler's declaration and the joint declarations of T.J. Bullock, Antoine Holmes and Duraid Micah, under penalty of perjury, claim that Mr. Micah was there for the meetings on both nights and witnessed the signing of the agreement. (See <u>Exhibit R</u> showing the original contract with 4 signatures on October 5, 2006 and then a letter from Mr. Zarate faxed to Mr. Bashiri dated October 24, 2006 which attached the agreement with Mr. Micah's signature added, as if he had signed on that night).

The Bashiri's do not know what Mr. Micah was told about the meetings the night of October 5, 2006. Mr. Micah had expressed surprise when Mr. Bashiri showed him Mr. Sadler's own statement showing what Nasser had paid him in the first hour of meetings on October 4, 2006. Mr. Micah may have been of assistance in the October 5, 2006 meetings to Mr. Bashiri by noting the changes that had been made on the agreement which were not in accordance to the decisions made on October 4, 2006.

As to the elders' declarations that they did not act in the capacity of elders, (<u>Please refer again to Exhibit O</u>) which clearly shows in their own words that they were in a position of spiritual counsel and judgment and that the supposed "mediation" was a actually a series of investigations that could have resulted in punishment or discipline. As they, in Exhibit M, claim that they are not lawyers or attorneys, why would they have taken it upon themselves to negotiate terms of a settlement agreement, deciding on dollar amounts, etc. in a case involving such a large amount of property and money. Why did they not recommend that both parties take the agreement to an expert such as an attorney or accountant before signing as it had been 10 hours of meetings over 2 nights and the agreement had been revised and revised. It was

approximately midnight when it was signed. Why did they use their spiritual influence and scriptures to encourage Br. Bashiri that "if someone asks for your outer garment, give him your inner too" or "be content with sustenance and covering" or "allow yourself to be wronged". Mr. Bashiri's decision to follow the agreement was based solely on the elders' position as elders, their spiritual recommendations. He had expressed concern to them that he was afraid that if he signed this agreement that Mr. Sadler would do what he had already done in the previous agreement – that Mr. Bashiri would pay him a lot of money and get nothing in return. The elders encouraged him to trust this arrangement and he did to the tune of $54,000.

Mr. Bullock who was on the Committee knew Mr. Bashiri for 20 years as he had introduced Mr. Bashiri to Christianity and after studying the Bible with him Mr. Bashiri converted to Christianity. He also conducted the wedding ceremony for Mr. and Mrs. Bashiri. Mr. Bashiri, albeit naively, had complete trust in this person. This elder violated his trust by taking distorting the truth and violating the confidentially of the meetings held in the back room of the church behind closed doors. The congregation is supposed to be able to view these "elders" as a "concealment from the wind", as "shepherds" in the congregation. Their responsibility involves keeping the congregation clean of wrongdoing, spiritually shepherding individuals, forming judicial committees, organizing meetings, ministry, etc. How damaging it was to Mr. Bashiri's faith, that these "trusted" men put in charge of the congregation, and after he had been cleared of "any" wrongdoing regarding Mr. Sadler's accusations, chose to support Mr. Sadler by perjuring themselves on their declarations. How likely would it be that anyone would confide or take their issues or problems to these elders if they knew that at any time these "elders", who are not even allowed to tell their wives what cases they are involved in, could break that sacred trust?

16

Counsel in both the Illinois lawsuit and the Arizonan lawsuit have enabled a "miscarriage of justice" to be committed against the Bashiri's by twisting and distorted the truth and purposefully omitting pertinent facts in order to generate continuous fees from their clients for their firms so that they can remain "billable". Mr. Reibman was fully aware of the facts when he decided to place the "illegal" lis pendens on the properties. Mr. Reibman was also in possession of Mr. Sadler's statement which he requested during a settlement attempt, showing that Mr. Bashiri had paid Mr. Sadler.

Please see Exhibit S for the following:

Copy of Vincent Sadler's Response to Nasser Bashiri's Declaration in Illinois Lawsuit.

Copy of Vincent Sadler's Supplemental Response to Nasser Bashiri's Declaration in Illinois Lawsuit.

Copies of the Declarations of the six (6) witnesses for Vincent Sadler in the Illinois Lawsuit.

The elders involved in this Committee and subsequent action do not represent the majority of elders in this organization, as the majority of them are diligent about following the procedural guidelines outlined in the scriptures and by the headquarters.

Dated: March 27, 2008

Respectfully submitted,

*Nasser Bashiri*

*Nancy Bashiri*

Nasser and Nancy Bashiri
21911 N. 36th St.
Phoenix, AZ 85050

17

CV   07 - 2268 - PHX - JAT

RECEIVED _____ COPY

MAR 2 8 2008

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
_____ B  DEPUTY

# <u>CERTIFICATE OF SERVICE</u>

This is to certify that on the 28th day of March 2008, a true and complete copy of the above and foregoing documents (noted below) in regards to United States District Court, District of Arizona, Case No. CV 07-2268-PHX-JAT was served upon the following:

- Response to Defendants' Motion to Transfer
- Exhibits A - S

| | |
|---|---|
| Contantino Flores, Esq.<br>Bankruptcy Trustee<br>P.O. Box 511<br>Phoenix, AZ  85001-0511 | Hand Delivered |
| Kevin C. McCoy<br>ALLEN, SALA & BAYNE, PLC<br>1850 N. Central Ave., Suite 1150<br>Phoenix, Arizona  85004 | Hand Delivered |
| Margaret A. Gillespie<br>Collins May Potenza Baran & Gillespie PC<br>201 North Central Avenue Ste 2210<br>Phoenix AZ  85004 | U.S. Mail |
| Richard T. Reibman<br>Schwartz Cooper Chartered<br>180 North La Salle St., Suite 2700<br>Chicago, IL  60601 | U.S. Mail |
| Schwartz Cooper Chartered<br>180 North La Salle St., Suite 2700<br>Chicago, IL  60601 | U.S. Mail |
| Vincent Sadler<br>1902 N. Kenmore Ave.<br>Chicago, IL  60614-4918 | U.S. Mail |

*Courtesy Copies Hand Delivered to the following*:

Judge Charles G. Case II                            Hand Delivered
U.S. Bankruptcy Court                               Ref. Case #08-00997
District of Arizona
230 N. First Ave
Courtroom 601, 6th Floor
Phoenix, AZ 85003


Judge James A. Teilborg                              Hand Delivered
U.S. District Court                          Ref. Case # CV 07-2268-PHX-JAT
District of Arizona
Sandra Day O'Connor U.S. Courthouse
401 W. Washington Street, Suite 130, SPC 1
Phoenix, AZ 85003-2118


These documents were filed in both Arizona District Court and Bankruptcy
Court.

Nasser and Nancy Bashiri
21911 N. 36th St.
Phoenix, AZ  85050
(501) 762-2525

# EXHIBIT A

Doc Id: 4180720
Recorded in Yavapai County, AZ
Ana Wayman-Trujillo, Recorder
CHICAGO TITLE INS CO

Doc Id: 4180720
BK 4545 / PG 988
10/09/2007 04:19 P
Rec Fee: 13.00

**Prepared by and Return to:**
Richard T. Reibman
Schwartz Cooper Chartered
180 North LaSalle Street, Suite 2700
Chicago, Illinois 60601
(312) 346-1300

## LIS PENDENS NOTICE

NOTICE IS HEREBY GIVEN BY VINCENT SADLER that Case No. 07 C 5464, styled

<u>Vincent Sadler v. Nasser Bashiri and Nancy Bashiri, husband and wife</u>, was commenced in the

United States District Court, Northern District of Illinois, Eastern Division on the 28th day of

September, 2007, and is now pending in said Court.

The action involves, in part, claims relating to real property situated in Yavapai County,

Arizona described as follows:

> Lot 61, LA BARRANCA, according to the plat of record in the office of the County
> Recorder of Yavapai County, Arizona, Recorded in Book 39 of Maps, Pages 19-24, records
> of Yavapai County, Arizona.

Also known as 15 Granite Mountain Road, Sedona, Arizona 86351

Parcel No.: 405-55-061 1

_____
Vince Sadler

**STATE OF ILLINOIS  )**
**COUNTY OF COOK    )**

I HEREBY CERTIFY that on this day before me, an officer duly qualified to take
acknowledgements, personally appeared Vince Sadler, to me known to be the person described in
and who executed the foregoing instrument and acknowledged before me that he executed the same.
He is personally known to me or has produced his Illinois Driver's License as identification.

WITNESS, my hand and official seal in the State and County last aforesaid this 3rd day of
Oct., 2007.

SEAL

```
"OFFICIAL SEAL"
SUSAN E DZYACKY
COMMISSION EXPIRES 09/20/08
```

_____
NOTARY PUBLIC

Print Name: Susan E Dyjacky

My commission expires: 9/20/08

**Recorded By Chicago
Title Insurance Company
as a Courtesy Only**

Doc Id: 4180719
Recorded in Yavapai County, AZ
Ana Wayman-Trujillo, Recorder
CHICAGO TITLE INS CO
BK 4545 / PG 987
10/09/2007 04:19 P
Rec Fee: 13.00

**Prepared by and Return to:**
Richard T. Reibman
Schwartz Cooper Chartered
180 North LaSalle Street, Suite 2700
Chicago, Illinois 60601
(312) 346-1300

## LIS PENDENS NOTICE

NOTICE IS HEREBY GIVEN BY VINCENT SADLER that Case No. 07 C 5464, styled <u>Vincent Sadler v. Nasser Bashiri and Nancy Bashiri, husband and wife,</u> was commenced in the United States District Court, Northern District of Illinois, Eastern Division on the 28th day of September, 2007, and is now pending in said Court.

The action involves, in part, claims relating to real property situated in Yavapai County, Arizona described as follows:

Lot 36, of Back O'Beyond Ranch, According to the Plat of Record in the Office of the County Recorder of Yavapai County, Arizona, Recorded in Book 33 of Maps, Page 46-50.

Excepting therefrom all coal, oil, gas and other mineral deposits as reserved in the patent to the Land.

Also known as 150 Scenic Drive, Sedona, Arizona 86336

Parcel No.: 408-13-063 6



_____
Vince Sadler

**STATE OF ILLINOIS  )**
**COUNTY OF COOK    )**

I HEREBY CERTIFY that on this day before me, an officer duly qualified to take acknowledgements, personally appeared Vince Sadler, to me known to be the person described in and who executed the foregoing instrument and acknowledged before me that he executed the same. He is personally known to me or has produced his Illinois Driver's License as identification.

WITNESS, my hand and official seal in the State and County last aforesaid this _3rd_ day of _Oct._, 2007.

Susan E Dzyacky
_____
NOTARY PUBLIC

Susan E Dzyacky
_____
Print Name:

My commission expires: _9/20/08_

"OFFICIAL SEAL"
SUSAN E DZYACKY
COMMISSION EXPIRES 09/20/08

SEAL

Recorded By Chicago
Title Insurance Company
as a Courtesy Only

448595.1 050669-38762

OFFICIAL RECORDS OF

# Unofficial
# Document

**Prepared by and Return to:**
Richard T. Reibman
Schwartz Cooper Chartered
180 North LaSalle Street, Suite 2700
Chicago, Illinois 60601
(312) 346-1300

*10050702 . 49*

### COURTESY RECORDING
### NO TITLE LIABILITY

### LIS PENDENS NOTICE

NOTICE IS HEREBY GIVEN BY VINCENT SADLER that Case No. 07 C 5464, styled
<u>Vincent Sadler v. Nasser Bashiri and Nancy Bashiri, husband and wife,</u> was commenced in the
United States District Court, Northern District of Illinois, Eastern Division on the 28th day of
September, 2007, and is now pending in said Court.

The action involves, in part, claims relating to real property situated in Maricopa County,
Arizona described as follows:

Lot 789, Village 11 at Aviano, according to the plat of record in Book 745 of Maps, page 19,
in the office of the county recorder of Maricopa County, Arizona;

EXCEPT all oil, gas, other hydrocarbon substances, helium or other substances of a gaseous
nature, coal, metals, minerals, fossils, fertilizers of every name and description, together with
all uranium, thorium or any other material which is or may be determined to be peculiarly
essential to the production of fissionable materials, whether or not of commercial value.

Also known as 21911 N. 36th Street, Phoenix, AZ 85050-7387

Parcel No.: 212-38-773

_____
Vince Sadler

**STATE OF ILLINOIS  )**
**COUNTY OF COOK    )**

I HEREBY CERTIFY that on this day before me, an officer duly qualified to take
acknowledgements, personally appeared Vince Sadler, to me known to be the person described in
and who executed the foregoing instrument and acknowledged before me that he executed the same.
He is personally known to me or has produced his Illinois Driver's License as identification.

WITNESS, my hand and official seal in the State and County last aforesaid this 3rd day of
Oct., 2007.

_____
NOTARY PUBLIC

Susan E Dzyacky
Print Name: _____

My commission expires: 9/20/08

"OFFICIAL SEAL"
SUSAN E DZYACKY
COMMISSION EXPIRES 09/20/08

448576.1 050669-38762

CHICAGO TITLE INSURANCE COMPANY

OFFICIAL RECORDS OF

Unofficial
Document

Prepared by and return to:
Vince Sadler
1902 North Kenmore Avenue
Chicago, IL 60614
773-525-1341

## MEMORANDUM OF AGREEMENT

This Memorandum of Agreement ("Memorandum") is made as of this __14th__ day of __June__ 2007 by Vince Sadler.

WHEREAS, Nasser Bashiri and Vince Sadler entered into an agreement dated October 5, 2006, which provided for Nasser Bashiri to pay to Vince Sadler $51,271.00 plus interest thereon to reimburse Vince Sadler for monies advanced by Vince Sadler to Nasser Bashiri for the purchase of the following described real property ("Subject Property") in Maricopa County, Arizona, to wit:

Lot 789, Village 11 at Aviano, according to the plat of record in Book 745 of Maps, page 19, in the office of the county recorder of Maricopa County, Arizona;

EXCEPT all oil, gas, other hydrocarbon substances, helium or other substances of a gaseous nature, coal, metals, minerals, fossils, fertilizers of every name and description, together with all uranium, thorium or any other material which is or may be determined to be peculiarly essential to the production of fissionable materials, whether or not of commercial value.

Also known as 21911 N. 36th Street, Phoenix, AZ 85050-7387

WHEREAS, Vince Sadler desires to record notice of said agreement in the Public Records of Maricopa County, Arizona, by recording this Memorandum.

NOW THEREFORE, Vince Sadler executed this Memorandum.

_____
Vince Sadler

**STATE OF ILLINOIS** )
**COUNTY OF COOK** )

I HEREBY CERTIFY that on this day before me, an officer duly qualified to take acknowledgements, personally appeared Vince Sadler, to me known to be the person described in and who executed the foregoing instrument and acknowledged before me that he executed the same. He is personally known to me or has produced his Illinois Driver's License as identification.

WITNESS, my hand and official seal in the State and County last aforesaid this __14th__ day of __June__ 2007.

> "OFFICIAL SEAL"
> Debra L. MacDonald
> Notary Public, State of Illinois
> My Commission Expires 9/26/07

_Debra L. MacDonald_
NOTARY PUBLIC
Print Name: _Debra L. MacDonald_

My commission expires: __9/26/07__

430535.2 050669-38762

# EXHIBIT B

Windows Live™

# Case #08-00997, Payments to Vincent Sadler

**From: Nasser Bashiri** (nasserbashiri@hotmail.com)
Sent: Fri 3/14/08 12:40 PM
To: trusteeflores@floreslawaz.com (trusteeflores@floreslawaz.com); tallen@asbazlaw.com (tallen@asbazlaw.com);
kmccoy@asbazlaw.com (kmccoy@asbazlaw.com)
Attachments: AR-M355N_20080314_124834.pdf (6.2 MB)

Security scan upon download 🌀 TREND

Gentlemen:

Attached please find Mr. Sadler's statement to me showing the payments I made to him in regards to properties solely in his name, with the exception of 28677 San Lucas. I have also attached my cancelled checks. I did not receive any repayment of the money I gave him, nor any interest in or right to property for the payments I gave him. Because of that, after paying him for over a year, I stopped as I was getting nothing for my money.

He then pursued me through the elders in his church and a 2nd agreement was drawn.

Sincerely,

Nasser Bashiri

Connect and share in new ways with Windows Live. Get it now!

# 2006
# Payment Summary

| N | AZ-BOB 150 Scenic D PdNB 2 VS | AZ-LaBarr 15 Granite Mtn Pd-NB 2 VS | AR Lake Hse 300 Morphew Pd-NB 2 VS | LaBarr 60 LaBarr M&I Bank | 5th 3rd Equity | 5th 3rd Commer | Assoc Line of Credit | Assoc Equity Line | BOB HOA | LaBarr HOA #61=$204.75 #71=$204.75 | BOB Taxes, $204.75 | LaBarr Taxes | Morphew Taxes | Morphew Insurance | Palmira 28677 Fifth Third Mortgage | Palmira 28677 Dues or Golf Member | Palmira 28658 Country Wide | Palmira 28658 Dues | Payment Totals | Recd NB |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | $978.73 | $1,334.24 | | | $135.00 | | | | | | | | | | $6,528.14 | 1/13/2006 |
| Feb-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | $967.00 | $989.96 | | | $102.38 | $102.38 | | | | | $1,352.69 | | | | $7,594.58 | 2/7/2006 |
| Mar-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | $1,005.11 | $729.38 | | | | | $1,263.69 | $480.50 | $150.00 | | $1,352.69 | | $1,611.68 | | $10,673.20 | 3/14/2006 |
| Apr-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | $915.12 | $1,077.67 | | | $135.00 | $204.75 | | | | $281.00 | $1,352.69 | | $1,611.68 | | $9,658.08 | 4/6/2006 |
| May-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | $0.00 | $530.03 | $1,156.21 | | | | | | | | $1,352.69 | $813.69 | $1,611.68 | | $9,544.47 | 4/28/2006 |
| Jun-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | | $0.00 | $738.13 | $660.00 | | | | | | | $1,352.69 | $784.50 | $1,611.68 | $784.50 | $10,011.67 | |
| Jul-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | | | $774.99 | $1,404.73 | $135.00 | $204.75 | | | | | $1,352.69 | $784.50 | $1,611.68 | $784.50 | $11,133.01 | |
| Aug-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | | | $869.21 | $1,420.72 | | | | | | | $1,352.69 | | $1,611.68 | $439.33 | $9,773.80 | |
| Sep-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | | | $869.21 | $1,438.25 | | | | | | | | | $1,611.68 | | $7,999.31 | |
| Oct-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | | | $869.21 | $1,047.64 | $135.00 | $204.75 | | | | | | | $1,611.68 | $784.50 | $8,732.95 | |
| Nov-06 | | | | | | | | | | | | | | | | | | | $0.00 | |
| Dec-06 | | | | | | | | | | | | | | | | | | | $0.00 | |
| TOTALS | $15,187.50 | $8,732.80 | | $9,925.80 | $3,865.96 | $4,661.26 | $5,276.96 | $5,971.34 | | | $1,263.69 | $480.50 | $150.00 | | $9,468.83 | | $12,893.44 | | | |



**Account:** 29003308112
**Page:** 2
**Date:** February 08, 2006





641   01/17/2006   $1,451.40
648   01/17/2006   $1,557.15
693   01/17/2006   $30,000.00





642   01/25/2006   $1,215.40
649   01/25/2006   $219.36
694   01/17/2006   $1,711.00

*vincent sadler*





643   01/19/2006   $1,399.36
650   01/13/2006   $474.12
695   01/17/2006   $2,606.77

*vincent sadler*





645   01/18/2006   $2,440.15
651   01/20/2006   $241.00
696   01/17/2006   $6,528.15





646   01/17/2006   $1,098.02
652   01/20/2006   $376.00
697   01/17/2006   $80.00

*Vincent sadler*





647   01/17/2006   $1,551.61
653   02/08/2006   $6,000.00
699   01/19/2006   $20,000.00





vincent sadler



426   04/14/2006   $174.09



434   05/01/2006   $674.67



441   04/27/2006   $10,000.00

vincent sadler



428   04/13/2006   $1,471.40



435   04/28/2006   $1,451.40



442   04/27/2006   $150.00



430   05/02/2006   $5,100.00



436   04/28/2006   $370.00



443   04/27/2006   $481.18



431   04/26/2006   $293.52



438   05/01/2006   $4,024.55



445   04/27/2006   $10,800.00



432   04/26/2006   $291.78



439   04/24/2006   $800.00



449   05/03/2006   $349.42



433   05/01/2006   $1,557.15



440   04/27/2006   $77.77



450   05/05/2006   $3,560.00

**FIRST AMERICAN BANK**

Account: 29003308112
Page: 2
Date: April 09, 2006



Vincent sadler

655    04/05/2006    $75.00

9621    04/07/2006    $9,523.08

665    03/27/2006    $6,576.02

9647    04/03/2006    $700.00

Vincent sadler

667    03/16/2006    $6,500.00

9660    04/06/2006    $30,000.00

Vincent sadler

668    03/15/2006    $10,673.20

9663    04/07/2006    $1,000.00

670    03/17/2006    $4,000.00

9619    03/28/2006    $12,000.00


**FIRST AMERICAN BANK**

Account: 2900330811-2
Page: 2
Date: August 08, 2006

494   07/24/2006   $20.00

Vincent Sadler

✓ July 06 Paid

495   07/13/2006   $16,285.95

496   07/24/2006   $75.00

497   07/24/2006   $100.00





603  11/10/2005   $200.00    625  11/16/2005   $2,709.47    635  12/02/2005   $194.87

  

614  11/10/2005   $61.22    628  11/25/2005   $3,000.00    636  12/08/2005   $291.75



Paul claus

 

619  11/14/2005   $5,000.00    629  11/14/2005   $3,000.00    638  12/05/2005   $100.82

Vince

  

622  11/17/2005   $1,000.00    630  11/25/2005   $3,120.00    672  12/06/2005   $279.20

  

623  11/15/2005   $72.69    632  11/22/2005   $800.00    673  12/06/2005   $273.50

Vince

 

624  11/16/2005   $2,625.82    633  11/29/2005   $2,606.77

# EXHIBIT C

### *FIRST DRAFT*
### PARTNERSHIP AGREEMENT

This agreement will commence on *Tuesday, April 4, 2005* between *Nasser Bashiri, 1914 Farnsworth Lane, Northbrook, Illinois 60062* and *Vincent Sadler, 1902 N. Kenmore, Chicago, Illinois 60614*.

The purpose of this partnership agreement is for the investment of real estate by purchasing lot(s) and building spec home(s) in Sedona, Arizona. Each party will contribute fifty percent (50%) towards the down payment of such property with financing being obtained in full by Vincent Sadler.

All property shall be solely in Vincent Sadler's name as he is the sole financier for the lot(s) and construction. Should Nasser Bashiri not fulfill the obligations of this contract, Vincent Sadler is free to do as he sees fit with the property.

Upon completion of said spec home, the property will be listed for sale by Nancy Bashiri in the Multiple Listing Service for 6% commission to be split with another agent if they are the one to provide a qualified buyer. If Nancy both lists and brings a buyer her commission will be 5%. Profit after commission and all expenses involved in completing the project will be divided equally between Vincent Sadler and Nasser Bashiri.

Should the property not sell within a year's time from start of project to end of designated time, which will be one year, both parties shall contribute equally to interest/mortgage payments, taxes, association fees or any expenses to maintain said property until such time as the property is sold.

If a disagreement arises that is not able to be prayerfully resolved between the parties, both parties waive their right to pursue the matter in a court of law and will instead submit to the decision and/or advice of a committee made up of 2 or 3 Elders from the North Congregation of Jehovah's Witnesses. Whatever resolution of said disagreement is decided upon by such elders will be fully accepted by both parties in the primary interest of maintaining the peace of the brotherhood.

In the event of the death or incapacitation of either party, the surviving or competent party will proceed with the completion and sale of the spec home and 50% of the profit from the sale, after commission and any expenses relating to the completion of said home will be distributed to the beneficiary designated by the partner preceding death or incapacitation of either partner.

The parties agree to use John Badiaco of Bar-J Builders (Sedona) and Mark Murray as draftsman (Clarkdale) for the project(s). Capital Title Agency will serve as the escrow company for purchase of such lot(s).

Accepted by:

_____Date_____     _____Date_____
Vincent Sadler                                Nasser Bashiri

**REVISED AS OF Wednesday, May 04, 2005**
**PARTNERSHIP AGREEMENT**

This agreement will commence on *Wednesday, May 04, 2005* between *Nasser Bashiri, 1914 Farnsworth Lane, Northbrook, Illinois 60062* and *Vincent Sadler, 1902 N. Kenmore, Chicago, Illinois 60614*.

The purpose of this partnership agreement is for the investment of real estate by purchasing lot(s) building spec home(s) and purchasing preconstruction. Vincent Sadler will borrow $400,000 to be used as down payments for the following:

La Barranca Lot #61 – Sedona, Arizona
Back-O-Beyond Lot #36 – Sedona, Arizona
Aviano at Desert Ridge Lot #789 w/ Serrantina model – Scottsdale, Arizona
Aviano at Desert Ridge – Lot and model to be determined – Scottsdale, Arizona
The Enclave at Palmira – Coach home model Augustine – Naples, Florida
Villa d' Este at Palmira – Lot and residence to be determined – Naples, Florida

Nasser Bashiri will be responsible for the interest on $200,000 of the $400,000 that Vincent Sadler obtains until the $200,000 is paid in full. Nasser Bashiri will also be responsible for 50% of the mortgage, association fees, taxes and any other expenses relating to the properties.

On the day of each property's closing both Nasser Bashiri and Vincent Sadler will be listed on the title to said property. Should Nasser Bashiri not fulfill the obligations of this contract, he will immediately sign a "Quit Claim Deed" giving up any interest in said property.

Upon completion of said spec home(s) in Sedona, the property will be listed for sale by Nancy Bashiri in the Multiple Listing Service for 6% commission to be split with another agent if they are the one to provide a qualified buyer. If Nancy both lists and brings a buyer her commission will be 5%. Profit after commission and all expenses involved in completing the project(s) will be divided equally between Vincent Sadler and Nasser Bashiri.

If a disagreement arises that is not able to be prayerfully resolved between the parties, both parties waive their right to pursue the matter in a court of law and will instead submit to the decision and/or advice of a committee made up of 2 or 3 Elders from the North Congregation of Jehovah's Witnesses. Whatever resolution of said disagreement is decided upon by such elders will be fully accepted by both parties in the primary interest of maintaining the peace of the brotherhood.

In the event of the death or incapacitation of either party, the surviving or competent party will proceed with the completion and sale of the spec home and 50% of the profit from the sale, after commission and any expenses relating to the completion of said home will be distributed to the beneficiary designated by the partner preceding death or incapacitation of either partner.

Accepted by:

_____ Date_____        _____ Date_____
Vincent Sadler                                Nasser Bashiri

# EXHIBIT D

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

July 17, 2006

Vince Sadler                                    Via Fax:  773-267-8982
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

RE:  1099 for 2005 Interest Payments

Dear Vince:

I spoke to Debbie a few days ago regarding the fact I did not receive a 1099 for 2005.
Debbie suggested I ask you about it, which I did, but have not received an answer.  I am
sure it is an oversight, but I do need it as soon as possible for my accountant.  Normally, I
should receive them by February.  Please advise.

Sincerely,

Nasser Bashiri

Nasser Bashiri

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

---

July 17, 2006


Vince Sadler                                    Via Fax:  773-267-8982
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

RE:    ARC Investments -- Special Account

Dear Vince/Debbie:

Please provide me with an accounting (bank statements since account opened) of all funds that have gone in or out of the special ARC Investment Account that houses funds such as the Palmira rental income, H2 rental income, etc.

Per our conversation, I was told that these funds are being used to pay items such as Topo surveys, etc. and as an officer of ARC Investments, I will need to be kept apprised of all activity regarding that account.  It is important for me to be informed, as I had believed these funds were originally going to be used to offset the mortgages on certain properties.

Thank you for your cooperation.

Sincerely,

Nasser Bashiri


Nasser Bashiri

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

---

July 19, 2006

Vince Sadler                                      Via Fax:  773-267-8982
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

Dear Vince:

As I stated in my letter of July 19th, I have given up all interest in the H Building Units and have removed mine and Nancy's personal furnishings/appliances from H2.  I have also removed all furnishings/appliances from Unit H6 as I have not received any reimbursement for these and they were all paid by me personally.  Receipts were faxed to you over a week ago.  It is no longer necessary for you to send a check.

If you choose to continue renting, you will have to execute a new contract with Hot Springs Vacation Rentals as I am no longer a partner and I have given up interest in the H Buildings.  Your actions have demonstrated your agreement of that July 19th letter as you have requested all rental proceeds for the month of July to be sent to you directly, without any portion being given to me as originally agreed upon.

After procuring renters last November for my Palmira property, of which you desired to be a partner, I have no accounting of the $1800 that is being sent to you monthly for rent as having been used to offset the mortgage as was agreed upon.  I asked the rental agency to send me the rental check from now so I can send the money in for the mortgage on that property as the property is in my name and I am responsible.

Sincerely,


Nasser Bashiri

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

---

July 19, 2006


Vince Sadler                                        Via Fax:  773-267-8982
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

RE:  LaBarranca Lot

Dear Vince:

It has been several months that I have been asking you to give me a letter stating that I
am allowed to sell my La Barranca lot, per your agreement, and that Nancy has
permission to list it.  Without that letter I cannot sell this lot.  I have called several times
over the last week or two in an effort to get this letter.  I spoke with Gina from Real
Estate 101 yesterday, and again, was told that she has not received anything to that affect.
I contacted Debbie three days ago and asked to have the letter sent.  She said she did not
have Gina's fax number so I provided her with it.

Please send this letter today.

Sincerely,

*Nasser Bashiri*

Nasser Bashiri

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

July 20, 2006

Via Fax:  773-267-8982

Vince Sadler
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

RE:    La Barranca and Back-O-Beyond lots, Sedona, Arizona

Dear Vince:

As a result of having to constantly remind you of the agreement you had made to allow me to have one of the La Barranca lots to sell and your inability to produce the proper letter allowing me to sell it which was to be sent to Gina at Real Estate 101, I hereby give up all interest/profit/responsibility in all three lots.

My frustration at your unwillingness to price to sell, commit to build, etc. has caused this. I have paid thousands of dollars in interest, time, energy, travel, etc. which I am now going to lose.  I had begged you not to pay cash for the lots, as in real estate investment, you put down as little as possible.  You have constantly ignored my advice and because of that it has cost us dearly.  You have made money on your money by the interest I have been paying you, which, as you put it was much better than having it sit in the bank. Because of your choice with the lots, it made closing on the future properties very difficult.

I have been in the real estate investment business for quite a few years and have never had the amount of aggravation or difficulty that I have had since working with you.  I have not been treated as a partner.  It has basically been that you will do whatever you want, whenever you want, however you want.  Case in point, buying 3 U.S. Homes without my knowledge or consent.  You paid over $100,000 more than what they were worth.  You have told me that you said we could cancel them.  You cancelled the one you put in Debbie's name.  But you are an exacting person, Vince, and we both know that had you let those go and the somehow they would have appreciated, you would have blamed me for losing money.

I am walking away from these three lots and everything I have put into to them, because I would rather lose money, time, energy and effort than to continue being tied to you.  At

some point, you came to feel that you were running the show and this was not a partnership. Since that is the case, you are more than welcome to "run" your own show.

The properties we have purchased were all good properties in excellent locations and will do well. We have already been able to rent some. I told you in the beginning that you have to be prepared to hold onto properties until the optimum time to sell. I also told you that renting can offset mortgages during that time. I told you that it is important to price to sell.

You did not have an interest in selling as you were collecting interest from me. While I continued to pay you interest, any profit margin I had was dwindling, while you were actually making money. As you put it, you were living off the interest I've been paying you, which has been substantial. I am sure that you will be much more motivated in selling once I'm out of the picture.

Vince, there is a limit to my long-suffering and you have now reached it. I have been beyond patient with you and I doubt that there are many men that would have struggled so hard to keep things peaceful and try and make you happy, while you changed your mind daily and did not respond to my requests. Since you seem to constantly forget conversations we've had, things I've requested or what you've said, I find it necessary to put all my decisions and thoughts in writing.

I might think it was just my imagination that dealing with you is this difficult if you had not bragged about what you've done to others and those that you and I have dealt with have been driven to the edge after only having minimal contact with you. Before you end up destroying every relationship or burn every bridge, I suggest you take a good hard look at how you are treating/dealing with people. Your philosophies in that regard have never been mine. I have always tried to be kind and patient with the people I do business with which is why I can no longer be involved in business with you. I would rather take the loss and rely on Jehovah, than to continue in this arrangement. You have stated you will not agree to anything. That is not a problem. You are not required to agree as I am giving you everything in your name and only keeping the minimal number in mine. I have tried to reason with you over and over again but there has been absolutely no success. I am not accustomed to being treated as a "janitor or hired hand" in the business that I helped facilitate by a "partner".

I was never responsible for "your office" or whatever Debbie does for you. Nancy and I have an office in our home, have put thousands of miles on our car, Nancy spent her own personal money to facilitate our trips to take care of property matters, faxing, phone calls, paper work, etc. We have never asked you for a dime. Whatever arrangement you made with Debbie was already in place before I ever came into the picture. Your office is in her apartment or her apartment is in your office, whatever the case may be. We could talk about the thousands of dollars you took from Nancy even after all she'd done for us, all because you were upset that you did not get half of the "referral" money she was getting from Glenn, which would have been illegal.

Did you know that Nancy quit her $52,000/year job to work with me before you ever came into the picture? She lost benefits and a regular paycheck. I have never taken part of her commission or referrals and I am her husband. She has two children to care for, bills to pay and has always been generous in helping me with anything she can...driving through the night, handling paperwork, scheduling, ironing out problems, furnishing, upgrades, discounts on listings for me, purchasing furnishings, trips, etc. Why would you possibly think that you should get half of what Nancy gets or that she should list properties and not get any commission because she is doing them for us? Do you know the time and expense involved in becoming an agent? The only reason she did so in Arkansas, as she already had her license in Arizona, was at yours and my request. She spent over $2,000 to do that and a lot of time and energy. Nancy has always worked since we got married. She was not a part of yours and my partnership. Even after what you did to her, she continued to help us out, particularly on the last unit.

Also, I suggest that you check with your accountant regarding the legality of trying to charge me the fees a bank charges on top of 10.5% interest (i.e. appraisal, loan origination, etc.). I do believe that unless you have a license as a mortgage broker or bank that it is illegal to charge those fees.

Sometimes I have to learn the hard way, because I always give people the benefit of the doubt. I'm sorry this has not worked out. I hope that this separation will give us both the opportunity to concentrate of the "more important things". I'm sure you will realize that this is for the best after you attend the convention.

Sincerely,


Nasser Bashiri

# EXHIBIT E

Windows Live™

## Case #08-00997 - Pmts made to Vince Sadler/2nd agreement

**From:** **Nasser Bashiri** (nasserbashiri@hotmail.com)
**Sent:** Fri 3/14/08 12:54 PM
**To:** trusteeflores@floreslawaz.com (trusteeflores@floreslawaz.com); tallen@asbazlaw.com (tallen@asbazlaw.com);
    kmccoy@asbazlaw.com (kmccoy@asbazlaw.com)
**Attachments:** AR-M355N_20080314_125844.pdf (4.4 MB)

Security scan upon download  TREND MICRO

Gentlemen:

Please see attached Payment Summary and my cancelled checks to Vincent Sadler in ref. to the 2nd agreement that was produced and signed in church.  As you can see, I paid approximately $54,000 (in addition to the approximately $120,00 for the first agreement referenced in my previous email).

Mr. Sadler, again, did not perform a single item on the "Agreement".  After numerous requests and letters over approximately 45 days after the agreement was signed to both the elders of the church and Mr. Sadler, I finally sent a 48 hour notice stating that if he did not perform on the agreement within 48 hours I would consider it invalid.  He did not as was evidenced by dates of correspondence from him that did not include any of the items and an email from the title company 7 days later saying that he would not comply with signing a purchase contract, which was one of the items he had only given me 90 days to close on, in the 2nd agreement.

At this point, I was out approximately $170,000, not including the money he was supposed to pay for Aviano (21911 N. 36th St.) according to the 2nd agreement.  He was supposed to pay half of all the closing costs, mortgage, utilities, expenses, association.  I have paid approximately $80,000 since we closed.

Sincerely,
Nasser Bashiri

Connect and share in new ways with Windows Live. Get it now!

# 2006 Payment Summary

| N | AR FL Lakeland Menu H2 H6 Entria Prior | AR FL Mellon Nascum Borina Sa Prior | AR FL Mellon Mellon Borina Sa Billings | AR FL Mellon MOA | FL Menu Dr | AR H2 Lakeland Report Seller | AR H2 Lakeland HS Utilities H2_H6 | AR H2 Lakeland new Homecoming 1st Magnus back $408 | AR H2 Lakeland 10.50% $122,468.82 Pd back to | AR H6 Lakeland 1st Magnus new WAMU Pd back to | AR H6 Lakeland 10.50% $121,562.56 | AR H7 Lakeland Homecomings Financial | AR H7 10.50% $124,223.58 Property Insurance Passten | H2, 6, 7, 28658 Property EPA Electric | 28658 $356 Prime Property Flood $759/Annual | Page 2 Payment Totals | Page 1 Payment Totals | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-06 | | | | | | | | | | | | | | | | | | |
| Feb-06 | | | | | | | | | | | | | | | | | | |
| Mar-06 | | | | | | | | | | | | | | | | | | |
| Apr-06 | | | | | | | | | | | | | | | | | | |
| May-06 | | | | | | | | | | | | | | | | | | |
| Jun-06 | | | | | | | | $651.27 | | $632.52 | | $537.98 | $543.47 | | | | $13,269.79 | $12,729.17  & credit of $ |
| Jul-06 | | | | | | | | $989.60 | $178.80 | $917.17 | $177.28 | $280.68 | $543.47 | $780.00 | $537.00 | $3,258.12 | $10,011.67 | plus bal due from 8/1 of $ |
| Aug-06 | | | | $4,536.76 | | | | $989.60 | $178.80 | $917.17 | $177.28 | $837.39 | $544.47 | | | $4,466.80 | $11,133.01 | minus $6,268.00 ("0" out)=$7,220.95 |
| Sep-06 | | | | $2,268.38 | | | | $1,004.52 | $178.60 | $989.66 | $177.28 | $837.39 | $71.72 | | $71.72 | $3,715.23 | $13,489.03 | minus $14,485.53 |
| Oct-06 | $103.88 | $661.00 | $2,268.38 | | | | $1,004.52 | $935.80 | $989.66 | $531.84 | $819.91 | $542.47 | | $73.22 | $7,009.69 | $7,999.31 | minus $543.47 per 104/406=$14,465.53 |
| Nov-06 | $40.00 | $56.99 | $10.94 | | | | $1,004.52 | $535.80 | $1,004.10 | $531.84 | $819.91 | $542.47 | $20.84 | | $7,776.63 | $8,732.95 | $543.47 per 104406=$15,966.11 |
| Dec-06 | | | | | | | | | | | | | | | | $0.00 | $0.00 | |
| | | | | | | | | | | | | | | | | $0.00 | $0.00 | |
| | $143.74 | | | | $4,536.76 | $4,639.51 | $1,607.40 | $4,460.62 | $1,595.52 | $3,895.87 | $2,717.35 | | | | | | Total per 104 = $97,652.59 |



Amount:        $37,652.59
Account:       4165733878
Bank Number:   08200007

Sequence Number:   4120143162
Capture Date:      11/08/2006
Check Number:      1334

**Bank of America Advantage**

NASSER X. BASHIRI   11-05
773-405-9283
451 LAKELAND DR. UNIT G6
HOT SPRINGS NATIONAL PARK, AR 71913

1334

81-7/820 AR
4104

Date _Nov/1/06_

Pay to the order of _Vincent Sadler_    | $37,652.59

_Thirtyseven Thousandsixhundred Fiftytwo 59/100_  Dollars

**Bank of America**

ACH R/T 082000073

Memo _For Aug/sep/oct Payment_    _Nasser Bashiri_

⑈08 2000 073⑈  0041 65733878⑈ 1334   ⑈0003765259⑈

0212421306
11082006
0710-0030-1
ENT=4165  TRC=4171  PK=02

▶042000314◀
FIFTH THIRD BANK
CINCINNATI, OH 11/06/06

⑈8585749769

123 043 4370
Deposit only

Cleared
on 11/08/06
_[signature]_

From : Nasser Bashir
To   : Tara Angels

Amount:          $10,594.31
Account:         4165733878
Bank Number:     08200007

Sequence Number:  4120143161
Capture Date:     11/08/2006
Check Number:     1329

Bank of America Advantage

1329

NASSER X. BASHIRI    11-05
773-405-9283
451 LAKELAND DR. UNIT G6
HOT SPRINGS NATIONAL PARK, AR 71913

81-7/820 AR
4104

Date NOV/1/06

Pay Vincent Sadler                          $10,594.31
to the order of

Ten Thousand Five hundred Ninety Fau Dollars    31/100

**Bank of America**

ACH R/T 082000073

Memo For Twolakes and bed n payment    Nasser Bashiri

⑈08 2000073⑈: 004 1657 3387 8⑈' 1329    '"000 105943 1⑈'

0212421305
11082006
0710-0030-1
ENT=4165 TRC=4171 PK=02

0420003144
FIFTH THIRD BANK
CINCINNATI,OH 11/06/06

5585749768

BANK OF AMERICA GA-B139'
081000852  ENT:0076 TRC:0474
ENT=0076 TRC=0474

46101081098

57601

723 0434370
Deposit Only

Cleared on
11/08/06

**Bank of America Advantage**

**NASSER X. BASHIRI**  11-05  J4 (3000)  1315
773-405-9283  J6 (3000)
451 LAKELAND DR. UNIT G6
HOT SPRINGS NATIONAL PARK, AR 71913      Date 10/12/06      81-7/820 AR
4104

Pay Vincent Sadler _____ $6000.00
to the order of
Six Thousand Dollars and 00/100 Dollars

**Bank of America**

ACH R/T 082000073

Memo For J4 and J6 Ernest deposit / Nasser Bashiri

⑈082000073⑈ 0041657338 78⑈ 1315

#6000.00

Mailed OCT/12/06 For Ernest Money

For Unit J4 (3000) J6 (3000)

# EXHIBIT F

Nasser Bashiri
451 Lakeland Dr.
Unit G6
Hot Springs, AR  71913

---

October 30, 2006

North Congregation Body of Elders                    Fax:  773-334-0473
Attn:  Br. Rudy Zarate

Dear Brothers:

I need the sales contract for the LaBarranca Lot, the Back-O-Beyond lot and the Enclave at Palmira in order to obtain mortgages for these properties so that Vince can receive his money for these properties.

Sincerely,

*Nasser Bashiri*

Nasser Bashiri

cc:    Vince Sadler  773-267-8982

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

November 6, 2006

Vince Sadler                                              Via Fax:  773-267-8982
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

RE:  Purchase Contract for 28658 San Lucas Lane, Bonita Springs, FL

Dear Vince:

In order to obtain financing to purchase the above property from you per the October 2006 elder's meeting and subsequent agreement, I need a contract.

Please either have the title company or your attorney in Florida draft a purchase contract in the amount of the original price you bought it for.

Sincerely,

*Nasser Bashiri*

Nasser Bashiri

cc:      Rudy Zarate (Via Fax 773-334-0473)

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

---

November 8, 2006

Vince Sadler                                        Via Fax:  773-267-8982
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

Dear Vince:

In order for me to proceed with the purchase of your coach home in Palmira (Bonita Springs, FL), please provide me with a copy of the HUD and your purchase contract for your Palmira Unit so that I can verify the $498,968.00.  As you know, I provided you with documentation for J6 per your request.

Once that amount has been verified, please either provide me with a sales contract for our agreement or let me know if you would like me to use my attorney in Florida to draft it.

On a separate issue, I am requesting you  provide me with documentation from the bank that you had mentioned in the elder's meeting that you are paying 8 ¼ percent to on the money you have put down on the various properties that I am now paying you 8 ¼ percent for.  This was the reason given for charging me 8 ¼ percent and I would just appreciate verification.

As you are aware, I received only a statement typed by Debbie but no supporting documentation which I have requested several times.  I paid you, in good faith, before I had any documentation, believing that it would be provided.

Also, I have not received the Corporation papers (per the agreement) or a copy of the letter given to the elders from your accountant regarding the 1099.  I am doing everything I can to fulfill the obligations I agreed to but there are things that I need from you in order to do that.

Sincerely,

Nasser Bashiri

Nasser Bashiri

cc:      Rudy Zarate (Via Fax 773-334-0473)

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

---

November 6, 2006

Vince Sadler                                    Via Fax:  773-267-8982
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

RE:  Purchase Contracts for LaBarranca and Back-O-Beyond Lots

Dear Vince:

In order to finance the lots, I have contacted Vivian Bishop of Capital Title Agency in Arizona to draft Escrow Instructions (contract) for both of the lots.  In order for her to do that, I need you to confirm the sales price for each as discussed in the elder's meeting in October.

La Barranca Lot – 15 Granite Mountain Road        $349,000

Back O Beyond Lot – 150 Scenic Drive              $620,000

Sincerely,

*Nasser Bashiri*

Nasser Bashiri

cc:      Rudy Zarate (Via Fax 773-334-0473)

Nasser Bashiri
451 Lakeland Dr.
Unit G6
Hot Springs, AR  71913

---

November 8, 2006

North Congregation Body of Elders          Fax:  773-334-0473
Attn:  Br. Rudy Zarate

Dear Brothers:

I spoke with Capital Title Agency in Arizona today and was informed that they have not received confirmation from Vince regarding the purchase prices for the LaBarranca and Back-O-Beyond lots in Sedona, AZ so that Vivian Bishop can complete the Escrow Instructions (purchase contract).

It has been over a month (October 5, 2006) since we signed the agreement in Chicago. The longer it takes for me to get purchase contracts, the shorter the time frame in order to get financing.  I am concerned this will put me in a time crunch to meet the March 1, 2007 deadline and then, as you are aware, Vince will charge me 14% interest.

I think that I have done everything in my power to fulfill my obligations thus far.

I was also informed that Debbie McDonald contacted Capital Title last week and asked them to call me because Vince wants the $100,000 now that he loaned me and has been receiving interest since 2005.  Please see the attached contract between Vince and I with Capital Title which does not expire until July 2008.  I am not required to pay this off early.

Sincerely,

*Nasser Bashiri*

Nasser Bashiri

cc:     Vince Sadler  773-267-8982

Nasser Bashiri
451 Lakeland Dr.
Unit G6
Hot Springs, AR  71913

---

November 8, 2006

North Congregation Body of Elders                                    Fax:  773-334-0473
Attn:  Br. Rudy Zarate

Dear Brothers:

I spoke with Capital Title Agency in Arizona today and was informed that they have not
received confirmation from Vince regarding the purchase prices for the LaBarranca and
Back-O-Beyond lots in Sedona, AZ so that Vivian Bishop can complete the Escrow
Instructions (purchase contract).

It has been over a month (October 5, 2006) since we signed the agreement in Chicago.
The longer it takes for me to get purchase contracts, the shorter the time frame in order to
get financing.  I am concerned this will put me in a time crunch to meet the March 1,
2007 deadline and then, as you are aware, Vince will charge me 14% interest.

I think that I have done everything in my power to fulfill my obligations thus far.

I was also informed that Debbie McDonald contacted Capital Title last week and asked
them to call me because Vince wants the $100,000 now that he loaned me and has been
receiving interest since 2005.  Please see the attached contract between Vince and I with
Capital Title which does not expire until July 2008.  I am not required to pay this off
early.

Sincerely,

Nasser Bashiri

Nasser Bashiri


cc:     Vince Sadler  773-267-8982

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

November 6, 2006

Vince Sadler                                    Via Fax:  773-267-8982
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

RE:  Purchase Contract for 28658 San Lucas Lane, Bonita Springs, FL

Dear Vince:

In order to obtain financing to purchase the above property from you per the October 2006 elder's meeting and subsequent agreement, I need a contract.

Please either have the title company or your attorney in Florida draft a purchase contract in the amount of the original price you bought it for.

Sincerely,

*Nasser Bashiri*

Nasser Bashiri

cc:     Rudy Zarate (Via Fax 773-334-0473)

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

November 6, 2006

Vince Sadler                                    Via Fax:  773-267-8982
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

RE:  Purchase Contracts for LaBarranca and Back-O-Beyond Lots

Dear Vince:

In order to finance the lots, I have contacted Vivian Bishop of Capital Title Agency in Arizona to draft Escrow Instructions (contract) for both of the lots.  In order for her to do that, I need you to confirm the sales price for each as discussed in the elder's meeting in October.

La Barranca Lot – 15 Granite Mountain Road        $349,000

Back O Beyond Lot – 150 Scenic Drive             $620,000

Sincerely,

*Nasser Bashiri*

Nasser Bashiri

cc:      Rudy Zarate (Via Fax 773-334-0473)

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

---

November 8, 2006

Vince Sadler                                          Via Fax:  773-267-8982
ARC Investments
4219 N. Pulaski, Unit 3F
Chicago, IL  60641

Dear Vince:

In order for me to proceed with the purchase of your coach home in Palmira (Bonita Springs, FL), please provide me with a copy of the HUD and your purchase contract for your Palmira Unit so that I can verify the $498,968.00.  As you know, I provided you with documentation for J6 per your request.

Once that amount has been verified, please either provide me with a sales contract for our agreement or let me know if you would like me to use my attorney in Florida to draft it.

On a separate issue, I am requesting you  provide me with documentation from the bank that you had mentioned in the elder's meeting that you are paying 8 ¼ percent to on the money you have put down on the various properties that I am now paying you 8 ¼ percent for.  This was the reason given for charging me 8 ¼ percent and I would just appreciate verification.

As you are aware, I received only a statement typed by Debbie but no supporting documentation which I have requested several times.  I paid you, in good faith, before I had any documentation, believing that it would be provided.

Also, I have not received the Corporation papers (per the agreement) or a copy of the letter given to the elders from your accountant regarding the 1099.  I am doing everything I can to fulfill the obligations I agreed to but there are things that I need from you in order to do that.

Sincerely,

*Nasser Bashiri*

Nasser Bashiri

cc:      Rudy Zarate (Via Fax 773-334-0473)

# EXHIBIT G

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**(501) 525-6268**

November 20, 2006

North Congregation Body of Elders                    Via Fax 773-334-0473
Attn:  Rudy Zarate

Dear Br. Zarate:

*Please make sure that the rest of the Committee receives this letter as well as the*
*attachments.*

We purchased Back-O-Beyond for $570,000 initially.  In the elder's meeting I gave
Vince $50,000 profit for that lot, making the total purchase price of $620,000.  Vince
chose instead of giving me $40,000 for my Palmira and $20,000 profit for Morphew Rd.,
to use the $50,000 as the profit I was to give him for Back-O-Beyond, the remaining
$10,000 as the profit from J-4.

I already sent a letter to Vince, copying Br. Zarate, explaining this.  Just as I expected, he
is not cooperating with the Escrow Instructions/Purchase Contract (see attached) which
shows that he received $50,000 directly for Back-O-Beyond leaving a balance of
$570,000.  I have already spent $7,000 for blue prints and architectural approval to build
on this lot.  It's been about a month and a half since we made this agreement.

If I don't show the $50,000 and only show a purchase price of $570,000, then Vince can
come back and say he never received the profit I promised him.  This is not "creative
financing" but is factual statement regarding how much I am paying for the lot including
the $50,000 in deductions that he took in lieu of cash as the promised $50,000 profit
which is considered earnest money paid directly to the seller (Vince) on the contract.  I
very much resent my reputation again being slandered, (please see email he sent in
response to Vivan Bishop).  I have stood by while he has damaged my reputation
continually with no consequence, being accused and misrepresented.

Brothers, it has been more than six weeks.  I have not received Articles of Incorporation
or the General Ledger of how much money Vince received from me and from the rents or
proof that he is paying the bank 8 ¼% on the money he is charging me that amount of
interest on.  Vince claims that we had a corporation "ARC Investments", yet I have not
received any documents to support this.  I have paid over $150,000 to ARC Investments
in interests and mortgages on properties under his name exclusively with no rights,
interest or control.  As you can see, I am buying the lots that I was a partner in, even

though I already paid Vince 1 ½ years of interest, roughly $30,000 for Back-O-Beyond alone. Still I am required to pay him an additional $50,000 in profit, which I agreed to and did in front of the brothers in the form of deductions for the sake of peace. If there is no proof that all of the money I paid went to a legally established corporation, where do I stand?

I did everything that was asked of me and more. I followed all of the brothers' direction, but it seems the more I give (or allow myself to be wronged), the more he feels I can be taken advantage of.

Since he is not willing to agree that I gave him $50,000 profit for Back-O-Beyond, I have no choice but to assume that he is not going to live up to the contract. That being the case, he has 48 hours from tonight to have signed contracts faxed to me for both LaBarranca and Back-O-Beyond for the amounts in the contracts I faxed him. I will also expect all the documents I have requested for the past months. If these things are not provided then there is no deal for the lots and I will expect to be reimbursed for all of the interest, plus association and property taxes that I have paid on these lots. I believe that is the only just thing since he obviously has had all the rights, control and interest in these lots for the past 1 ½.

It has been a year that Vince has allowed me to believe that I was going to be able to build on these lots. After I have spent $10,000 in expenses to get plans, initial builder payment and approval by the association, still I am being "stonewalled". I will assume by Vince's actions that he wants to collect the interest now of 8 ¼ percent (still waiting for proof that is what he is paying the bank) and then 14% interest after March 1st.

Therefore, if he does not carry out his end of the deal…I will start charging him interest of 8 ¼ percent for the interest I have paid on all three Sedona lots and Morphew Lane and the expenses until March 1st and then 14% after. That is, after all, only fair, isn't it? At least, Vince seemed to think that was more than fair. Will he think so if he has to pay it? I will not deal with him regarding this, so please pass this on to him. I have done everything I possibly can. Since he has not agreed to admit that he received $50,000 in profit which I allowed him to deduct what he owed me from, then that will also mean if the contracts are not signed, that I will keep my Palmira and he will keep his. According to the contract, which I have followed to the last detail up to this day, he is responsible for invalidating the agreement.

Sincerely,

*Nasser Bashiri*

Nasser Bashiri

cc: Vince Sadler (via fax 773-267-8982)

# EXHIBIT H

INBOX          Compose          Addresses              **nasserbashiri@cablelynx.com**

Folders        Options

Current Folder: **real-estate**

**Welcome:** nasserbashiri@cablelynx.com                                          Calendar

 Message List  Delete                         Forward | Reply | Reply All |

      **Subject:** Vince
        **From:** "Vivian Bishop" <vbishop@capitaltitle.com>
        **Date:** Mon, November 27, 2006 3:10 pm
          **To:** nasserbashiri@cablelynx.com (more)
   **Priority:** Normal
**Read receipt:** requested [Send read receipt now]
   **Options:** View Full Header | View Printable Version | View as HTML | Allow Sender | Block Sender| Add to Addressbook

What do you want me to do about Lot 36, Back O Beyond Ranch. Vince will
not sign the Escrow Instructions showing the $50,000.00 paid direct. He
insists that the sales price is $570,000.00 and no more.


Vivian Bishop
Branch Manager
Capital Title Agency
850 Cove Parkway, #A
Cottonwood, AZ  86326
(928) 634-9561
email: vbishop@capitaltitle.com

This information may be legally privileged and/or is confidential, and is intended
for the use of the addressee named above. Any other use is strictly prohibited. If
you have received this communication in error, please immediately notify me and
destroy the communication. Any wrongful interception of this transmission is
prohibited and punishable under federal law.


                   Download this as a file


**Attachments:**

| | | | | |
|---|---|---|---|---|
| untitled-[1.2] | **5 k** | [ text/html ] | | Download  \|  View |
| image001.jpg | **7.6 k** | [ image/x-citrix-jpeg ] | **image001.jpg** | Download |

               Delete & Prev  |  Delete & Next

         Move to:  INBOX          | Move |

# EXHIBIT I

**Vincent Sadler**
**ARC Investments**
**4219 N. Pulaski Rd.**
**Chicago, IL 60641**

September 26, 2006

Dear Nasser,

I received the letter from the body of Elders of the North Congregation dated 9-23-06. I fully accept the recommendation and I would like to judiciously follow their direction to take our dispute to a professionally qualified third party. I hope you agree that the best way to do this is to have our dispute resolved by an arbitration proceeding conducted by the American Arbitration Association in accordance with its rules.

I so appreciate all the time and effort all the elders that have involved themselves in this matter, and out of respect, I will follow their direction carefully. There are just a few arbitration agencies available to hear this kind of dispute. If you want to use a different arbitration association, I will consider your suggestions.  If you agree to follow the direction of the elders of the North Congregation's determination to take this dispute to arbitration and not to court, please sign the second page of this letter and return it back to me. Signing this letter is necessary to move forward.  If I don't receive your original, signed, signature page within ten days of the date of this letter, I will regretfully assume you do not want to cooperate in this process.

I'm sure you wish this problem to be finished as quickly as possible, as I do also.

Thank you in advance for your willingness to move forward to a peaceful resolution.

Your brother,

Vincent Sadler

cc:   Bro. Aldridge
      Bro. Haight
      Bro. Zarate

387071.2 050669-33505

September 26, 2006

The undersigned, Vincent Sadler and Nasser Bashiri, agree to follow the
direction of the North Congregation's body of Elders and to seek peace in
their dispute. Accordingly, we agree to arbitrate our dispute at the American
Arbitration Association in accordance with their rules.

_____          _____
     Vincent Sadler                                     9/26/06
                                              Date

_____          _____
     Nasser Bashiri                                     9/26/06
                                              Date

cc:    Bro. Aldridge
       Bro. Haight
       Bro. Zarate

387071.2 050669-33505

# EXHIBIT J

Document Prepared By:
Steve Q. Galiano
ReconTrust Company, N.A.
1330 W. Southern Ave.
MS: TPSA-88
Tempe, AZ 85282-4545
(800) 540-2684

When recorded return to:
VINCENT SADLER
4219 N Pulaski Rd
Chicago, IL 60641

DOCID#0001164837932005N

## SATISFACTION OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS: Mortgage Electronic Registration Systems, Inc. the owner and holder of a certain mortgage deed executed by
VINCENT SADLER
bearing date 01/27/2006, recorded on 02/15/2006 in Official Records Book N/A, Page N/A , Instrument # 2006000069476 in the office of the Clerk of the Circuit Court of LEE County State of Florida, securing a certain note in the principal sum of $417,000.00 Dollars, and certain promises and obligations set forth in said mortgage deed, upon the property situated in said State and County hereby acknowledge full payment and satisfaction of said note and mortgage deed, and surrenders the same as canceled, and hereby directs the Clerk of the said Circuit Court to cancel the same of record.

(CORPORATE SEAL)

IN WITNESS WHEREOF the said Corporation has caused these presents to be executed in its name, and its corporate seal to be hereunto affixed, by its proper officers thereunto duly authorized, the 11 day of August, 2006.

ATTEST: _____
Stella Romero
Assistant Secretary

Mortgage Electronic Registration Systems, Inc.

Signed and delivered in the presence of:

_____
Mirna Linares
Witness

By _____
Mileybi Lopez, Authorized Officer
Assistant Secretary

STATE OF ARIZONA
COUNTY OF MARICOPA

On 08/11/2006, before me, R. Higgins, Notary Public, personally appeared Mileybi Lopez personally known to me (or proved to me on the basis of satisfactory evidence) to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity, and that by his/her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

Witness my hand and official seal.

_____
R. Higgins, Notary Public
Expires: 10/12/2009

OFFICIAL SEAL
R. HIGGINS
NOTARY PUBLIC - ARIZONA
MARICOPA COUNTY
My Comm. Expires Oct. 12, 2009

# EXHIBIT K

Vincent Sadler
4219 N. Pulaski Rd.
Chicago, IL 60641

*239 – 261*
*972*

VIA FAX – 501.520-0239

November 10, 2006

Nasser Bashiri
451 Lakeland Dr., Unit G6
Hot Springs, AR  71913

Dear Nasser,

In response to one of your November 8, 2006 letters, I understand how important the timely nature of getting the purchase contract for the 28658 San Lucas Lane #101, Bonita Springs, FL is to you. As I stated in my previous letter, the person responsible for these records was Debbie MacDonald and because of your treatment of her, she is no longer willing to help in these matters. I will need to find these items myself and this will take a little time, but I will do the best I can.

If you are truly interested in proceeding quickly as you've stated, you can provide me with All the paperwork for 28677 San Lucas Lane #101 as well as the sales contract for this property as well as the paperwork to transfer 14630 Meravi Dr to me. This will eliminate any further delay.

In an attempt to expedite things, As I mentioned in our meeting, I obtained an attorney directly after our meeting, a Mr. Pilon who was willing to proceed in doing the transfer of our property. I suggested to him to call you, thinking that he would be able to expedite, both of us and that this could be cheaper than having two attorney's, since we both agreed on what was to happen. He told me that after his first conversation with you that you agreed, and everything would be fine and go through, but apparently after you contacted him a second time, because of your voice mail and conversation with him, he would no longer be able to represent either of us …   Strange isn't it.  But this is further causing delays.

I will obtain another attorney to draw up the things I need to provide.

As for the letter from the accountant, per our agreement, I have faxed you a copy and then again provided you another copy at our meeting October 4, 2006. How many times are you going to ask for this?

Again, this letter and all letters and documentation are filed at Debbie's house.

I truly want to conclude all these matters as quickly as possible. But because of not having Debbie to expedite, this will take longer.

As you can see, there are several things we both need to obtain to conclude this matter.

Sincerely,

*Aren't you at "Debbie's house"*

Vincent Sadler

cc:  TJ Bullock – (via fax 773.506.2010)
      Rudy Zarate (via fax 773.334.0473)

# EXHIBIT L

# PROPERTY HISTORY DETAIL



**Address**
300 MORPHEW RD
Hot Springs, AR 71913

**MLS #**71200



©2007 Microsoft Corp ©2006 NAVTEQ, and /or Tele Atlas, Inc.

| MLS # 71200 | Class RESIDENTIAL | | List Date | | | Days On M: |
|---|---|---|---|---|---|---|
| Chg Date | Chg Type | | Status | Price | Agent - Agt Name | List Ofc 1 Name |
| 11/14/2006 10:42:00 PM | Asking Price | | ACT | $309,000 √ | PAULETTE MANN | TRADEM/ REAL EST |
| 10/29/2006 12:40:00 AM | Status | | ACT | $299,000 | PAULETTE MANN | TRADEM/ REAL EST |
| 9/23/2006 9:48:00 AM | Status | | BOM | $299,000 | PAULETTE MANN | TRADEM/ REAL EST |
| 8/7/2006 2:10:00 PM | Status | | ACG | $299,000 | PAULETTE MANN | TRADEM/ REAL EST |
| 7/15/2006 4:17:00 PM | First Recorded Entry | √ July /06 | ACT | $299,000 | PAULETTE MANN | TRADEM/ REAL EST |

| MLS # 64006 | Class RESIDENTIAL | List Date | | | Days On Market 1 |
|---|---|---|---|---|---|
| Chg Date | Chg Type | Status | Price | Agent - Agt Name | List Ofc 1 Name |
| 7/29/2005 | Status | SLD | $240,000 | TISH FULENWIDER | TRADEM/ REAL EST |
| 6/28/2005 | Status | PND | $289,900 | TISH FULENWIDER | TRADEM/ REAL EST |
| 4/21/2005 | First Recorded Entry | ACT | $289,900 | TISH FULENWIDER | TRADEM/ REAL EST |

## ALL FIELDS DETAIL



| | | | | |
|---|---|---|---|---|
| MLS # | 71200 | # Bedrooms | 2 |
| Status | ACTIVE | # Full Baths | 1 |
| Type | Waterfront Single Family | # Half Baths | 0 |
| Address | 300 MORPHEW RD | | |
| City | Hot Springs | | |
| State | AR | | |
| Zip | 71913 | | |
| Area | Lake Hamilton | | |
| Class | RESIDENTIAL | | |
| Asking Price | $309,000 | | |
| Sale/Rent | For Sale | | |
| IDX Include | Yes | | |

Virtual Tour:          http://www.visualtour.com/shownp.asp?SK=13&T=673019

## GENERAL

| | | | |
|---|---|---|---|
| County | Garland | Agent | PAULETTE M/ |
| Listing Office 1 | TRADEMARK REAL ESTATE - Main (501) 318-3200 | Sub Agent Compensation | 0 |
| Buyer Agent Compensation | 3 | Non MLS Compensation | 3 |
| Owner Name | Sadler | Occupant Name | vacant |
| Keybox Serial Number | 29523 | Key Box Date | 7/18/06 |
| IDX/Broker Recip Incl Y/N | Yes | Internet Publication Y/N | Yes |
| Entered Twice Y/N | No | Approx SqFt | 900 |
| Subdivision | Clints Lakeshor | Approx Lot Size | 100lake x 708 |
| Deed: Book/Page | 2573/635 | Deed: Tax Record | 15944 |
| Legal | lot 3 block 2 of Clints Lakeshore S/D | Will Subdivide Y/N | No |
| Approx Year Built | 1940 | School District | Lake Hamilton |
| Termite Company | George | Directions | 70W to left on . Anderson Rd. 1 driveway on rig |
| Dining Room Level | m | Master Bedroom Level | m |
| Master Bedroom Approx Siz | 12x12 | Bedroom 2 Level | m |
| Bedroom 2 Approx Size | 12x12 | Kitchen Level | m |
| Kitchen Approx Size | 16x10 | Living Room Level | m |
| Living Room Approx Size | 17x16 | Associated Document Count | 2 |
| Update Date | 2/6/2007 | Status Date | 10/29/2006 |
| HotSheet Date | 11/14/2006 | Price Date | 11/14/2006 |
| Input Date | 7/15/2006 | Original Price | $299,000 |
| Price/Sq Feet | $343.33 | | |

## FEATURES

| DOCUMENTS ON FILE | FOUNDATION/BASEMENT | LISTING TYPE | UTILITIES |
|---|---|---|---|
| Boundary Survey | Crawl Space | Exclusive Right-To-Sell | Sewer-Public |
| Legal Description | **GARAGE** | **POSSESSION** | Water-Public |
| Termite Contract | Carport | Negotiable | Electric-Munic |
| **DOCUMENTS ONLINE** | Two Car | **ROAD SURFACE** | Gas-Natural |
| Boundary Survey | **HEATING/AIR CONDITIONING** | Gravel | TV-Cable |
| Legal Description | Window Units | Paved | Telephone-Pr |
| Termite Contract | Space Heater - Gas | **SHOWING INSTRUCTIONS** | **WALLS** |
| **DINING AREA** | **INTERIOR FEATURES** | Other (See Remarks) | Paneling |
| Eat-In Kitchen | Hot Water Heater-Gas | **STORIES** | **SOURCE OF S** |
| **EXTERIOR FEATURES** | Walk-in Shower | One Story | Courthouse |
| Screened Porch | **KITCHEN EQUIPMENT** | **STYLE** | **WATERFRON** |
| Storage Building | Free-Standing Stove | Bungalow/Cottage | Dock-Swimmi |
| Guest House | Refrigerator Stays | Fixer-Upper | Lake Hamiltor |
| **EXTERIOR** | **LOT** | | Lake Frontag |
| Frame | Acreage | | **AGENCY NOT** |
| **FLOORS** | Level | | Sub Agent |
| Wood | Cleared | | **CONDITION** |
| Vinyl | Out of City | | Needs Work |
| | | | Value in Land |

## FINANCIAL

| Estimated Annual Taxes | 569.64 | Tax Year | 2005 |
|---|---|---|---|

## ALL FIELDS DETAIL

| | | | | |
|---|---|---|---|---|
| | MLS # | 70022 | # Bedrooms | 3 |
| | Status | ACTIVE | # Full Baths | 3 |
| | Type | Waterfront Condo | # Half Baths | 0 |
| | Address | 451 LAKELAND DR | | |
| | Unit # | H-6 | | |
| | City | Hot Springs | | |
| | State | AR | | |
| | Zip | 71913 | | |
| | Area | HOTSPRINGSSOUTH | | |
| | Class | RESIDENTIAL | | |
| | Asking Price | $450,000 | | |
| | Sale/Rent | For Sale | | |
| | IDX Include | Yes | | |

## GENERAL

| | | | |
|---|---|---|---|
| County | Garland | Agent | JUDY HEIKES - (501) 609-6996 |
| Listing Office 1 | TRADEMARK REAL ESTATE - Main (501) 318-3200 | Sub Agent Compensation | 2.5 |
| Buyer Agent Compensation | 2.5 | Non MLS Compensation | 2.5 |
| Owner Name | Vince Sadler | Occupant Name | Vacant |
| IDX/Broker Recip Incl Y/N | Yes | Internet Publication Y/N | Yes |
| Entered Twice Y/N | No | Approx SqFt | 3168 |
| Subdivision | Lakeland Harbor | Approx Lot Size | 0 |
| Legal | Building H Unit 6 Phase 2 Lakeland Harbor Condominiums 451 Lakeland Drive- Hot Springs, Garland Co, | Approx Year Built | 2006 |
| School District | Hot Springs | Directions | Central to Lakeland Drive to 451 on Left |
| Dining Room Level | M | Dining Room Approx Size | 16.6x15 |
| Master Bedroom Level | U | Master Bedroom Approx Siz | 29.6x20.8 |
| Bedroom 2 Level | M | Bedroom 2 Approx Size | 14.6x17 |
| Bedroom 3 Level | M | Bedroom 3 Approx Size | 13x14.3 |
| Kitchen Level | M | Kitchen Approx Size | 15x11 |
| Living Room Level | M | Living Room Approx Size | 15x17 |
| Utility Room Level | M | Utility Room Approx Size | 11x7 |
| Other Room 1 Room | M Ba | Other Room 1 Level | U |
| Other Room 1 Approx Size | 15x10.5 | Other Room 2 Room | SR |
| Other Room 2 Level | U | Other Room 2 Approx Size | 14x11.8 |
| Associated Document Count | 0 | Update Date | 5/10/2006 |
| Status Date | 5/10/2006 | HotSheet Date | 5/10/2006 |
| Price Date | 5/10/2006 | Input Date | 5/10/2006 |
| Original Price | $450,000 | Price/Sq Feet | $142.05 |

## FEATURES

**AREA AMENITIES**
  Swimming Pool(s)
  Clubhouse
  Hot Tub
  Gated Entrance
**DOCUMENTS ON FILE**
  Legal Description
  Lead Based Paint
  Property Disclosure
**DOCUMENTS ONLINE**
  Legal Description
  Lead Based Paint
  Property Disclosure
**DINING AREA**
  Separate Dining Room
**ENERGY FEATURES**
  Insulated Windows
  Insulated Doors
**EXTERIOR FEATURES**
  Patio
  Deck
  Partially Fenced
  Pool - In Ground

**ASSOCIATION/CONDO FEE**
  Building Exterior
  Termite Contract
  Grounds
  Entrance Security
  Dock Maintenance
**FLOORS**
  Carpet
  Tile
  Ceramic
**FIREPLACE**
  Glass Doors
  Decorative/Non-Functional
**GARAGE**
  Garage
  Assigned
**HEATING/AIR CONDITIONING**
  Central Cool - Electric
  Central Heat - Electric
  Heat Pump

**INTERIOR FEATURES**
  Dry Bar
  Breakfast Bar
  Washer Connection
  Dryer Connection-Electric
  Hot Water Heater-Electric
  Walk-in Shower
  Smoke Detector
  Walk-in Closet
  Balcony/Loft
  Built-Ins
  Fan-Ceiling
  Master Bedroom w/Bath
**KITCHEN EQUIPMENT**
  Built-In Stove
  Microwave
  Electric Range
  Surface Range
  Dishwasher
  Disposal
**LISTING TYPE**
  Exclusive Right-To-Sell
**OTHER ROOMS**

**SHOWING INSTRUCTIONS**
  Call Listing Office/Agent
  Lock Box
  Show Anytime-Registr w/LO
  Vacant
**STORIES**
  Two Story
**STYLE**
  Traditional
**UTILITIES**
  Sewer-Public
  Water-Public
  Electric-Municipal
  TV-Cable
**WALLS**
  Sheet Rock
  Sheet Rock Ceiling
**WARRANTY**
  1Yr Warr Offrd by Builder
**SOURCE OF SQUARE FEET**
  Plans & Specs
**WATERFRONT**
  Lake Hamilton

**Nancy Bashiri**

| | |
|---|---|
| **From:** | Real Estate 101, Inc. [oneohone@sedona.net] |
| **Sent:** | Wednesday, April 25, 2007 7:10 PM |
| **To:** | 'Nancy Bashiri' |
| **Subject:** | FW: Land Sales in VOC |

Gina M. Tartamella
Real Estate 101, Inc.
1725 W. Hwy 89A, Suite 4
Sedona, AZ  86336
Office:  928-282-7300
Fax:  928-282-1840

*Told bros in Chicago — nothing done*

-----Original Message-----
From: Real Estate 101, Inc. [mailto:oneohone@sedona.net]
Sent: Wednesday, September 06, 2006 9:39 AM
To: 'Vincent Sadler'
Subject: RE: Land Sales in VOC

I will keep you posted if my client is serious and wants to move forward.  I have been doing a good job of staying out of the middle of all this.  So good, that I didn't even know that Dick had written you a letter.  The issues between you and the Bashiri's are just that...between you and them.
There are always two sides and sometimes three sides to every story!

Take care and Ill keep you posted.

Gina M. Tartamella
Real Estate 101, Inc.
1725 W. Hwy 89A, Suite 4
Sedona, AZ  86336
Office:  928-282-7300
Fax:  928-282-1840

-----Original Message-----
From: Vincent Sadler [mailto:vincentsadler@hotmail.com]
Sent: Tuesday, September 05, 2006 6:36 PM
To: oneohone@sedona.net
Subject: RE: Land Sales in VOC

*Please see letter attached from my broker that I received after I received a call from Crye Leike in Hot Springs that Vince told them I was supposed to give him ½ of my referral.*

Thanks Gina

If you have any serious interest please let me know, everything is the same as before I have nt heard anything yet. if you have a serious interest let me know I can move forward without hearing anything Im really sorry about all the trouble I can only imagine all the rumors flying around there about me, I have already heard some of them,  I received a letter from Dick, I was

really surprised how he got involved, it seem he thinks i was asking for part of nancy's referral(WHAT) no ideas how that got there, but I intend to send him a letter after I research some things. This is so crazy you have no

idea.  I hope your well I'ii talk to soon  thanks for your help    Vince

>From: Gina M Tartamella <oneohone@sedona.net>
>Reply-To: Gina M Tartamella <oneohone@sedona.net>
>To: vincentsadler@hotmail.com

*By the way, Gina didn't know about the situation*

1

**Tax Parcel: 405-55-071**

**60 La Barranca Dr #L71 , Sedona AZ 86351**

**Listing #: 118154**
Listing Agent: John A. Limotte      Listing Office: Coldwell Banker/1st Aff Br#2
DOM: 8                                                     Listing Price 384,900

Picture History
Listing Date: 03/11/08

| Date | Time | New Status | Old Status | New Price | Old Price | Selling Date | DOM | Change Type | Changed By |
|------|------|-----------|-----------|-----------|-----------|--------------|-----|-------------|------------|
| 03/11/08 | 3:27:10 pm | Active | | 384,900 | 0 | | 0 | New | Suzanne H. Tonsich (50103) |

**Tax Parcel: 405-55-071**

**60-Lot 71 La Barranca Dr, Sedona AZ 86351**

⊕ **Listing # 113749**
Listing Agent: John A. Limotte       Listing Office: Coldwell Banker/1st Aff Br#2
DOM: 183                                     Listing Price  449,000

Picture History
Listing Date: 04/16/07
Expiration Date: 10/16/2007

**60 La Barranca Dr, Sedona AZ 86351**

⊕ **Listing # 105328**
Listing Agent: Gina M. Tartamella        Listing Office: Real Estate 101, Inc.
DOM: 362                                          Listing Price  549,000

Picture History
Listing Date: 11/01/05
Expiration Date: 10/31/2006

**La Barranca Dr, Sedona AZ 86351**

⊕ **Listing # 104324**
Listing Agent: Michael McShane        Listing Office: Russ Lyon Realty of Sedona
DOM: 14                                            Selling Price  385,000

Listing Date: 08/19/05
Sold Date: 02/04/1055

Information has not been verified, is not guaranteed, and is subject to change.
Copyright ©2008 Rapattoni Corporation. All rights reserved.

## Property Details

For Property Located At
**60 La Barranca Dr
Sedona, AZ 86351-6935
Yavapai County**

### Owner Info:

| | | | |
|---|---|---|---|
| Owner Name: | Sadler Vincent | Tax Billing Zip+4: | 4918 |
| Owner Phone: | (773) 525-1341 | Recording Date: | 10/18/2005 |
| Tax Billing Address: | 1902 N Kenmore Ave | Annual Tax: | $1,839 |
| Tax Billing City & State: | Chicago Il | State Use: | Vacant-Residential |
| Tax Billing Zip: | 60614 | Universal Land Use: | Residential Lot |

### Location Info:

| | | | |
|---|---|---|---|
| Subdivision: | La Barranca | Carrier Route: | R004 |
| Census Tract: | 17.00 | | |

### Tax Info:

| | | | |
|---|---|---|---|
| Tax ID: | 405-55-071 | Total Assessment: | $325,800 |
| Tax Year: | 2007 | Tax Area: | 0971 |
| Annual Tax: | $1,839 | Legal Description: | La Barranca Lot 71 Sec 17 & 18-16-6e Cont .96ac 39/19-24 |
| Assessment Year: | 2009 | Lot Number: | 71 |
| Land Assessment: | $325,800 | | |

### Characteristics:

| | | |
|---|---|---|
| Lot Acres: | | .96 |

### Last Market Sale:

| | | | |
|---|---|---|---|
| Recording Date: | 10/18/2005 | Deed Type: | Warranty Deed |
| Settle Date: | 09/00/2005 | Owner Name: | Sadler Vincent |
| Sale Price: | $385,000 | Seller: | Balmuth Steve & Maria |
| Document No: | 4324-368 | Cash Down: | $385,000 |

### Sales History:

| | | | |
|---|---|---|---|
| Recording Date: | 10/18/2005 | 01/17/2003 | 12/17/1999 |
| Sale Price: | $385,000 | $157,000 | $158,000 |
| Buyer Name: | Sadler Vincent | Balmuth Steve & Marla | Frey Thomas D & Margaret A |
| Seller Name: | Balmuth Steve & Maria | Frey Thomas D & Margaret A | Jacks Canyon Llc |
| Document No: | 4324-368 | 3994-173 | 3718-550 |
| Document Type: | Warranty Deed | Warranty Deed | Sheriff's Deed |

### Mortgage History:

| | | |
|---|---|---|
| Mortgage Date: | 10/27/2005 | 01/17/2003 |
| Mortgage Amt: | $346,500 | $117,750 |
| Mortgage Lender: | M&I Marshall & Ilsley Bk | Washington Mutual Bk Fa |
| Mortgage Type: | Conventional | Conventional |

---

Courtesy of Nancy Bashiri
Sedona Verde Valley

---

The data within this report is compiled by First American CoreLogic from public and private sources. If desired, the accuracy of the data contained herein can be independently verified by the recipient of this report with the applicable county or municipality.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| VINCENT SADLER, | ) | |
| | ) | |
| Plaintiff and Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 07 C 5464 |
| | ) | |
| NASSER BASHIRI and NANCY | ) | |
| BASHIRI, husband and wife | ) | |
| | ) | |
| Defendants and Counter-Plaintiffs. | ) | |

## SUPPLEMENTAL DECLARATION OF VINCENT SADLER

Vincent Sadler declares as follows:

1.     I never told Defendant that I was paying interest at the prime rate on the properties I had financed that were the subject of our dispute.  In fact, some of the properties were purchased without financing.  Defendant had actual knowledge of which properties had been financed (and the rate) and which properties were not financed.

2.     On October 4-5, 2006, we negotiated two interest rates in the Settlement Agreement.  One rate was intended to cover my implied cost of carrying the properties for approximately ninety days, within which time he was supposed to buy them.  As explained below, we negotiated this rate as the "prime rate," which was 8.25% at all relevant times.

3.     The other interest rate we negotiated was the 14% interest rate that became effective if Defendant did not perform buy the properties within the stated time, typically ninety days. So interest would be calculated at 8.25% for approximately 90 days and then would jump to 14%.  This was intended to provide an incentive for Defendant to do what he was required to do.

4.     As for the first rate (see paragraph 2 above), when we negotiated this in our settlement meetings on October 4-5, 2006, Defendant initially offered to pay 9% interest. However, I wanted a floating interest rate such as prime, which adjusts to the market. I knew that if I had to borrow against any of the properties, I would be able to borrow at the prime rate.  I did not want a fixed rate from Defendant and end up borrowing at a higher rate if interest rates increased.  As a result, we ended up with a rate lower than the rate which Defendant originally proposed.

5.     On November 18, 2006, several weeks after the Settlement Agreement was signed, I agreed to transfer my rights under a pending real estate contract to Alex Aldridge and also agreed to make a loan to him to cover approximately $8,000 in closing costs. None of my dealings with Aldridge occurred while the mediation was conducted on October 4-5, 2006. The property that was the subject of the transaction was not one of the properties that is the subject of the Complaint in this case or any of my dealings with Defendant.

6.     Duraid Micah was present on October 4 and October 5, 2006 during the mediation sessions. His declaration in support of the Motion for Summary Judgment is accurate.

7.     Defendant actively participated in the negotiations on October 4-5, 2006. He was alert at all times and very vocal in advocating for himself. If Defendant asked his wife to sit in a car for 2.5 hours, this was of his own doing and he never told anyone this. His wife would have been welcome to come inside the building and relax there. I never insisted the Settlement Agreement be signed before everyone was ready to sign it.

8.     There is nothing that Defendant learned about the properties after the Settlement Agreement that he didn't know at the time of the Settlement Agreement was signed. Defendant is not being truthful when he says he learned he "had been had" when he returned home in paragraph 18 of his declaration.   All information about the properties was transparent to him. Both prior to and during the mediation, various financial information, spreadsheets and the like were distributed among the parties and the mediators so that we could discuss the properties in detail.

9.     I originally financed 14630 Meravi Drive through TBI Mortgage Company in July 2006. In August 2006 (i.e. the next month), I paid off the entire mortgage balance. There was no debt against the property. The reason Defendant was on the title was because his name was on the contract with the developer, even though my money was used for the downpayment. The developer would not allow me to substitute my name for Defendant's name on the Contract, so both of us were on the title. There was no reason in October 2006 and no reason now why Defendant cannot transfer his interest in 14630 Meravi to me, as he agreed to do).

10.     No lawyer or any other person ever told me that Defendant could not transfer his quit claim his interest in 14630 Meravi Drive. No lawyer or any other person ever told me that Defendant could not quit claim his interest in 28677 San Lucas Lane.

11.     Under the Settlement Agreement, Defendant was supposed to transfer the building plans for LaBarranca to me. I received a 1-page fax from Defendant containing a line drawing and nothing more. This 1-page drawing was not what Defendant was supposed to give me.

12.     In Paragraph 11 of his Declaration, Defendant refers to 28677 San Lucas Lane as "[his] property" and lists very specific prices for the purchase. He fails to tell the Court, however, that I paid the $116,900.00 for the earnest money deposit, which made it possible for Defendant to obtain financing. Defendant obtained $330,000.00 in financing. He did not finance the entire purchase price. That the Settlement Agreement states that I would pay $40,000 in consideration for a quit claim deed makes perfect sense when one realizes that Defendant had no equity in the property, while I had already invested $116,900.00. Put another way, in exchange for investing zero, Defendant was going to receive a $40,000.00 windfall. No wording was ever changed in the Settlement Agreement after it was signed.

13.     Defendant knew who at least three of the mediators were before even coming to Chicago for the mediation. Prior to the mediation, Defendant asked me in writing to give one of the mediators, Rudy Zarate certain paperwork regarding the properties that were the subject of our dispute. He sent copies of that letter to Zarate and to Alex Aldridge, another mediator. Also, another mediator, T.J. Bullock called Defendant to coordinate the dates and times of the settlement discussions.

14.     I never listed for sale any property allocated to Defendant under the Settlement Agreement.

15.     Defendant was aware and had documentation regarding his own delinquent payments before October 4, 2006 and Defendant's delinquent payments were discussed, proved and agreed upon at the October 4-5, 2006 meetings and then written into the Settlement Agreement as the second point ("NB will pay the balance $37,652.59 w/in 30 days..."). Other than his initial payment under the Settlement Agreement, which are described in Paragraph 26 of Plaintiff's Statement of Material Facts, Defendant paid no other amounts owed to Plaintiff under the Settlement Agreement.

16.     After the Settlement Agreement was signed, Defendant sent me two real estate contracts  (for 15 Granite Mtn. Rd. and for Back O'Beyond) purportedly for the purpose of transferring title. One contract, however, had the wrong price. I signed the contract, but

corrected the price and initialed the correction, and gave it to the mediators along with my other deliveries. I signed the other contract, which was correct. Defendant refused to accept the contracts, just like he refused to accept the other deliveries from the mediators.

17.    Attached as Exhibit A is a copy of the return of service of process in this case, showing that Defendants were served at 21911 N. 36th St., Phoenix, AZ. This is the house referred to as "Aviano" in the pleadings. After being served with the Complaint, Defendant filed an appearance form using a different street address. However, on January 10, 2008, Defendant filed a "Notice of Change of Address" to request that all filings be sent to him at the Aviano address. See Exhibit B.

18.    Attached as Exhibit C is a copy of a certified letter I sent Defendant on November 26, 2006.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on this _31 st_ day of _January_, 2008.

_____
VINCENT SADLER

**3977378 OR: 4187 PG: 1257**
RECORDED in OFFICIAL RECORDS of COLLIER COUNTY, FL
02/22/2007 at 01:17PM DWIGHT E. BROCK, CLERK
CONS      333800.00
REC FEE      35.50
DOC-.70     2336.60
COPIES        4.00

Return to (via enclosed envelope)
North American Title Company
9115 Corsea Del Fontana Way, Suite 200
Naples, Florida 34109

This Instrument Prepared
under the supervision of:
Ambarina A. Perez, Esq.
North American Title Company
700 NW 107 Avenue, Suite 240
Miami, Florida 33172

Retn:
NORTH AMERICAN TITLE CO
PICK UP

Property Appraiser's Folio No.:
49660070525

FL14060884

### SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED (this "Deed") is made as of this 30th day of November, 2006 by and between U.S. HOME CORPORATION, a Delaware corporation ("Grantor") having a mailing address of 10481 Six Mile Cypress Parkway, Ft. Myers, Florida 33912 and VINCENT SADLER, A SINGLE MAN AND ALEX B. ALDRIDGE AND MERI ALDRIDGE, HUSBAND AND WIFE whose mailing address is 4219 North Pulaski, Unit 2F, Chicago, IL 60641 ("Grantee").

### WITNESSETH:



THAT Grantor, for and in consideration of the sum of Ten and No/100 Dollars ($10.00), and other good and valuable consideration, the receipt of which is hereby acknowledged, by these presents does grant, bargain and sell unto Grantee, and Grantee's heirs, successors and assigns forever, all the right, title, interest, claim and demand that Grantor has in and to the following described real property (the "Property") located and situate in the County of Collier, State of Florida, to wit:

Unit No. 832 in Building No. 8 of Terrace II at Heritage Bay, a Condominium, according to the Declaration of Condominium thereof as recorded in Official Records Book 4128 at Page 1714, of the Public Records of Collier County, Florida, as amended.

The Property is conveyed subject to the following:

A.    Conditions, restrictions, limitations, reservations, easements and other agreements of record affecting the Property, if any; but this provision shall not operate to reimpose the same.

B.    Any community development, recreation, water control, water conservation, watershed improvement or special taxing districts affecting the Property including, without limitation, the obligation to pay maintenance assessments, capital assessments and/or taxes in connection therewith, if any.

C.    Applicable zoning, land use  and subdivision ordinances, restrictions and/or agreements.

D.    Real estate, ad valorem and non ad valorem taxes and/or assessments, for this and subsequent years not yet due and payable.

E.    Validly existing rights of adjoining owners in any walls and fences situated on a common boundary, if any.

F.    All provisions of the Declaration of Condominium for Terrace II at Heritage Bay, a Condominium recorded in Official Records Book 4128 at Page 1714 ("Declaration of Condominium"), the Declaration of Covenants, Conditions, Easements and Restrictions for Heritage Bay recorded in Official Records Book 3968 at Page 4031 ("Heritage Bay Declaration") and the Declaration of Covenants, Conditions and Restrictions for Heritage Bay Golf & Country Club recorded in Official Records Book 3989 at Page 2218 (the "Club Declaration"), all as amended and modified from time to time, which include, without limitation, restrictions, covenants, conditions, easements, lien rights, obligations to pay assessments and architectural restrictions, and all of which are recorded in the Public Records of Collier County, Florida, and are incorporated by reference in their entirety into this Deed.

OR: 4187 PG: 1258

G.    The covenant set forth in Resolution No. 03-255, Development Order No. 03-01 that the Property is located in an area potentially subject to hurricane impacts, the hurricane evacuation clearance time for Collier County or the Southwest Florida Region is high, and hurricane shelter spaces are limited.

H.    All covenants, conditions and restrictions contained in this Deed are equitable servitudes, perpetual and run with the land including, without limitation, Sections G, I, J, K and L.

I.    The requirements of Chapter 558 of the Florida Statutes (2005) as it may be renumbered and/or amended from time to time.

J.    Grantor and Grantee specifically agree that this transaction involves interstate commerce and that any Dispute (as hereinafter defined) shall first be submitted to mediation and, if not settled during mediation, shall thereafter be submitted to binding arbitration as provided by the Federal Arbitration Act (9 U.S.C. §§1 et seq.) and not by or in a court of law or equity.  "Disputes" (whether contract, warranty, tort, statutory or otherwise), shall include, but are not limited to, any and all controversies, disputes or claims (1) arising under, or related to, this Deed, the underlying purchase agreement, the Property, the community in which the Property is located or any dealings between Grantee and Grantor (with the exception of "consumer products" as defined by the Magnuson-Moss Warranty-Federal Trade Commission Act, 15 U.S.C. §2301 et seq., and the regulations promulgated thereunder); (2) arising by virtue of any representations, promises or warranties alleged to have been made by Grantor or Grantor's representative; and (3) relating to personal injury or property damage alleged to have been sustained by Grantee, Grantee's children or other occupants of the Property, or in the community in which the Property is located.  Grantee has accepted this Deed on behalf of his or her children and other occupants of the Property with the intent that all such parties be bound hereby.

(1)    Any and all mediations commenced by Grantor or Grantee shall be filed with and administered by the American Arbitration Association (or any successor thereto ("AAA") in accordance with the AAA's Supplementary Mediation Procedures for Residential Construction Disputes in effect on the date of the request.  If there are no Supplementary Mediation Procedures for Residential Construction Disputes currently in effect, then the AAA's Construction Industry Mediation Rules in effect on the date of such request shall be utilized.  Unless mutually waived in writing by the Grantor and Grantee, submission to mediation is a condition precedent to either party taking further action with regard to any matter covered hereunder.

(2)    If the Dispute is not fully resolved by mediation, the Dispute shall be submitted to binding arbitration and administered by the AAA in accordance with the AAA's Supplementary Arbitration Procedures for Residential Construction Disputes in effect on the date of the request.  If there are no Supplementary Arbitration Procedures for Residential Construction Disputes currently in effect, then the AAA's Construction Industry Arbitration Rules in effect on the date of such request shall be utilized.  Any judgment upon the award rendered by the arbitrator may be entered in and enforced by any court having jurisdiction over such Dispute.  Unless the Grantor and Grantee otherwise agree, claims in excess of $10,000.00 but less than $250,000.00 shall utilize the Regular Track Procedures of the Construction Industry Arbitration Rules, as modified by the Supplementary Arbitration Procedures for Residential Construction.  If the claimed amount exceeds $250,000.00 or includes a demand for punitive damages, the Dispute shall be heard and determined by three arbitrators; however, if mutually agreed to by the Grantor and Grantee, then the Dispute shall be heard and determined by one arbitrator.  Arbitrators shall have expertise in the area(s) of Dispute, which may include legal expertise if legal issues are involved.  All decisions respecting the arbitrability of any Dispute shall be decided by the arbitrator(s).  At the request of any party, the award of the arbitrator(s) shall be accompanied by detailed written findings of fact and conclusions of law.  Except as may be required by law or for confirmation of an award, neither a party nor an arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both Grantor and Grantee.

(3)    The waiver or invalidity of any portion of this Section J shall not affect the validity or enforceability of the remaining portions of Section J of the Deed.  Grantee and Grantor further agree (1) that any Dispute involving Grantor's affiliates, directors, officers, employees and agents shall also be subject to mediation and arbitration as set forth herein, and shall not be pursued in a court of law or equity; (2) that Grantor may, at its sole election, include Grantor's contractors, subcontractors and suppliers, as well as any warranty company and insurer as parties in the mediation and arbitration; and (3) that the mediation and arbitration will be limited to the parties specified herein.

(4)    To the fullest extent permitted by applicable law, Grantor and Grantee agree that no finding or stipulation of fact, no conclusion of law, and no arbitration award in any other arbitration, judicial, or similar proceeding shall be given preclusive or collateral estoppel effect in any arbitration hereunder

unless there is mutuality of parties. In addition, Grantor and Grantee further agree that no finding or stipulation of fact, no conclusion of law, and no arbitration award in any arbitration hereunder shall be given preclusive or collateral estoppel effect in any other arbitration, judicial, or similar proceeding unless there is mutuality of parties.

(5)    Unless otherwise recoverable by law or statute, each party shall bear its own costs and expenses, including attorneys' fees and paraprofessional fees, for any mediation and arbitration. Notwithstanding the foregoing, if a party unsuccessfully contests the validity or scope of arbitration in a court of law or equity, the noncontesting party shall be awarded reasonable attorneys' fees, paraprofessional fees and expenses incurred in defending such contest, including such fees and costs associated with any appellate proceedings. In addition, if a party fails to abide by the terms of a mediation settlement or arbitration award, the other party shall be awarded reasonable attorneys' fees, paraprofessional fees and expenses incurred in enforcing such settlement or award.

(6)    Grantee may obtain additional information concerning the rules of the AAA by visiting its website at www.adr.org or by writing the AAA at 335 Madison Avenue, New York, New York 10017.

(7)    Grantor supports the principals set forth in the Consumer Due Process Protocol developed by the National Consumer Dispute Advisory Committee and agrees to the following:

(8)    Notwithstanding the requirements of arbitration stated in Section J(2) of this Deed, Grantee shall have the option, after pursuing mediation as provided herein, to seek relief in a small claims court for disputes or claims within the scope of the court's jurisdiction in lieu of proceeding to arbitration. This option does not apply to any appeal from a decision by a small claims court.

(9)    Grantor agrees to pay for one (1) day of mediation (mediator fees plus any administrative fees relating to the mediation). Any mediator and associated administrative fees incurred thereafter shall be shared equally by Grantor and Grantee.

(10)    The fees for any claim pursued via arbitration in an amount of $10,000.00 or less shall be apportioned as provided in the Supplementary Rules for Residential Construction Disputes of the AAA or other applicable rules. Unless provided otherwise by the Supplementary Rules for Residential Construction Disputes of the AAA or other applicable rules, for claims that exceed $10,000.00, the filing party shall pay up to the first $750.00 of any initial filing fee to initiate arbitration. Under the following conditions, Grantor agrees to pay up to the next $2,000.00 of any initial filing fee: (1) Grantee has participated in mediation prior to initiating the arbitration (2) the Grantor and Grantee have mutually agreed to waive mediation; or (3) Grantor is the filing party. The portion of any filing fee not covered above, and any case service fee, management fee or fees of arbitrator(s), shall be shared equally by the Grantor and Grantee.

(11)    Notwithstanding the foregoing, if either Grantor or Grantee seeks injunctive relief, and not monetary damages, from a court because irreparable damage or harm would otherwise be suffered by either party before mediation or arbitration could be conducted, such actions shall not be interpreted to indicate that either party has waived the right to mediate or arbitrate. The right to mediate and arbitrate should also not be considered waived by the filing of a counterclaim by either party once a claim for injunctive relief had been filed with a court.

K.    Notwithstanding the Grantor and Grantee's obligation to submit any Dispute to mediation and arbitration, in the event that a particular dispute is not subject to the mediation or the arbitration provisions of Section J of this Deed, then the Grantor and Grantee agree to the following provisions: GRANTEE ACKNOWLEDGES THAT JUSTICE WILL BEST BE SERVED IF ISSUES REGARDING THIS DEED ARE HEARD BY A JUDGE IN A COURT PROCEEDING, AND NOT A JURY. GRANTEE AND GRANTOR AGREE THAT ANY DISPUTE, CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE HEARD BY A JUDGE IN A COURT PROCEEDING AND NOT A JURY. GRANTEE AND GRANTOR HEREBY WAIVE THEIR RESPECTIVE RIGHT TO A JURY TRIAL.

L.    All provisions of that Grant of Easement recorded in Official Records Book 4110 at Page 1216 among the Public Records of Collier County, Florida, which includes, without limitation, an obligation of Grantee to maintain, repair and replace the easement area and improvements described therein.

Grantor does hereby warrant, and will defend, the title to the Property hereby conveyed, subject as aforesaid, against the lawful claims of all persons claiming by, through or under Grantor, but none other.

Grantee, by acceptance of this Deed, automatically agrees for itself, and its heirs, personal representatives, successors and assigns, to observe and to be bound by all of the terms and conditions set forth in this Deed and in the documents identified above, all exhibits attached thereto, and all future amendments thereof including, without limitation, the provisions of the Declaration of Condominium, the Heritage Bay Declaration and the Club Declaration, if any, applicable to the Property.

IN WITNESS WHEREOF, Grantor has caused these presents to be executed and its seal to be affixed the day and year first above written.

WITNESSES:

Print Name: **IMELDA DE LEON**

Print Name: **ANNETTE M. WEIHMAN**

U.S. HOME CORPORATION,
a Delaware corporation

By:

Name: John P. Hagan
Name: Div. Vice President
Title:

(SEAL)

STATE OF FLORIDA
COUNTY OF COLLIER

The foregoing instrument was acknowledged before me this 30th day of November, 2006 by John P. Hagan, as Div. Vice President of U.S. HOME CORPORATION, a Delaware corporation, who is personally known to me, on behalf of the corporation.

My Commission Expires:

NOTARY PUBLIC, State of Florida at Large

**ANNETTE M. WEIHMAN**
Print Name

Rev. 11/01/06

4091265  OR: 4298 PG: 3778

RECORDED in OFFICIAL RECORDS of COLLIER COUNTY, FL
11/02/2007 at 01:53PM DWIGHT E. BROCK, CLERK

| | |
|---|---|
| CONS | 100000.00 |
| REC FEE | 35.50 |
| DOC-.70 | 700.00 |
| COPIES | 4.00 |

THIS DOCUMENT PREPARED WITHOUT EXAMINATION
OR OPINION OF TITLE BY:
RETURN TO:      Stephen D. McCann, Esquire
                Stephen D. McCann, P.A.
                2180 Immokalee Road
                Suite 306
                Naples, Florida 34110

Retn:
STEPHEN D MCCANN
2180 IMMOKALEE RD #306
NAPLES FL 34110

Folio Number - 76528901848

## SPECIAL WARRANTY DEED

This Special Warranty Deed ("Deed") is made this 16 day of September, 2007, Between Vincent Sadler, a single man, and Alex B. Aldridge and Meri Aldridge, Husband and Wife, whose post office address is 4219 North Pulaski, Unit 2F, Chicago, Illinois 60641, hereinafter referred to as "Grantor," and Alex B. Aldridge and Meri Aldridge, Husband and Wife, whose post office address is 4923 N Mason, Chicago, Illinois 60630, hereinafter referred to as "Grantee."

W I T N E S S E T H :

That the Grantor, for and in consideration of the sum of -------
TEN AND 00/100 ($10.00)-----------Dollars) and other good and valuable considerations to said Grantor in hand paid by said Grantee, the receipt whereof is hereby acknowledged, has granted, bargained and sold to the said Grantee and Grantee's heirs and assigns forever, the following described real property ("Property"), situate, lying and being in Collier County, Florida, to-wit:

Unit No. 832 in Building No. 8 of Terrace II at Heritage Bay, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 4128, at Page 1714, of the Public Records of Collier County, Florida, as amended.

TOGETHER with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

To Have and to Hold, the same in fee simple forever.

SUBJECT to the following:

    (a)   Conditions, restrictions, limitations, reservations, easements and other agreements of record affecting the Property, if any; but this provision shall not operate to reimpose the same;

    (b)   Any community development, recreation, water control, water

conservation, watershed improvement or special taxing districts affecting the Property including, without limitation, the obligation to pay maintenance assessments, capital assessments and/or taxes in connection therewith, if any; .

(c)   Applicable zoning, land use and subdivision ordinances, restrictions and/or agreements;

(d)   Real estate, ad valorem and non ad valorem taxes and/or assessments, for this and subsequent years not yet due and payable;

(e)   Validly existing rights of adjoining owners in any walls and fences situated on a common boundary, if any;

(f)   All provisions of the Declaration of Condominium for Terrace II at Heritage Bay, a Condominium, recorded in Official Records Book 4128, at Page 1714 ("Declaration of Condominium"), the Declaration of Covenants, Conditions, Easements and Restrictions for Heritage Bay recorded in Official Records Book 3969, at Page 4031 ("Heritage Bay Declaration") and the Declaration of Covenants, Conditions and Restrictions for Heritage Bay Golf & Country Club recorded in Official Records Book 3989, at Page 2218 (the "Club Declaration"), all as amended and modified from time to time, which include, without limitation, restrictions, covenants, conditions, easements, lien rights, obligations to pay assessments and architectural restrictions, and all of which are recorded in the Public Records of Collier County, Florida; and are incorporated by reference in their entirety into this Deed;

(g)   The covenant set forth in Resolution No. 03-255, Development Order No. 03-01 that the Property is located in an area potentially subject to Hurricane impacts, the hurricane evacuation clearance time for Collier County or the Southwest Florida Region is high, and hurricane shelter spaces are limited;

(h)   All covenants, conditions and restrictions contained in this Deed are equitable servitudes, perpetual and run with the land including, without limitation, Sections g, i and j;

(i)   The requirements of Chapter 558 of the Florida Statutes (2005) as it may be renumbered and/or amended from time to time;

(j)   All provisions of that Grant of Easement recorded in Official Records Book 4110, at Page 1216, among the Public Records of Collier County, Florida, which includes, without limitation, an obligation of Grantee to maintain, repair and replace the easement area and improvements described therein.

OR: 4298 PG: 3780

(k)   Outstanding   condominium   and   homeowners   association assessments, if any; and

(l)   Mortgage dated November 15, 2006, from Grantor as Mortgagor to Universal American Mortgage Company, LLC, a Florida limited liability company, as Lender recorded February 22, 2007, in Official Records Book 4187, Page 1261, of the Public Records of Collier County, Florida, in the original principal amount of $300,400.00.

and said Grantor does hereby fully warrant the title to said land, and will defend the same against the lawful claims of all persons claiming by through or under Grantor.

*"Grantor" and "Grantee" are used for singular or plural, as context requires.

In Witness Whereof, Grantor has hereunto set Grantor's hand and seal the day and year first above written.

Signed, sealed and delivered in our presence:

_____
Witness

Hanan Azarie
Please print name

_____
Witness

Tania Coleman
Please print name

_____
Witness as to Alex B. & Meri Aldridge

Hanan Azarie
Please print name

_____
Witness as to Alex B. & Meri Aldridge

Tania Coleman
Please print name

_____
Vincent Sadler

_____
Alex B. Aldridge

_____
Meri Aldridge

POOR QUALITY ORIGINAL

STATE OF ILLINOIS            )
                             )
COUNTY OF  Cook              )

    I HEREBY CERTIFY that on this day before me, an officer duly qualified to take acknowledgments, personally appeared Vincent Sadler, to me known to be the person described in and who executed the foregoing instrument and acknowledged before me that he executed the same.    He    is    personally    known    to    me    or    has    produced _____IL DL_____ as identification.

    WITNESS my hand and official seal in the County and State last aforesaid this 16th day of September , 2007.

<table>
<tr><td>(SEAL)</td><td>"OFFICIAL SEAL"<br>Debra L. MacDonald<br>Notary Public, State of Illinois<br>My Commission Expires 9/26/07</td><td>Debra L. MacDonald<br>NOTARY PUBLIC<br>Debra L. MacDonald<br>Please Print Name<br>My Commission Expires: 9/26/2007</td></tr>
</table>

STATE OF ILLINOIS

COUNTY OF  Cook

    I HEREBY CERTIFY that on this day before me, an officer duly qualified to take acknowledgments, personally appeared Alex B. Aldridge and Meri Aldridge, husband and wife, to me known to be the persons described in and who executed the foregoing instrument and acknowledged before me that they executed the same.  They are personally known to me or have produced _____IL DL_____ as identification.

    WITNESS my hand and official seal in the County and State last aforesaid this 16th day of September , 2007.

<table>
<tr><td>(SEAL)</td><td>"OFFICIAL SEAL"<br>Debra L. MacDonald<br>Notary Public, State of Illinois<br>My Commission Expires 9/26/07</td><td>Debra L. MacDonald<br>NOTARY PUBLIC<br>Debra L. MacDonald<br>Please Print Name<br>My Commission Expires: 9/26/2007</td></tr>
</table>

F:\WP51\Sadler\ALDRIDGE\SPECIALWARRANTYDEED.rtf
September 16, 2007

SPECIALWARRANTYDEED[1]
September 16, 2007



**Collier County**
**CLERK OF THE CIRCUIT COURT**

Close Window

Case Information:

| Case Information | |
|---|---|
| **Style:** AURORA LOAN SERVICES LLC vs ALDRIDGE, ALEX B | |
| **Uniform Case #:** 112007CA0042390001XX | **Filed:** 11/07/2007 |
| **Clerks File #:** 0704239CA | |
| **Court Type:** CIRCUIT CIVIL | **Disposition Judge:** |
| **Case Type:** MORTGAGE FORECLOSURES | **Disposed:** |
| **Judge:** HAYES, HUGH D | **Reopen Reason:** |
| **Case Status:** OPEN | **Reopened:** |
| **Next Court Date:** | **Reopen Close:** |
| **Last Docket Date:** 03/05/2008 | **Appealed:** |

Parties:

| Name | Type | Y.O.B | City, State, Zip |
|---|---|---|---|
| AURORA LOAN SERVICES LLC | PLAINTIFF | | |
| HOFFMAN, L JOSEPH | PLAINTIFF'S ATTORNEY | | MIAMI, FL 33156 |
| ALDRIDGE, ALEX B | DEFENDANT | | CHICAGO, IL 60630 |
| ALDRIDGE, MERI | DEFENDANT | | CHICAGO, IL 60630 |
| SADLER, VINCENT | DEFENDANT | | CHICAGO, IL 60630 |
| UNKNOWN SPOUSE | DEFENDANT | | |
| DOE, JOHN | DEFENDANT | | |
| NKA VASQUEZ, JOHN | DEFENDANT | | NAPLES, FL 34120 |
| DOE, MARY | DEFENDANT | | |
| NKA VASQUEZ, DIANE | DEFENDANT | | NAPLES, FL 34120 |
| HERITAGE BAY UMBRELLA ASSN INC | DEFENDANT | | |
| TERRACE II AT HERITAGE BAY ASS | DEFENDANT | | |
| MCCANN, STEPHEN DOUGLAS | DEFENDANT'S ATTORNEY | | |
| SHIELDS, CHRISTOPHER JOHN | DEFENDANT'S ATTORNEY | | |

Dockets:

| Date | Text |
|---|---|
| 03/05/2008 | MINUTES - HEARING SEE SCHEDULE MINUTES FOR DETAILS |
| 03/05/2008 | PLAINTIFFS ATTORNEY HERNANDEZ PRESENT BY PHONE/DEFENDANT PRESENT/ MOTION FOR SUMMARY JUDGMENT--CANCELLED FOR DEFENDANT ALDRIDGE/MOTION FOR SUMMARY JUDGMENT FOR VINCENT SADLER--GRANTED--MOTION TO VACATE AS TO LILIANA SADLER--NOT HEARD--NO NOTICE OF HEARING/ATTORNEY MCCANN TO PREPARE RECOMMENDED ORDER & PARTIES WAIVE EXCEPTION PERIOD/ATTORNEYS FEES--ABANDONED BY DEFENDANT ATTORNEY MCCANN |
| 02/29/2008 | CORRESPONDENCE FROM COUNSEL TO CLERK |
| 02/29/2008 | AMENDED ANSWER BY VINCENT AND LILIANA SADLER |

| | |
|---|---|
| 02/29/2008 | MOTION TO QUASH AND VACATE DEFAULT |
| 02/29/2008 | AFFIDAVIT IN OPPOSITION TO PLAINTIFFS MOTION FOR SUMMARY JUDGMENT |
| 02/26/2008 | ORDER OF REFERRAL TO HEARING OFFICER/GEN MASTER<br>DAVID FRIEDMAN/FORECLOSURE DOCKET 3/5/08 S/HAYES 2/25/08<br>ORIGINAL ORDER IN FORECLOSURE DEPARTMENT |
| 02/14/2008 | MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUD<br>BY PLAINTIFF FROM VINCENT SADLER |
| 02/14/2008 | AFFIDAVIT IN SUPPORT OF MOTION FOR SUMMARY JUDGMEN OF VINCENT SADLER |
| 02/14/2008 | AFFIDAVIT AS TO ATTORNEYS FEES (EXPERT) |
| 02/14/2008 | AFFIDAVIT AS TO ATTORNEYS FEES |
| 02/14/2008 | MOTION FOR SUMMARY JUDGMENT BY VINCENT SADLER |
| 02/14/2008 | NOTICE OF HEARING; CERTIFICATE OF SERVICE 3/5/08 @ 9:00 |
| 02/14/2008 | AFFIDAVIT IN OPPOSITION TO MOTION FOR SUMMARY JUDG BY VINCENT SADLER |
| 02/14/2008 | CORRESPONDENCE FROM COUNSEL TO CLERK |
| 01/07/2008 | AFFIDAVIT OF DISINTERESTED ATTORNEY AS TO FEES |
| 12/26/2007 | MOTION FOR DEFAULT, DEFAULT ISSUED ON<br>12/28/07 ON UNKNOWN SPOUSE OF VINCENT SADLER NKA JANE DOE |
| 12/26/2007 | MOTION FOR DEFAULT, DEFAULT ISSUED ON<br>12/28/07 ON ALEX B ALDRIDGE & MERI ALDRIDGE |
| 12/26/2007 | NON-MILITARY AFFIDAVIT BY L JOSEPH HOFFMAN ESQ |
| 12/26/2007 | NON-MILITARY AFFIDAVIT BY L JOSEPH HOFFMAN ESQ |
| 12/26/2007 | AFFIDAVIT IN SUPPORT OF MOTION FOR FINAL SUMMARY JUDGMENT |
| 12/26/2007 | MOTION FOR SUMMARY JUDGMENT<br>AND MOTION FOR ATTORNEYS FEES AND MEMORANDUM |
| 12/26/2007 | NOTICE OF HEARING ON 03/05/08 @ 9:00 MOTION FOR SUMMARY JUDGMENMT |
| 12/26/2007 | NOTICE OF DROPPING PARTY JOHN DOE AND MARY DOE |
| 12/26/2007 | AFFIDAVIT AS TO COSTS |
| 12/26/2007 | AFFIDAVIT AS TO ATTORNEYS FEES |
| 12/26/2007 | AFFIDAVIT OF SERVICE OF SUMMONS VINCENT SADLER 11/16/07 |
| 12/26/2007 | AFFIDAVIT OF SERVICE OF SUMMONS MERI ALDRIDGE 11/16/07 |
| 12/26/2007 | AFFIDAVIT OF SERVICE OF SUMMONS ALEX B ALDRIDGE 11/16/07 |
| 12/26/2007 | AFFIDAVIT OF SERVICE OF SUMMONS<br>TERRACE II AT HERITAGE BAY ASSN INC 11/20/07 |
| 12/26/2007 | AFFIDAVIT OF SERVICE OF SUMMONS<br>HERITAGE BAY UMBRELLA ASSN INC 11/21/07 |
| 12/26/2007 | AFFIDAVIT OF SERVICE OF SUMMONS<br>UNKNOWN SPOUSE OF VINCENT SALDER 11/16/07 |
| 12/26/2007 | AFFIDAVIT OF SERVICE OF SUMMONS JOHN DOE NKA JOHN VASQUEZ 12/06/07 |
| 12/26/2007 | AFFIDAVIT OF SERVICE OF SUMMONS MARY DOE NKA DIANE VASQUEZ 12/06/07 |
| 12/10/2007 | ANSWER BY VINCENT SADLER |

| 12/10/2007 | CORRESPONDENCE FROM COUNSEL TO CLERK |
| 11/26/2007 | ANSWER & AFFIRMATIVE DEFENSES<br>.BY TERRACE II AT HERITAGE BAY ASSOCIATION INC |
| 11/14/2007 | ORDER APPOINTING SPECIAL PROCESS SERVER<br>MIKE BARKER ET AL S/HAYES 11/14/2007 |
| 11/13/2007 | MOTION TO APPOINT PROCESS SERVER MIKE BARKER ET AL |
| 11/08/2007 | SUMMONS ISSUED<br>TERRACE II AT HERITAGE BAY ASSN INC/MARY DOE/JOHN DOE/HANDED TO<br>PROCESS SERVER |
| 11/08/2007 | SUMMONS ISSUED<br>ALEX B ALDRIDGE/MERI ALDRIDGE/HERITAGE BAY UMBRELLA ASSN INC/VINCENT<br>SADLER/UNKNOWN SPOUSE/HANDED TO PROCESS SERVER |
| 11/07/2007 | PAID - $2.00/ADDITIONAL DEFEND FEE: $ 6.00 |
| 11/07/2007 | NOTICE OF LIS PENDENS |
| 11/07/2007 | COMPLAINT |
| 11/07/2007 | CIVIL COVER SHEET |

Events:

| Docket Type | Judge | Court Date | Court Time |
|---|---|---|---|
| MOTION HEARING | FRIEDMAN, MAGISTRATE DAVID | 03/05/2008 | 09:00 |

Financials:

| Amount Assessed | Amount Paid | Last Payment Date |
|---|---|---|
| 261.00 | 261.00 | 11/08/2007 |

*** 4134024 OR: 4334 PG: 1013 ***
RECORDED in OFFICIAL RECORDS of COLLIER COUNTY, FL
02/29/2008 at 02:08PM DWIGHT E. BROCK, CLERK
REC FEE        10.00
COPIES          2.00

Prepared by:
Return to:
Stephen D. McCann, Esquire
Stephen D. McCann, P.A.
2180 Immokalee Road, #306
Naples, Florida 34110

Retn:
STEPHEN D MCCANN
2180 IMMOKALEE RD #306
NAPLES FL 34110

**AFFIDAVIT**

STATE OF ILLINOIS

COUNTY OF COOK

**LEGAL DESCRIPTION:** Unit No. 832 in Building No. 8 of Terrace II at Heritage Bay, a Condominium, according to the Declaration of Condominium thereof, as recorded in Official Records Book 4128, at Page 1714, of the Public Records of Collier County, Florida, as amended.

TOGETHER with all the tenements, hereditaments and appurtenances thereto belonging or in anywise appertaining.

PROPERTY ADDRESS: 10285 Heritage Bay Boulevard #832, Naples, Florida 34120

Before me, the undersigned authority, personally appeared Vincent Sadler, who being by me first duly sworn, deposes and says:

1.    My permanent residence and the permanent residence of my family is located at 1003 N Kenmore 1 E Chicago, Illinois 60614 and I and my family have never resided at the Unit. My spouse's name is Liliana Sadler. The Unit is not my homestead.

2.    I further state that I am familiar with the penalties as provided by the laws of the State aforesaid for falsely swearing to statements made in an instrument of this nature. I further certify that I have read, or have had read to me, the full facts of this Affidavit and I understand its content.

_____
Vincent Sadler

The foregoing instrument was sworn to, subscribed and acknowledged before me this 14th , day February , 2008, by Vincent Sadler, who is personally known to me or who has produced IL DL as identification.

Official Seal
Debra L MacDonald
Notary Public State of Illinois
My Commission Expires 10/16/2011

_____
Notary Public
My Commission Expires: 10/16/2011
(SEAL)

C:\WP51\Sadler_Affidavit_Loan_Services_NONHOME.rtf
February 13, 2008

# EXHIBIT N

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

VINCENT SADLER,            )     **CASE NO. 07C-5464**
    Plaintiff,          )
                    )
                    )
**vs.**                  )
                    )
NASSER BASHIRI and      )
NANCY BASHIRI, husband and wife, )
    Defendants.         )
                    )

**FILED**

NOV 2 6 2007 *eu*
11-26-07
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## DEFENDANTS' MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, TO TRANSFER THE CASE TO ANOTHER DISTRICT

**COMES NOW**, the Defendants, Nasser Bashiri and Nancy Bashiri, who respectfully request this Honorable Court pursuant to Fed.R.C.P. 12(b) to dismiss the Plaintiff's Complaint for lack of venue; or, in the alternative, to transfer this matter to the United States District Court for the District of Arizona. In support thereof, Defendants respectfully state as follows:

1. The plaintiff filed his Complaint on September 27, 2007. A true and correct copy of that Complaint is attached as Exhibit A.

2. In the Complaint, it is alleged that the defendant breached what the plaintiff calls a "settlement agreement" regarding the purchase, sale, maintenance, and distribution of the proceeds from several investment properties. None of the subject real property is located in the State of Illinois. Instead, most of the subject property is located in Arizona and Florida.

- 1 -

3. Plaintiff's Complaint is based solely on diversity of citizenship, the defendants being citizens of the State of Arizona, and the plaintiff's being citizens of the State of Illinois.

4. The plaintiff argues that venue is appropriate in the Northern District of Illinois solely because Chicago is where the so-called "settlement agreement" is said to have occurred, specifically at a church meeting in Chicago where all of the parties concerned (plaintiffs, defendants, and the church members) attempted to reach a settlement of the party's differences which had been submitted to the Church for disposition. Plaintiff's complaint does not state the location of the agreement between the parties, but instead relies on the location of this intervening "settlement agreement". The plaintiff does not assert that the defendants are residents, domicilliaries, or otherwise citizens of Illinois for purposes of venue. The plaintiff does not claim that any of the subject properties are located in Illinois – in fact, his allegations state just the opposite. Instead, the plaintiff appears to have chosen to file this suit in Northern Illinois solely out of concern for his own convenience, and this is not a legitimate basis for venue in federal diversity action.

5. The plaintiff asserts that a number of witnesses to the purported settlement agreement reside in Illinois, but whether this is true or not, the witnesses referred to by the plaintiff are merely witnesses to the signatures of the parties and have no substantial testimony to offer in and of themselves. The defendants, on the other hand, have many Arizona witnesses to present that were first hand witnesses of the actions of the parties and of the maintenance of their real property that will not be available to testify and refute the allegations of the plaintiff if this case is maintained in Illinois. These include both expert and lay witnesses, and they are described more specifically herein.

- 2 -

6. A substantial portion of the acts or omissions giving rise to the civil action did not occur in Cook County, Illinois, but instead occurred in Maricopa County and Yavapai County, Arizona.

7. The plaintiff has filed suit in the Northern District of Illinois for no other reason than that trying the case in Arizona (where the defendants live, where most of the relevant witnesses reside, and where most of the subject property is located) would be inconvenient to the plaintiff and its counsel, and plaintiff's convenience in and of itself, is not legitimate basis for venue.

8. It cannot reasonably be asserted that the Northern District of Illinois is a convenient forum for the Plaintiff.

**COUNT I**
**MOTION TO DISMISS FOR LACK OF VENUE**
**UNDER FED.R.C.P. 12(b)(3)**

9. The defendants incorporate all allegations in all preceding paragraphs as if fully set forth herein at length.

10. Pursuant the Federal Rules of Civil Procedure, the defense of "improper venue" may, at the option of the pleader, be made by motion instead of a responsive pleading. Fed.R.C.P. 12(b)(3).

11. Venue is proper in a judicial district where a defendant resides if all defendants reside in the same state; in a district where a substantial part of the events giving rise to the claim took place; or in a district where any defendant is subject to personal jurisdiction, if there are no other appropriate venues. See, 28 U.S.C.A. §1391(a).

12. **Under the United States Code:**

    *(a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.* 28 U.S.C.A. §1391(a).

13. If a district court finds venue to be improper, that court should dismiss the case, or, if justice requires, transfer the case to a district where venue is proper. 28 U.S.C.A. §1406(a).

14. In this instance case venue is wholly improper in the Northern District of Illinois.

15. For the reasons set forth in the moving Defendant's Brief in Support of Motion to Dismiss, which is attached hereto and incorporated by reference herein as if fully set forth at length, it is averred that there is no provision in §1391 for venue to lie in the Northern District of Illinois; therefore, this civil action should be dismissed for lack of venue pursuant to Fed.R.C.P. 12(b)(3) and 28 U.S.C.A. §1406(a).

WHEREFORE, the Defendants Nasser and Nancy Bashiri respectfully move this Honorable Court to grant this Motion and dismiss this civil action for lack of venue, in accordance with the attached proposed Order.

- 4 -

## COUNT II
## MOTION IN THE ALTERNATIVE TO TRANSFER VENUE OF THIS MATTER
## TO DISTRICT OF ARIZONA ON THE GROUNDS OF
### *FORUM NON CONVENIENS*

16. Moving Defendants incorporate all allegations in all preceding paragraphs as if fully set forth herein at length.

17. Under the Statutes of the United States, it is indicated that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C.S. § 1404(a).

18. The moving Defendants submit that, under the facts of this case as alleged in the Complaint, the plaintiff could have brought this action in the United States District Court for the District of Arizona, and for the sake of the convenience of the parties and witnesses, this civil action must therefore be transferred to that District.

19. For the reasons set forth in the moving defendants' Brief in Support of Motion to Dismiss, which is attached hereto and incorporated by reference herein as if fully set forth at length, it is averred that this Court should find that the balance of factors weighs in favor of an Arizona forum; and that in these circumstances the defendants' motion to dismiss for *forum non-conveniens* should be granted.

20. Another distinct factor mitigating in favor of transferring this case to the District of Arizona is the pending action in the Arizona federal courts involving these same parties and pertaining to the same property that is the subject of the plaintiff's Complaint in Northern Illinois. Immediately following the filing by the plaintiff of its Complaint in Northern Illinois, plaintiff's counsel filed various notices of *lis pendens* in Arizona and Florida relating to the real properties that are the subject of the Illinois filing.

Because plaintiff and plaintiff's counsel filed notices of *lis pendens* relating to property that is not affected by the litigation, the defendants have commenced a federal court action in the District of Arizona requesting both money damages and specific performance relating to the groundless filing of the *lis pendens*. As with the underlying Illinois filing by the plaintiff, the Arizona courts are in a much better position to determine the merits of the plaintiff's present claims along with the issues raised by defendants in the Arizona court case that has already been filed.

WHEREFORE, the defendants Nasser and Nancy Bashiri respectfully moves this Honorable Court to grant this Motion and transfer this civil action to the United States District Court for the District of Arizona in accordance with the attached proposed Alternative Order.

Respectfully submitted,

Nasser Bashiri

Nancy Bashiri

**Nasser and Nancy Bashiri, Defendants**
**7222 East Gainey Ranch Road, Unit 238**
**Scottsdale AZ 85258**
**501 762-2525**

## CERTIFICATE OF SERVICE

This to certify that on the 20-th day of November, 2007, a true and complete copy of the

above and foregoing **DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE,**

**TO TRANSFER THE CASE TO ANOTHER DISTRICT** with supporting brief and proposed

orders was served on the opposing counsel by depositing in the United States mail

addressed as follows:

Richard T. Reibman
Schwartz Cooper Chartered
180 North La Salle, Suite 2700
Chicago, IL 60601
**Attorneys for Plaintiff**

*Nasser Bashiri*
*Nancy Bashiri*
**Nasser and Nancy Bashiri**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

VINCENT SADLER,  )  CASE NO. 07C-5464
   Plaintiff,  )
     )
vs.  )
     )
NASSER BASHIRI and  )
NANCY BASHIRI, husband and wife,  )
   Defendants.  )
     )

## ALTERNATIVE ORDER

AND NOW, this _____ day of _____, 2007, upon due consideration of the

Defendants Nasser Bashiri and Nancy Bashiri's Motion to Dismiss under Rule 12(b) /

Motion to Transfer Venue, and any Response thereto, it is hereby ORDERED and

DECREED that the defendants' Motion is GRANTED, and it is further

ORDERED that the above-captioned civil action is hereby TRANSFERRED, for the

convenience of the parties and witnesses, to the United States District Court for the

District of Arizona; with the costs of the transfer to be paid by the Plaintiff.

BY THE COURT:

_____
U.S.D.J.

- 9 -



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

VINCENT SADLER,
    Plaintiff,

vs.

NASSER BASHIRI and
NANCY BASHIRI, husband and wife,
    Defendants.

)
)
)
)
)
)
)
)
)

CASE NO. 07C-5464

# FILED

NOV 2 7 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## BRIEF IN SUPPORT OF DEFENDANTS
## MOTION TO DISMISS PURSUANT TO FED.R.CIV.P. 12(b)

Defendants Nasser and Nancy Bashiri submit this brief in support of its *Motion to Dismiss* through Federal Rule of Civil Procedure 12b, and specifically, for improper venue, or, in the alternative, to transfer the matter from this Court to the United States District Court for the District of Arizona, pursuant to the doctrine *forum non conveniens*, as codified in 28 U.S.C. § 1404(a).

### I. INTRODUCTION

Jurisdiction in this case is based upon diversity of citizenship between the parties. *See* Exhibit A. A review of the residency of the parties is important for the appropriate analysis for the motion to dismiss for improper venue, or in the alternative, to transfer to the United States District Court, for the Southern District of Arizona. The plaintiff claims to be a citizen of the State of Illinois. On the date of filing, the defendants were admitted by the plaintiff to be residents of the State of Arizona. *See* Exhibit A.

The plaintiff does not assert that the defendants are residents, domicilliaries, or otherwise citizens of Illinois for purposes of venue. The plaintiff does not claim that any

- 10 -

of the subject properties are located in Illinois – in fact, his allegations state just the opposite. Instead, the plaintiff appears to have chosen to file this suit in Northern Illinois solely out of concern for his own convenience, and this is not a legitimate basis for venue in federal diversity action.

Not one count of the plaintiff's stated cause of action involves real property located in Illinois. The following summarizes the location of the various properties as referenced by the corresponding counts in the plaintiff's Complaint:

| APPLICABLE COUNT OF SADLER'S ILLINOIS COMPLAINT | REAL PROPERTY LOCATION |
|---|---|
| COUNT ONE | 28677 SAN LUCAS BONITA SPRINGS, FL |
| COUNT TWO | 14630 MERAVI DR BONITA SPRINGS, FL |
| COUNT THREE | 21911 N. 36TH ST PHOENIX, AZ |
| COUNT FOUR | 150 SCENIC DRIVE SEDONA, AZ |
| COUNT FIVE | 15 GRANITE MTN RD SEDONA, AZ |
| COUNT SIX | 28658 SAN LUCAS BONITA SPRINGS, FL |
| COUNT SEVEN | 9213 QUARTZ LANE NAPLES, FL |
| COUNT EIGHT | 10285 HERITAGE BAY NAPLES, FL |

Plaintiff, in the Complaint, argues that venue is appropriate in the Northern District of Illinois solely because

"a substantial portion of the events giving rise to the claims occurred within the Northern District of Illinois. Among other things, (a) when the plaintiff and defendant commenced their business relationship, plaintiff was a resident of Chicago, Illinois and defendant was a resident of Northbrook, Illinois, (b) the mediation described below occurred in Chicago, Illinois, (c) the five mediators present, all of whom are witnesses, reside in the Chicago, Illinois metropolitan area, and (d) the settlement agreement described below was executed by the parties in Chicago, Illinois and witnessed by the mediators in Chicago, Illinois."

See Exhibit A, ¶ 4.

Although this plea to the venue of the Court to hear the case in Illinois is indeed artfully worded, it says little of substance. Although Chicago is where the so-called "settlement agreement" is said to have occurred, this meeting of the parties was nothing more than a church meeting in Chicago where all of the parties concerned (plaintiffs, defendants, and the church members) attempted to reach a settlement of the party's differences which had been submitted to the Church for disposition. Plaintiff's complaint does not state the location of the original agreement between the parties, and that unstated location would be far more relevant as a factor in establishing the appropriate venue than the location of any interim attempted church intervention. The description of the church members that attempted to settle this matter at the church as "mediators" as stated by the plaintiff's Complaint is an overstatement and exaggeration of those church members present significance to make the present venue at least sound more reasonable. However, those so-called "mediators are not significant witnesses in any form of the word - and they certainly do nothing to compose a substantial portion of the witnesses or evidence that will be presented at the trial of this matter.

- 12 -

The defendants, on the other hand, have many Arizona witnesses to present that were first hand witnesses of the actions of the parties and of the maintenance of their real property that will not be available to testify and refute the allegations of the plaintiff if this case is maintained in Illinois. These include both expert and lay witnesses, and they are more specifically described as follows: (This list of defendants' witnesses includes, but is not limited to the following)

Vivian Bishop – Cottonwood, Arizona – Escrow officer for Capital Title Agency. This witness was involved in the original property purchase and drew up the escrow instructions. This witness will also testify as to conversations she had with the plaintiff in which the plaintiff was apparently attempting to expand his fraudulent activities.

Donna Wisemann – Sedona, Arizona – President of the Sedona, Arizona, branch of M&I Bank. This witness was involved with financing one of the lots involved in plaintiff's Complaint.

Vincent Volturo – Scottsdale, Arizona – Mortgage broker for Northsight Mortgage in Scottsdale Arizona. This witness has been the defendants'' mortgage broker on many properties purchased by the parties and was involved in obtaining financing for a construction loan on one of the lots referred to in the plaintiff's Complaint.

Mark Murray – Clarkdale, Arizona – This witness designed several of the parties' spec homes and the plaintiff had dealings with him regarding designing homes for two of the Sedona lots, designated by the plaintiff's Complaint.

Paul Klas – Sedona, Arizona - Owner of Aspen Rein Builders, and was the contractor designated to build the houses on two of the lots designated in the plaintiff's Complaint.

The plaintiff does not assert that the defendants are residents, domicilliaries, or otherwise citizens of Illinois for purposes of venue. The plaintiff does not claim that any of the subject properties are located in Illinois – in fact, his allegations state just the opposite. Instead, the plaintiff appears to have chosen to file this suit in Northern Illinois solely out of concern for his own convenience, and this is not a legitimate basis for venue in federal diversity action.

A substantial portion of the acts or omissions giving rise to the civil action did not occur in Cook County, Illinois, but instead occurred in Maricopa County and Yavapai County, Arizona. The plaintiff has filed suit in the Northern District of Illinois for no other reason than trying the case in Arizona (where the defendants live, where most of the relevant witnesses reside, and where most of the subject property is located) would be inconvenient to the plaintiff and its counsel, and plaintiff's convenience in and of itself, is not legitimate basis for venue.

It cannot reasonably be asserted that the Northern District of Illinois is a convenient forum for the Plaintiff. Pursuant to Fed.R.Civ.P. 12(b)(3), defendants move to have this case dismissed for improper venue or, alternatively, to transfer this civil action to the United States District Court for the Southern District of Arizona pursuant to 28 U.S.C.S. §1404(a).

## II. ARGUMENT

A.   <u>This civil action should be dismissed pursuant to Fed.R.Civ.P. 12(b)(3) for lack of venue or, alternatively, transferred to the United States District Court for the Southern District of Arizona</u>

Pursuant the Federal Rules of Civil Procedure, the defense of "improper venue" may at the option of the pleader be made by motion instead of a responsive pleading.

Fed.R.C.P. 12(b)(3). The proper venue for a civil action founded on diversity jurisdiction is determined using the guidelines of 28 U.S.C. § 1391. Venue is proper in a judicial district where a defendant resides if all defendants reside in the same state; in a district where a substantial part of the events giving rise to the claim took place; or in a district where any defendant is subject to personal jurisdiction, if there are no other appropriate venues. *See*, 28 U.S.C.A. §1391(a).

Under the United States Code, 28 U.S.C.A. §1391(a),

> (a) A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

If a district court finds venue to be improper, that court should dismiss the case or, if justice requires, transfer the case to a district where venue is proper. 28 U.S.C.A. §1406(a).

In this instance case venue is wholly improper in the Northern District of Illinois. No defendants reside in Illinois, and therefore, the provisions of §1391(a)(1) do not apply.

The plaintiff purports to base venue in the Northern District of Illinois on § 1391(a)(2). This contention is without merit as it is clear that a substantial portion of the events giving rise to this case did not occur in Illinois, but rather in Arizona. As stated previously, this matter essentially involves a claim concerning the transfer, maintenance and sale of various real property located in Arizona and Florida, but not Illinois.

It is abundantly clear that the substantial portion of the events or omissions giving rise to this action Arizona, not in Illinois. The Northern District of Illinois is *not* the appropriate venue for this matter under §1391(a)(2).

With respect to §1391(a)(3), there *is* indeed a district in which the action "may otherwise be brought," that is, District of Arizona. Therefore, as there is another district where the action may otherwise be brought, venue in the Northern District of Illinois cannot lie under §1391(a)(3), regardless of whether the moving defendants are subject to personal jurisdiction here.

This Court ought to be persuaded by the case of <u>Hatala</u> v. Morey's Piers, Inc., where the plaintiffs brought a civil action against the defendant arising from an injury which occurred at Morey's Amusement Park, located in New Jersey. As in the case at bar, the plaintiffs in <u>Hatala</u> brought an action in diversity of citizenship in the Eastern District of Pennsylvania, because the defendant there was deemed to be a resident of Pennsylvania under a personal jurisdiction analysis. However, the district court was of the opinion that venue in the Eastern District of Pennsylvania was improper under §1391(a)(2) because the plaintiff's accident occurred in New Jersey, therefore that was the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. <u>Hatala</u>, 2004 U.S. Dist. Lexis 14653 (E.D. Pa., July 28, 2004), *citing* <u>Cottman Transmission Systems v. Martino</u>, 36 F.3d 291, 294 (3d Cir. 1994) (the test for determining venue is not the defendant's contacts with a particular district, but rather the location of those events or omissions giving rise to the claim).

In the instant matter, venue is proper in the District of Arizona because none of the defendants reside in Illinois,  the events giving rise to the action (or in this case, the real property that is the subject of the pending litigation)  occurred or is located in Arizona and Florida, and, as the moving defendants will not contest the exercise of personal jurisdiction over them in the District of Arizona,  the action could "otherwise" have been brought there. Thus there is no provision in §1391 for venue to lie in the Northern District of Illinois. Venue in this district would be improper as nothing substantial has occurred in Illinois.

Where defendants challenge venue under Rule 12(b), the plaintiff has the burden of proving that venue is proper in this district.  First Financial Leasing Corp. v. Hartge, 671 F.Supp. 538, 542 (N.D.Ill. 1987); Payne v. Marketing Showcase, Inc., 602 F.Supp 656, 658 (N.D.Ill. 1985).  On the facts presented by the circumstances of this case, the plaintiff cannot meet this burden and the case should be dismissed for lack of venue or transferred to the District of Arizona.

B.    In the alternative, this civil action must be transferred to the United States District Court for the District of Arizona pursuant to the doctrine of forum non conveniens

Under the Statutes of the United States, it is indicated that "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C.S. § 1404(a). The moving defendants submit that, under the facts of this case as alleged in the Complaint, the plaintiff could have brought this action in the United States District Court for the District of Arizona, and for the sake of the convenience of the parties and witnesses, this civil action must therefore be transferred to that District.

- 17 -

When considering a motion for dismissal for *forum non-conveniens*, the United States Supreme Court has listed the factors which are to be considered including: 1) the relative ease of access to sources of proof; 2) the cost of trial attendance for willing witnesses; 3) the cost of compelling trial attendance for unwilling witnesses; 4) community interest in the litigation; 5) the relative congestion of the court dockets and prospects for an earlier trial; 6) in a diversity case, the relative familiarity of the courts with the applicable state law. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947) Letter-Rite Inc. v. Computer Talk Inc. 605 F.Supp. 717, 720 n.3 (N.D.Ill. 1985). These same factors are applicable to the analysis under 28 U.S.C. § 140(a).    Most of the witnesses, in particular the witnesses with substantial relevant testimony, are all in Arizona. The real property involved is property that is not located in Illinois – therefore, the Illinois courts cannot be said to be as familiar with the particular state laws involved in the states where the property is located, i.e., in Arizona and Florida. Lastly, there can be no credible argument made that the federal courts in Arizona are more congested than the courts in Chicago. Accordingly, it is likely that the parties will be able to obtain an earlier trial in Arizona rather than in Chicago.

Private interest factors that should be evaluated by this Court overwhelmingly favor this case being transferred to the District of Arizona. These private interest factors include:

> The relative ease of access to sources of proof; the availability of compulsory process for attendance of the unwilling, and the cost of obtaining attendance of willing witnesses; the possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

Gulf Oil Corporation v. Gilbert, 330 U.S. 501, 508 (1947).

- 18 -

It is abundantly clear that under the facts of this case, all of the private and public-interest factors that have been outlined above weight strongly in favor of a transfer of this case to the District of Arizona.  This action involves real property located in Arizona, the witnesses live in Arizona, and the defendants live in Arizona.

It is therefore clear, with this action being transferred to the Southern District of Arizona, the defendants, the Arizona court, and relevant witnesses, would have much easier access to the sources of proof. Also, as most if not all of the pertinent witnesses in this case would be located in Arizona, if this case was transferred there, the mechanism for compulsory process for attendance of those witnesses at deposition and trial, would be readily available. In addition the cost of obtaining the attendance of witnesses would be substantially lower than having to arrange for the transportation of witnesses from Arizona to Illinois.  Therefore, this Court should find that the balance of factors weighs in favor of an Arizona forum. In these circumstances the Defendants' motion to dismiss for *forum non-conveniens* should be granted.

### III. CONCLUSION

The moving Defendant asserts that, for the instant matter, venue is obviously improper in the Northern  District of Illinois,  because the defendants do not reside in Illinois, the real property involved is not located in Illinois, and the action could "otherwise" have been brought in a more convenient forum, that is the District of Arizona.

As an alternative, under 28 U.S.C.S. § 1404(a), the Plaintiff could have brought this action in the United States District Court for the District of Arizona, and for the sake of the convenience of the parties and witnesses, and the most efficient administration of justice, this action should be transferred to Arizona.

This Defendant therefore moves, and for the reasons as outlined in this Motion and Brief, that this Honorable Court Dismiss the Complaint for Lack of Venue; or, in the alternative, transfer this matter to the United States District Court for the District of Arizona pursuant to the doctrine of *forum non conveniens*.

Respectfully submitted,

*Nasser Bashiri*

*Nancy Bashiri*

**Nasser and Nancy Bashiri, Defendants**
**7222 East Gainey Ranch Road, Unit 238**
**Scottsdale AZ  85258**
**501  762-2525**

## CERTIFICATE OF SERVICE

This to certify that on the _20th_ day of November, 2007, a true and complete copy of the

above and foregoing  BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN

THE ALTERNATIVE, TO TRANSFER THE CASE TO ANOTHER DISTRICT with supporting

brief and proposed orders was served on the opposing counsel by depositing in the

United States mail addressed as follows:


Richard T. Reibman
Schwartz Cooper Chartered
180 North La Salle, Suite 2700
Chicago, IL  60601
Attorneys for Plaintiff

Nasser Bashiri
Nancy Bashiri
**Nasser and Nancy Bashiri**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

VINCENT SADLER,　　　　　　　)　　CASE NO. 07C-5464
　　Plaintiff,　　　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　Judge Andersen
vs.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　)　　Magistrate Judge Mason
NASSER BASHIRI and　　　　　　)
NANCY BASHIRI, husband and wife,　)　　**FILED**
　　Defendants.　　　　　　　　)
　　　　　　　　　　　　　　　　)　　　NOV 2 7 2007

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## <u>DEFENDANTS' FIRST AMENDED ANSWER TO PLAINTIFF'S COMPLAINT</u>

TO THE HONORABLE JUDGE OF SAID COURT:

　　NOW COMES Nasser Bashiri and Nancy Bashiri, the defendants, who file this their First Amended Answer to Plaintiff's Complaint to Enforce Settlement Agreement and for Other Relief, and generally denies the allegations of said complaint. Additionally, the defendants make specific answer and objection to that complaint as follows:

## ADMISSIONS AND DENIALS

　　1.　　Denied. The defendants are unable to admit or deny the allegations of paragraph 1 of the complaint because the defendants have no knowledge of the residence or domicile of the plaintiff Vincent Sadler. Accordingly, the allegations of this paragraph are denied.

　　2.　　Admitted in part, denied in part. The defendants admit that they are married and presently reside in Arizona. The defendants deny that the community property laws of Arizona are applicable.

1

3.    Denied.  As to plaintiff's claims against the defendants, the defendants deny that any good faith allegations of the plaintiff exceed the minimum jurisdictional amount for federal diversity actions.

4.    Denied.  First, the defendants object to the multiplicitous and compound separate allegations found at paragraph 4 of the plaintiff's complaint. Plaintiff makes no less than seven specific factual allegations in one paragraph as prohibited by both Rule 8(d) of the Federal Rules of Civil Procedure and Local Rule 10.1.  Without waiving said objection, the defendants further respond to the allegations of this paragraph of the plaintiff's complaint as follows:

The  defendants deny that the Northern District of Illinois is the appropriate venue for the plaintiff to have filed the present action.  First, the plaintiff claims that there is jurisdiction based on diversity because the defendants are residents of Arizona, but at the same time claim as a basis for venue that at all relevant times the defendants were residents of Illinois.   The plaintiff cannot have it both ways, and the defendants object to this inconsistency.  Secondly, plaintiff claims in paragraph 4 that venue is based on his allegation that the underlying mediation agreement  "occurred" in Chicago, was executed in Chicago, and that the mediators are witnesses that reside in Chicago.   What plaintiff fails to mention is that the subject agreement concerns real property located primarily in Arizona, Arkansas and Florida.  Of the multiple parcels of real property at issue, not a single one is located in Illinois.  The alleged fact that the agreement occurred in Chicago and was purportedly executed in Chicago is of no significance.  The plaintiff does not allege that there was a choice of law provision whereby the

2

parties could have chosen to have any disputes litigated in accordance with Illinois law, this because there is no such provision. Plaintiff claims that the so-called religious "mediators" are all from Chicago, and that therefore venue is appropriate in the Northern District of Illinois because they will be called as witnesses. The defendants would submit that the subject agreement speaks for itself, and the plaintiff has stated no reason why these religious leaders should necessarily be called as witnesses. Plaintiff has made no allegation that the evidentiary parol evidence rule will not be applicable necessitating further input or testimony from them. On the contrary, these "mediators" appear to now be designated as witnesses by plaintiff's counsel solely in desperate and transparent attempt to contrive venue out of thin air. The defendants deny in the strongest possible terms any suggestion that this case was brought in the appropriate forum, even assuming for the sake of present argument that jurisdiction would otherwise exist.

5.      Denied. Simply put, the factual circumstances described by the plaintiff in paragraph 5 of his complaint did not occur. The defendants object to the hearsay nature of this allegation (e.g., "Defendant stated that he wanted to buy . . ."), which allegation's incompetence and irrelevancy is compounded by the failure of plaintiff's counsel to verify the allegations of his client's complaint. Counsel does not even bother to state that his allegations are made "on information and belief". These allegations, in their present form, do not merit further consideration.

3

6.     Denied.  In paragraph 6 of the plaintiff's complaint the plaintiff alleges that "the parties agreed to purchase properties and to share all income and expenses equally."   The defendants object to this allegation as being vague and incomprehensible.  The statement of the plaintiff is so overbroad as to make it meaningless.   Even the plaintiff's own proffered evidence (i.e., the alleged "settlement agreement") does not provide that "the parties agreed to purchase properties and to share all income and expenses equally."     Plaintiff's allegations in this respect are again inconsistent within themselves, and accordingly are denied.

7.     Denied.  Again, the allegations of this paragraph are so vague, overbroad and incomprehensible as to make them meaningless.   This case is said by plaintiff in other sections of his compliant to involve  multiple agreements concerning multiple parcels of real property, yet this allegation lumps them all in together by the use of such phrases as "Defendant did not share expenses equally," "Defendant did not . . . provide down payments for properties", etc., but plaintiff fails to specifically identify what properties the plaintiff is referring to when he makes these unsupported allegations.  Accordingly, the defendants deny the allegations found in this paragraph and leaves the plaintiff to its proof.

8.     Denied in part.   Defendants again object to the ambiguity and overbreadth of the allegations of this paragraph of the plaintiff's complaint.  Neither these specific defendants, nor any other defendant, could possibly know what allegations to defend against when they are so vaguely stated without specificity in contravention of the Federal Rules of Civil Procedure and the Local

4

Court rules. Accordingly, the plaintiff denies the allegations found in this paragraph and leaves the plaintiff to its proof.

9.       Denied. Defendants object on the basis of vagueness and lack of specificity. Plaintiff curiously states, "A dispute ensued." One might wonder if there ever was a lawsuit filed that a dispute <u>didn't</u> ensue. That's why plaintiffs bring lawsuits in the first place, because "a dispute ensued." Plaintiff's statement is nothing more than a meaningless truism. It certainly does nothing to substantiate any cause of action against these defendants. The vague allegation of this paragraph of the plaintiff's complaint is denied.

10.      The defendants object to this allegation of the plaintiff's complaint as being an unconstitutional violation of the First Amendment to the federal Constitution, specifically the provision providing for separation of church and state. In this paragraph of the plaintiff's complaint, the plaintiff admits that its claim is based from its inception a meeting at church among fellow church members (here referring to everyone concerned including the plaintiff, defendants, and those religious leaders that volunteered, as church members, to attempt to settle this disagreement). If the plaintiff is not satisfied with how this turned out, his remedy is to go back to the church, not to ask the court to do the church's job. Plaintiff would instead transparently attempt to divert the attention of the court from the religious nature of this dispute by characterizing the church elders as being "mediators". The defendants would submit that the plaintiff is now attempting, without constitutional justification, to compel the federal government to unconstitutionally interfere with what is essentially a religious

dispute that this court lacks jurisdiction to entertain on a constitutional basis.

11.    The defendants again object to the allegations of this paragraph as an attempt by the plaintiff to compel the federal government to unconstitutionally intrude upon a dispute that was previously settled by a religious forum outside the jurisdiction of this court.  For present purposes, the church elders, whether they had laptop computers or not (as alleged in this paragraph), are <u>not</u> mediators.

12.    Denied.  Defendants deny that those referred to were "mediators", and deny that the document referred to as a "settlement agreement" has any probative secular contractual value, whether it be on a constitutional basis or otherwise, as above described.

13.    The defendants object to the allegations of this paragraph under the best evidence rule.  The document referred to speaks for itself, and the allegations at paragraph 13 do not accurately state the substance of the disputed document.

14.    Denied.  The allegations of this paragraph are again as vague as the other allegations found in this complaint.   For the plaintiff to say that the "Defendant paid certain amounts he was required to pay under the Settlement Agreement" says nothing.

15.    Denied.  Defendants object to the allegations of paragraph 15 on the grounds of vagueness and lack of specificity.

16.    Denied.  Defendants specifically deny that plaintiff has "performed all of its obligations," whatever that means, and further objects to this blanket claim as being self-serving and hopelessly vague.  What obligations?

17.    Defendant incorporates by reference its response to the incorporated paragraphs alleged in this paragraph of the plaintiff's complaint.

18.    Admit.

19.    Deny.  Defendant objects to the relevance of the so-called "settlement agreement".  The purported document speaks for itself.

20.    Denied.  Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants.    The plaintiff is left to its proof.

21.    Defendant incorporates by reference its response to the incorporated paragraphs alleged in this paragraph of the plaintiff's complaint.

22.    Admit.

23.    Deny.  Defendant objects to the relevance of the so-called "settlement agreement".  The purported document speaks for itself.

24.    Denied.  Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants.    The plaintiff is left to its proof.

25.    Defendant incorporates by reference its response to the incorporated paragraphs alleged in this paragraph of the plaintiff's complaint.

26.    Denied. The defendants do not know of the specific financial dealings of the plaintiff and have no way of confirming or denying the veracity of the allegations found in this paragraph of the plaintiff's complaint. Accordingly, the defendants deny said allegation and leave the plaintiff to its proof.

27.    Denied. The defendants object to the multiple allegations found in one paragraph of the complaint as being in contravention of both the Federal Rules of Civil Procedure and the local rules. Without waving said objection, the defendant specifically denies the multiple allegations found therein. What the plaintiff is claiming is simply not true.

28.    Denied. Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants.    The plaintiff is left to its proof.

29.    Denied. The defendants owe nothing to the plaintiff as alleged, whether it be by way of money damages for interest or otherwise.

30.    Defendants incorporate by reference its response to the incorporated paragraphs alleged in this paragraph of the plaintiff's complaint.

31.    Denied. The defendants object to the multiple allegations found in one paragraph of the complaint as being in contravention of both the Federal Rules of Civil Procedure and the local rules. Without waving said objection, the defendant specifically denies the multiple allegations found therein. Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement

agreement itself, and the alleged breach of the agreement by the defendants. The plaintiff is left to its proof.

32. Denied. Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants. The plaintiff is left to its proof.

33. Denied. The defendants owe nothing to the plaintiff as alleged, whether it be by way of money damages for interest or otherwise.

34. Defendants incorporate by reference its response to the incorporated paragraphs alleged in this paragraph of the plaintiff's complaint.

35. Denied. The defendants object to the multiple allegations found in one paragraph of the complaint as being in contravention of both the Federal Rules of Civil Procedure and the local rules. Without waving said objection, the defendant specifically denies the multiple allegations found therein. Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants. The plaintiff is left to its proof.

36. Denied. Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants. The plaintiff is left to its proof.

37. Denied. The defendants owe nothing to the plaintiff as alleged,

whether it be by way of money damages for interest or otherwise.

38. Defendants incorporate by reference its response to the incorporated paragraphs alleged in this paragraph of the plaintiff's complaint.

39. Denied. The defendants object to the multiple allegations found in one paragraph of the complaint as being in contravention of both the Federal Rules of Civil Procedure and the local rules. Without waving said objection, the defendant specifically denies the multiple allegations found therein. Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants. The plaintiff is left to its proof.

40. Denied. Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants. The plaintiff is left to its proof.

41. Denied. The defendants owe nothing to the plaintiff as alleged, whether it be by way of money damages for interest or otherwise.

42. Defendants incorporate by reference its response to the incorporated paragraphs alleged in this paragraph of the plaintiff's complaint.

43. Denied. The defendants object to the multiple allegations found in one paragraph of the complaint as being in contravention of both the Federal Rules of Civil Procedure and the local rules. Without waving said objection, the defendant specifically denies the multiple allegations found therein. Plaintiff's

allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants. The plaintiff is left to its proof.

44. Denied. Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants. The plaintiff is left to its proof.

45. Denied. The defendants owe nothing to the plaintiff as alleged, whether it be by way of money damages for interest or otherwise.

46. Defendants incorporate by reference its response to the incorporated paragraphs alleged in this paragraph of the plaintiff's complaint.

47. Denied. The defendants object to the multiple allegations found in one paragraph of the complaint as being in contravention of both the Federal Rules of Civil Procedure and the local rules. Without waving said objection, the defendant specifically denies the multiple allegations found therein. Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of the agreement by the defendants. The plaintiff is left to its proof.

48. Denied. Plaintiff's allegation at this paragraph of its complaint assumes the existence of facts that are themselves disputed, including but not limited to the validity of the settlement agreement itself, and the alleged breach of

the agreement by the defendants.   The plaintiff is left to its proof.

49.   Denied.  The defendants owe nothing to the plaintiff as alleged, whether it be by way of money damages for interest or otherwise.

## AFFIRMATIVE DEFENSES

50. The plaintiff's complaint fails to state a claim upon which relief could be granted.

51. The plaintiff's complaint fails to sufficiently allege and disclose the status or standing of the plaintiff to bring this action.

52. The plaintiff's complaint is barred by the statute of limitations and/or by the equitable doctrine of laches.

53. The plaintiff's complaint is not verified according to law.

54. The plaintiff's complaint is barred by res judiciata, collateral estoppel, and/or issue preclusion.

55. The defendant owes nothing to the plaintiff because of previous payments that have already been made.

56. The cause of action alleged by plaintiff's complaint is constitutionally incapable of resolution by the federal courts as it is premised upon a religious determination that is constitutionally barred from being adjudicated by the First Amendment to the United States Constitution.

57.   The defendant owes nothing to the plaintiff because any account that the plaintiff may have had with the plaintiff has already been settled.

WHEREFORE, PREMISES CONSIDERED, defendant prays that this Court dismiss Plaintiff's Complaint, deny plaintiff and counsel all relief sought, award the defendants any costs and attorney fees associated with having to defend this action, and grant such other and further relief to which the defendants may be entitled in law or in equity.

Respectfully submitted,

*Nasser Bashiri*

*Nancy Bashiri*

**Nasser and Nancy Bashiri, Defendants**
7222 East Gainey Ranch Road, Unit 238
Scottsdale AZ 85258
501 762-2525

## VERIFICATION

We, Nasser and Nancy Bashiri, declare and state as follows:

We are the named defendants in the above entitled and numbered cause.

All of the statements made in the DEFENDANT'S VERIFIED ANSWER TO PLAINTIFF'S COMPLAINT are true and complete to the best of our knowledge and belief.

We make this declaration under penalty of perjury in Scottsdale, Arizona, on the _5th_ day of _November_, 2007.

*Nasser Bashiri*

*Nancy Bashiri*

**Nasser and Nancy Bashiri, Declarants**

13

## CERTIFICATE OF SERVICE

This to certify that on the _5th_ day of November, 2007, a true and complete copy

of the above and foregoing  DEFENDANTS' FIRST AMENDED ANSWER TO

PLAINTIFF'S COMPLAINT   was served on the opposing counsel by depositing in

UPS overnight addressed as follows:


Richard T. Reibman
Schwartz Cooper Chartered
180 North La Salle, Suite 2700
Chicago, IL  60601
Attorneys for Plaintiff

*Nasser Bashiri*

*Nancy Bashiri*

**Nasser and Nancy Bashiri**

Case 1:08-cv-03839     Document 21-2     Filed 03/28/2008     Page 111 of 111

 **SHIPPING TOOLS**

| **Your Tracking Information** |
|---|

| Status: | **DELIVERED** |
|---|---|
| Last Scan: | **11/6/2007 12:47:00 PM DELIVERED CHICAGO, IL US** |
| Delivered To: | **CHICAGO, IL US** |
| Delivery Date: | **Tuesday, November 6, 2007** |
| Delivery Time: | **12:47:00 PM** |
| Delivery Location: | **MAIL ROOM** |
| √ Signed By: | **GRAMMER** |
| Carrier: | **UPS** |
| Service: | **Next Day Air Saver** |
| √ Expected: | **11/6/2007** |
| UPS Tracking Number: | **1Z3X2R02A405694443** |

Scan History:

11/6/2007 12:47:00 PM DELIVERED CHICAGO, IL US
11/6/2007 6:00:00 AM OUT FOR DELIVERY CHICAGO, IL US
11/6/2007 5:28:00 AM ARRIVAL SCAN CHICAGO, IL US
11/6/2007 3:41:00 AM DEPARTURE SCAN ROCKFORD, IL US
11/6/2007 1:57:00 AM LOCATION SCAN ROCKFORD, IL US
11/6/2007 1:46:00 AM UNLOAD SCAN ROCKFORD, IL US
11/6/2007 1:09:00 AM ARRIVAL SCAN ROCKFORD, IL US
11/5/2007 9:09:00 PM DEPARTURE SCAN PHOENIX, AZ US
11/5/2007 7:15:00 PM ARRIVAL SCAN PHOENIX, AZ US
11/5/2007 6:27:00 PM DEPARTURE SCAN PHOENIX, AZ US
11/5/2007 6:05:00 PM ORIGIN SCAN PHOENIX, AZ US
11/5/2007 7:16:00 PM BILLING INFORMATION RECEIVED  US

**NOTE:** The times listed in the scan details are local time.

Done

*Status as of Tuesday, November 13, 2007 5:44:35 AM Pacific Standard Time*

Learn More

| **Track Another Package** |
|---|

Enter tracking number: _____ Submit

Tracking provided for

  

FedEx®

Having trouble? Click here for help. ● iShip, Inc. Privacy Policy

© 1998 - 2007 iShip, Inc. iShip, the iShip logo, Price It, Track It, Sell It, and Shipping Insight are trademarks of iShip, Inc. iShip, Inc. is a subsidiary of United Parcel Service of America, Inc. Logo and marks used by permission. All rights reserved.

# EXHIBIT O

# North Congregation of Jehovah's Witnesses
## Chicago, IL   9-28-06

Dear Brother Bashiri,

Please meet with a committee of Elders with the North Congregation in one more attempt to settle this matter within the Congregation before continuing your agreed course of arbitration. We will meet on the evening of **Wednesday October 6th** with Brother Sadler and you at our Kingdom Hall at 4572 N. Elston. Please come with an agreement in the form of dollars and properties in mind to offer to Brother Sadler to settle this matter before going to arbitration. Let us know what would be acceptable to you. We have sevral Elders prepared to meet with both parties together.

Your Brothers,

*North Congregation Body of Elders*

# North Congregation of Jehovah's Witnesses
## Chicago, IL  9-23-06

Dear Brothers,

Brother Haight of the Hot Springs Congregation contacted me Sunday Sept. 18th requesting to know what the North Congregation body of Elders had determined regarding the situation where Bro. Nasser Bashiri and Bro. Vincent Sadler entered into a business agreement in 2005. This agreement states in part, " If a disagreement arises that is not able to be prayerfully resolved, both parties... will submit to the decision and/or advice of a committee of 2 or 3 Elders from the North Congregation of Jehovah's Witnesses. Whatever resolution of said disagreement is decided upon by such Elders will be fully accepted by both parties in the primary interest of maintaining the peace of the brotherhood."

The 2 Elders who were assigned by the body of Elders to investigate this dispute shared with the entire body of Elders their findings after many hours of interviews, reviewing spreadsheets and business agreements, and research. At the very least we recommend the following...

1) That the parties involved continue to work toward a peaceful resolution in a timely expedient manner so as to follow the Scriptural direction to "be about settling matters quickly" (Matt. 5:25) Time is of the essence.

2) As the Body of Elders are ministers not legal counsel or certified accountants, and due to the great amount of property and money involved, we recommend that Nasser Bashiri and Vince Sadler seek a professionally qualified third party to assist them in dividing up the properties and debts and assist in dissolving this business arrangement by using "a multitude of counselors" (Prov. 24:6). This is to keep the  matter out of a court of law while still creating a fair and binding agreement.

Please follow the Scriptural direction of the Body of Elders.


Your Brothers,

Rudy Zarate, Alex Aldridge, Larry Hill, Franklin Bullock

# North Congregation of Jehovah's Witnesses
# Chicago, IL   9-28-06

Dear Brother Bashiri,

Please meet with a committee of Elders with the North Congregation in one more attempt to settle this matter within the Congregation before continuing your agreed course of arbitration. We will meet on the evening of **Wednesday October 4th** with Brother Sadler and you at our Kingdom Hall at 4572 N. Elston. Please come with an agreement in the form of dollars and properties in mind to offer to Brother Sadler to settle this matter before going to arbitration. Let us know what would be acceptable to you. We have sevral Elders prepared to meet with both parties together.

Your Brothers,

*North Congregation Body of Elders*

*(correct date Wed. Oct 4th)*

Rudy Zarate
2430 W. Wilson
Chicago IL 60625

*Jan 02 07 8.45p Zarate*

Brother Vince Sadler
Brother Nasser Bashiri

Dear Brothers;

We're writing to clarify our position regarding the business agreement that we arbitrated and to share some Bible principles that will hopefully have a bearing on how matters are finally resolved.

We would first like to commend you brothers for not being hasty in this matter but for trying to bring this disagreement to a peaceful resolution. At 1 Corinthians 6, the Apostle Paul counseled the Corinthian brothers for taking one another to court. There he encouraged the brothers to try to resolve disagreements within the congregation. You brothers applied that suggestion and sat down in person with this committee to arbitrate a peaceful resolution to the problem. In doing that, you brothers are to be truly commended. However, it has come to our attention that the agreement that was reached has not been abided by for various reasons. We're certain that it is disappointing for all concerned that this problem has not been resolved. However, it is the feeling of the entire committee that there is nothing else that we can do as far as arbitrating this financial disagreement. Having said that, we do feel that a peaceful resolution can still be reached if Bible principles are followed, but of course, this will require the cooperation of both of you brothers.

Here are some Bible principles we recommend you keep in mind as well as comments from the "faithful slave" regarding them. As you move forward, please keep these principles in mind.

1. **Psalm 15:4 – [g83 2/8 p. 15 Put It in Writing!]** "Sometimes the most judicious of people find themselves locked into an undesirable agreement. Some break their word rather than suffer a loss. Yet the Bible commends the person who has "sworn to what is bad for himself, and yet he does not alter." (Psalm 15:4) This means being willing to accept the consequences of your bad agreement—chalking it up to experience.
   However, there is *some* recourse. Note the principle embodied in Proverbs 6:1-3 according to *Today's English Version* of the Bible: "Son, have you promised to be responsible for someone else's debts? Have you been caught by your own words, trapped by your own promises? Well then, son, . . . this is how to get out of it: hurry to him, and *beg him to release you.*" Your persistent efforts may result in your being freed from the unwise agreement. If not, Jesus' counsel to let your *"Yes* mean Yes" will likely help you accept the consequences with stoic calm.— Matthew 5:33-37."

2. **1 Corinthians 6:1-7 – [w95 5/1 p. 30 What Will Your Business Cost You?]** But what if a Christian brother seems to have treated you unfairly in business? Should you take him to court? The Bible is very clear on this. "Does anyone of you that has a case against the other dare to go to court before unrighteous men, and not before the holy ones?" asked Paul. What if a problem is not satisfactorily resolved right away? Paul added: "It means altogether a defeat for you that you are having lawsuits with one another. Why do you not rather let yourselves be wronged? Why do you not rather let yourselves be defrauded?" Just think what a black mark it would put on the Christian organization if outsiders heard of true Christians fighting it out in court! Could it be that in such cases the love of money has become stronger than love for brother? Or could it be that one's honor has been tarnished and retaliation is foremost in mind? Paul's counsel shows that in such cases it would be better to take a loss than to go to court.

1

It may seem easy during such discussions to agree with Bible principles, but afterward will you really show that you listened by applying the counsel given? Love for God and for our fellow Christians would impel us to do so. Undoubtedly, being in business is going to cost you something. Hopefully, the price you pay will be reasonable. When confronted with decisions or any questionable situation, keep in mind that there are many things in life that are far more valuable than money. By keeping money in its place, keeping one's word, being honest, and dealing with business associates in the Christian way, we can see to it that a business costs no more time and money than necessary, and at the same time, we can preserve friendships, a good conscience, and a fine relationship with Jehovah.

3. **Matthew 5:23-25 – [w86 11/15 p. 19 par. 17 Maintaining Christian Unity in Business Relationships]** In any business relationship between brothers, problems can arise. Some of the minor problems can be solved simply by applying the principle at 1 Peter 4:8, which says: "Above all things, have intense love for one another, because love covers a multitude of sins." If problems cannot be solved in that way, they should not be allowed to fester and worsen. This could result in a loss of mutual respect and in alienation. The solution often lies in kind, frank communication before the situation grows worse. God's Word counsels us to settle disputes quickly.

4. **Genesis 13:5-11 – [w86 11/15 p. 20 par. 19 Maintaining Christian Unity in Business Relationships]** When counseling those who are having business difficulties, the elders could point them to the unselfish example set by Abraham when his relationship with Lot was in jeopardy. Abraham, though older, kindly gave Lot the first choice of land rather than risk a breach in relationships.

5. **1 Timothy 6:8 – [w01 6/15 pp. 6-7 How Can You Keep a Balanced View of Money?]** Paul offers the alternative to greed, which is contentment. He says: "So, having sustenance and covering, we shall be content with these things." (1 Timothy 6:8) This description of all that we really need—"sustenance and covering"—may sound rather simplistic or naive. Of course, servants of God are not required to live in self-imposed poverty. However, Paul does remind us what poverty really is: lack of food, clothing, and shelter adequate for survival where one lives. On the other hand, if we have those things, we have the basis for contentment.
Could Paul be serious about such a description of contentment? Is it really possible to be satisfied with merely the basics—food, clothing, and shelter? Paul should know. He experienced firsthand the wealth and privileges of high rank in the Jewish community and of Roman citizenship. (Acts 22:28; 23:6; Philippians 3:5) Paul also suffered severe hardships in his missionary activities. (2 Corinthians 11:23-28) Through it all, he learned a secret that helped him to maintain contentment. What was that? Paul explained in one of his letters: "I know indeed how to be low on provisions, I know indeed how to have an abundance. In everything and in all circumstances I have learned the secret of both how to be full and how to hunger, both how to have an abundance and how to suffer want." (Philippians 4:12) ...Extremes of wealth or hardship can test our priorities. Paul spoke of spiritual resources that enabled him to be content regardless of material circumstances: "For all things I have the strength by virtue of [God] who imparts power to me." (Philippians 4:13) Rather than looking to his possessions, many or few, or to his circumstances, good or bad, Paul looked to God to satisfy his needs. The result was contentment.

2

6. **Proverbs 2:11 - [w97 3/15 p. 21 pars. 16-18 Let Discernment Safeguard You]** Discernment helps us to realize that profits do not result from all investments. Yet, what if fraud is involved? **Fraud is "the intentional use of deception, trickery, or perversion of truth for the purpose of inducing another to part with some valuable thing belonging to him or to give up a legal right."** Jesus Christ outlined steps that may be taken when a person thinks he has been defrauded by a fellow worshiper. Yet, what if a professing Christian actually defrauded us? Discernment can safeguard us from taking action that may put the congregation in a bad light. Paul advised fellow Christians to let themselves be wronged and even defrauded instead of taking a brother to court.—1 Corinthians 6:7. Our genuine brothers and sisters are not 'full of fraud and villainy,' like the sorcerer Bar-Jesus. (Acts 13:6-12) So let us use discernment when money is lost in business ventures involving fellow believers. If we are thinking about taking legal action, we should consider the possible effects on us personally, on the other person or persons, on the congregation, and on outsiders. Pursuing compensation could consume much of our time, energy, and other resources. It might result only in enriching attorneys and other professionals. Sadly, some Christians have sacrificed theocratic privileges because of becoming overly absorbed in these things. Our being sidetracked in this manner must make Satan happy, but we want to make Jehovah's heart rejoice. (Proverbs 27:11) On the other hand, accepting a loss may spare us heartaches and save much time for us and for the elders. It will help to preserve the congregation's peace and will enable us to keep on seeking first the Kingdom.

It is our fervent prayer that you brothers will be able to work this out. Both of you have served Jehovah for many years and helped many of God's people. Both of you have resources, talents and most of all, a heartfelt desire to both please Jehovah and help his people. You have both spent many hours praising Jehovah's name. Please brothers, consider this in your future discussions.


_____

Rudy Zarate (Chairman)

_____

Antoine Holmes

_____

Duraid Micah


3

*The Bashiri's*
*451 Lakeland Dr.*
*Unit G6*
*Hot Springs, AR 71913*
*(501) 762-2828*

January 14, 2007

North Congregation Body of Elders
c/o Br. Rudy Zarate                                    Via Fax (773) 334-0473

Dear Brothers:

Thank you for all of your hard work. I am so sorry that despite all the efforts that were made to resolve this situation that it was not able to be. I know it was not for lack of effort, time and prayer on your part. I very much appreciated the letter you sent and have taken the counsel to heart.

This letter is not a complaint; I am just sending it so that others may be protected in the future. When I went into business with Vince, I truly believed that I was helping him because he was upset that another brother had allegedly cheated him. As I had 20 years of experience in real estate and Vince had expressed a desire to get out of the stock market, we talked about working together. Also, he had done some property investment prior to our relationship. I was under the impression that we were 50/50 partners. In the beginning, he allowed me to believe that and I was fooled. Perhaps I was naïve because I have not experienced being treated badly by any brother. Since I had been working with my worldly father-in-law for the last 5 years as 50/50 partners and had never had an issue, both of us profiting from this business, I did not anticipate any problem with Vince, since he was a brother.

When we purchased the property, Vince put the properties under his name only. I kept hoping that sooner or later he would add my name to the title or at least put properties in my name. I didn't push it because he had been so "hurt" by the other brother and told me he didn't trust anyone. I tried to prove beyond a shadow of a doubt that I would never hurt him. Also, in working with Michael Davidson, there had never been an issue of which properties were under whose name because we always shared 50/50 responsibility and profit. As time went on, Vince showed his true colors and no matter how much I gave in, it was never enough.

Later on, by lying and cunning Vince tried to get all of the Lakeland Harbor condominiums under his name, even after he knew that all of the Lighthouse condos were already under his name. He then, a week before we were supposed to close on J units, pulled out and told everyone that I would have to close on them. He took the best units (H building) with the best views and boat dock for himself, leaving me with the least desirable units and little time to pull financing together. My reputation with the builders was put on the line. Vince told me to cancel these units and was going to blame me for not following through to the builders. Since they knew we were Witnesses, I did everything I could to follow through and did. I was forced to sell one to my father-in-law for only $20K profit while Vince's units in H building are worth $50K more. He then demanded half of the profit for the J unit I had sold which was mine. We did cancel one of the 3 units in J because Vince insisted we cancel one because landscaping and other amenities had not been completed. He then spoke to Gary Kimmet of K&S Development apologizing and blaming me for cancelling.

After we bought the 3 lots in Sedona, I immediately tried to get plans together to build. Vince agreed to this and agreed to the builder, the size and the plans. I went through time, energy and expense to accomplish this in a timely manner. When it came down to fulfilling this, he would not cooperate. I was then stuck because the lots were under his name and so I couldn't build or sell. All I could do was to continue to give him interest on properties that obviously weren't even mine nor was there any indication of his willingness to be partners. After all of my effort over several months, I literally pleaded with him

to please let me have at least one lot of his choice so that I could sell it so I wouldn't have to pay a mortgage for nothing. He would not allow me that and showed me no mercy.

Vince claimed that his money was sitting in the bank collecting a very low rate of interest, approximately 2%. He obviously was collecting a lot more interest from me and so was unmotivated to build or sell. You can imagine the position this put me in.

When we purchased 300 Morphew Rd, it was for the purpose of building either homes or condos. Donna Meadows, a realtor in Hot Springs, was asked by me and Vince to find out if there were any building restrictions. There were not. After the purchase, I told Vince I would contact a builder to get recommendations on what could be built and how many. I did this in December of 2005 and reported the findings to Vince. The builder felt that we could easily build 4 condominiums which would cost $200K to build and could be sold for $400K. We had paid $240K for the lot, which I had negotiated for $60K less than the list price, even though Vince was willing to pay $270. This builder was experienced and builds subdivisions. Vince paid cash for the lot and was charging me 7% interest, while the banks were only charging 6%. As usual, this property was under Vince's name only and he, again, pulled the rug out from under me, refusing to go forward. Meantime he was collecting rent from the man living in the cottage on the property for one year. I did not receive a penny nor was he willing to apply that rent to the mortgage.

As time went on, he tried to raise the interest rate on all the properties to 11.5% (please see attached) and backdate it several months, adding closing costs, appraisal, loan application and other fees which he had not paid but expected me to give him, which is illegal unless you are a licensed lender. He also stated that this interest rate could be changed at anytime as long as I was informed in writing. This was fraud and extortion.

Vince collected rent of $1800 a month from 28677 San Lucas Dr. which was a property under my name. When I asked him to apply the $1800 towards the mortgage, he said he wanted to have at least $3,000 in the ARC Investments account for expenses that might come up in relation to the property. After two months of him collecting $1800 a month, I contacted him and asked him to now please start applying the $1800 to the mortgage. He refused and continued to collect $1800 a month for the next 8 months, which was total rent collection of 10 months.

When we purchased the H units at Lakeland Harbor, I suggested that I would furnish one unit and he could furnish another so that we could rent them for vacation rentals which would bring approximately $400 a night during tourist season. After I furnished one of the units, I was able to rent it out through Hot Springs Vacation Rentals for a gross amount of $10,000 for one month. Vince did not furnish the other one as we had agreed. After pleading with him to furnish another unit so that we wouldn't be sitting on an empty unit, he said that it was my job to furnish it and rent it and he would reimburse me for the furnishings when he got the receipts. I was not in agreement that this was my job as it had never been discussed. Nevertheless, for the sake of peace, I offered to pay to furnish it and he could reimburse me. My family and I went through a lot of time, effort and expense getting it furnished and ready for rental.

I faxed Debbie and Vince a copy of all of the receipts and for 3 weeks did not receive a response or reimbursement. Since the property was under Vince's name, Debbie immediately contacted the rental agency and demanded that all rental checks for the H units be sent to Vince directly. I called Vince and told him that was no problem if he received the rental checks but he said he was not going to give me half or apply it to the mortgage. Even though we were partners, I was paying interest on the down payments and half the mortgage and had furnished both units with no reimbursement. I pleaded for him to at least pay the mortgage with that money. He told me that the money was going to stay in ARC Investments and continued to ask me for the mortgage for the H units, which were under his name. That is the critical moment that I realized I had been taken. I had previously tried to just believe he would change. I was absolutely devastated and ill that a brother could be this cruel and dishonest.

It was at that time, I stopped paying him anything because the properties were not under my name and he had proven this was not a partnership. I was so sick that I had been paying and working for nothing! It was not as if I did not have my own business to concentrate on, in addition to this.

At this point, I realized that I had lost over $100K that I had paid Vince for all these properties which he had demonstrated repeatedly were his only. I decided I had to do something to stop the financial bleeding. Not only was he collecting the interest for the property but he kept raising it and kept me from alleviating any of the financial burden by refusing to sell, build or apply rent to help cover the mortgages. It was at this time, that he contacted you brothers and accused me of fraud and of the one time I raised my voice to him on the phone when he accused me of not being a Christian and telling me "may Jehovah judge you".

Whether you realized it or not, I had been doing everything in my power to "keep peace" for over a year. I fully believe that not many men inside or outside of the congregation would have put up with what I have. Was I required to give up everything I had and to sacrifice my own family's well-being for Vince? When you brothers encouraged me to allow myself to be wronged, had I not already allowed myself to be wronged over and over again. I remember, in the elder's meeting, Alex Aldridge adamantly insisting that I allow myself to be wronged. It was like adding insult to injury. Over the months of conversations, meetings and faxes I have felt like I've been screaming into a vacuum. It's as if no one has heard anything I have said. Even when you brothers sent me that touching letter of counsel, I prayed to Jehovah with all my heart to resolve this. I was willing to let everything go.

However, both Br. Zarate and Br. Haight repeatedly encouraged us to put everything in writing and try one more time. Br. Haight used the example of David and Saul and encouraged us not to give up. He also told us the example of one of the Kings of Israel who the prophet told to strike the ground with arrows. The King did but only 3 times. The prophet told him had he continued to strike the ground up to 7 times, he would have been restored completely. The last example we were given was of a brother who had been involved in 'worldly business practices' with 10 witness families. None of them came forward and told the brothers they felt they had been cheated. As a result, the brother continued with his worldly "business practices". He was eventually disciplined and turned around completely. He is now an elder. Br. Haight told us that if those families had come forward, this brother might have had an opportunity to look at how he was conducting business and turn around much sooner and families might have been spared. It took 3 those three examples for me to finally agree to try this again.

After Br. Zarate told us we were to sign the arbitration agreement per Vince's demands after Nancy asked him 3 times if we should, one of the elders at our hall told us he had not heard of an elder body recommending an outside legal solution and encouraged us to put everything we had gone through in writing along with all documentation and send it to the Society. We chose, however, to trust in the elder arrangement of the North Congregation Body of Elders by coming to Chicago and trying to resolve this.

I feel that I am obligated to report all these things to you as evidence for your benefit should there arise any other business situations involving Vince and other members of the organization.

Sincerely,

*Nasser Bashiri*

Nasser Bashiri

cc: Br.Haight/South Congregation

INBOX          Compose          Addresses

### *nasserbashiri@cablelynx.com*

Folders     Options

Current Folder: **real-estate**

**Welcome:** nasserbashiri@cablelynx.com                                    Calendar

✉ Message List | 🗑 Delete                         Forward  Reply | Reply All |

| | |
|---|---|
| **Subject:** | Re: North Congregation Body of Elders |
| **From:** | "Rudy Zarate" <rztz@mac.com> |
| **Date:** | Thu, February 1, 2007 4:16 pm |
| **To:** | nasserbashiri@cablelynx.com |
| **Priority:** | Normal |
| **Options:** | View Full Header | View Printable Version | Allow Sender | Block Sender| Add to Addressbook |

Yes Bro. Bashiri, I will give this message to the Elders that are
caring for the investigation. I am not assigned to this. I will ask
them to contact you. I will see them tonight.

RZ

On Feb 1, 2007, at 11:48 AM, nasserbashiri@cablelynx.com wrote:

> Dear Br. Zarate:
>
> Per yours and Br. Haight's request, we promptly delivered to The North
> Congregation Body of Elders, in writing, charges against Vince
> Sadler and
> questions/concerns regarding the handling of such matters over the
> past
> months.  This was 2 1/2 weeks ago and we were told that the
> information we
> sent of approximately 15 pages was being taken to the brothers.
> Can you
> please provide us with the status of these issues as soon as possible?
>
> We are currently in Arizona and can be reached on our cell
> 501-762-2628.
> Arizona is currently one hour earlier than Illinois and we have our
> meeting from 7:00 - 9:00 p.m. (AZ time) this evening.
>
> Sincerely,
> Nasser Bashiri
>
>
>

                     Download this as a file


                  Delete & Prev |  Delete & Next

            Move to:  INBOX              [ Move ]

# EXHIBIT P

*Nasser Bashiri*
*451 Lakeland Dr.*
*Unit G6*
*Hot Springs, AR  71913*
*501-762-2828*

---

**DATE:**　　**April 24, 2007**

**TO:**　　**Br. Robert Haight**　　　　**Fax:  501-624-1649**
　　　　**Br. Joel Wall**　　　　　　**Fax:  810-885-4657**

**FROM:**　　**Nasser Bashiri**　　　　　**Fax:  501-520-0239**

**RE:**　　**Vince Sadler Accusation reg. "Getting Rich Off His Money"**

---

Dear Brothers:

Vince Sadler has made the claim that I "got rich from his money". In 2006, according to Vince's own spreadsheet, he received interest and rent on the following properties which he paid for fully in cash. This is complete "profit" he received and does not include all of the expenses and mortgage payments he received from me in connection with all the properties in the partnership.

<u>Interest Vince Received for 2006 on Cash Properties:</u>
| | |
|---|---|
| Back-O-Beyond lot | $16,706.25 |
| 15 Granite Rd. (La Barranca) | $ 9,606.08 |
| 300 Morphew Lane | $ 7,651.16 |
| Equity Line #1 | $ 3,865.96 |
| Equity Line #2 | $ 5,971.34 |
| Vince's Palmira (28658 San Lucas) | $14,505.12 |
| Half of $360K down payment for<br>  The H units in Lakeland Harbor | $ 6,300.00 |
| 1st Payment after Oct. contract<br>  Interest Only | <u>$10,000.00</u> |
| **TOTAL INTEREST ONLY** | **$74, 605.91** |

<u>Vince collected rent of approximately $30,000 for 2006</u>:

- Nasser's Palmira (28677 San Lucas), Bonita Springs, FL

- 300 Morphew Rd., Hot Springs, AR

- H units in Lakeland Harbor, Hot Springs, AR

**TOTAL INTEREST & RENT      $104,605.91**

Please ask Vince what profit (interest or rent) I received from him during 2006.  Unless Vince can prove his claim, I would consider that as slander.

Sincerely,

Nasser Bashiri

Nasser Bashiri

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**
**501-762-2828**

DATE:      **April 24, 2007**

TO:        **Br. Robert Haight**          **Fax:  501-624-1649**
           **Br. Joel Wall**             **Fax:  810-885-4657**

FROM:      **Nancy Bashiri**             **Fax:  501-520-0239**

RE:        **Emails from Vivian Bishop/Capital Title Agency - Arizona**

Dear Brothers:

Please see the two attached emails from Vivian Bishop/Branch Manager for Capital Title Agency regarding the following:

1. Vince approached Nasser and asked to lend him money.  Nasser was using a private lender in Sedona at that time and Vince told him he would give him a lower interest rate.  Vince demanded his money 3 months later, although there was a signed contract between he and Vince through Capital Title's Account Servicing Department for a year of two (Nasser has the contract).  Nasser paid the money in three months because Vince wanted it, even though he had to pay a 3 month prepayment penalty since there was 6 months guaranteed interest.  Vince kept the prepayment penalty even though he was the one that asked Nasser to pay early.  He told the brothers in Chicago that Nasser had never paid the $200K loan back.  Nasser presented the evidence that he had. Nothing was done.  This money was for Nasser's own business ventures and Vince offered the money at the time they were in Vivian Bishop's office signing papers for one of the lots.  This proves that Vince knew Nasser would be continuing with his own business as Nasser and I have both attested to and that he was eager to invest his money with Nasser so he could get interest. Nasser already had the loan with another lender.

2. Vivian Bishop has still not received signed contracts for either 15 Granite or Back-O-Beyond lots.  It has now been 6 months since the October contract was signed with the brothers in Chicago.

I am awaiting another email which I should have by Friday from Vivian Bishop that shows that Vince tried to call another loan he'd given Nasser for $100K (contract with Capital Title's Account Servicing Department).  Vivian responded that he could not call

**Nancy Bashiri**

**From:** Vivian Bishop [vbishop@capitaltitle.com]
**Sent:** Monday, November 20, 2006 9:11 AM
**To:** nasserbashiri@cablelynx.com; Nancy Bashiri
**Subject:** FW: Sales Contract for 150 Scenic Dr

*Vince's response.*

Vivian Bishop
Branch Manager
Capital Title Agency
850 Cove Parkway, #A
Cottonwood, AZ  86326
(928) 634-9561
email: vbishop@capitaltitle.com

---

**From:** Vincent Sadler [mailto:vincentsadler@hotmail.com]
**Sent:** Saturday, November 18, 2006 5:45 PM
**To:** Vivian Bishop; rztz@mac.com
**Subject:** Sales Contract for 150 Scenic Dr

Dear Vivian,

As I told you on the phone, the contract price for the property at 150 Scenic Dr is $570,000 and not $620,000 and $50,000 fee to seller. A signed agreement by Nasser and myself bears this out. Our simple Sales Contract needs to reflect that and nothing else. I would like to fulfill just what we agreed to and nothing else. I want no part, nor will I participate in anymore creative financing.

Thank you Vivian for all your help.

Sincerely,

Vince

This information may be legally privileged and/or is confidential, and is intended for the use of the addressee named above.  Any other use is strictly prohibited.  If you have received this communication in error, please immediately notify me and destroy the communication.  Any wrongful interception of this transmission is  prohibited and punishable under federal law.

11/20/2006

INBOX      Compose      Addresses      Folders

**nasserbashiri@cablelynx.com**

Options

Current Folder: **INBOX**

**Welcome:** nasserbashiri@cablelynx.com                                    Calendar

Message List | Delete                        Forward | Reply | Reply All |

**Subject:** Vince lending
**From:** "Vivian Bishop" <vbishop@capitaltitle.com>
**Date:** Tue, April 24, 2007 11:02 am
**To:** nasserbashiri@cablelynx.com
**Priority:** Normal
**Read receipt:** requested [Send read receipt now]
**Options:** View Full Header | View Printable Version | View as HTML | Allow Sender | Block Sender| Add to Addressbook

Vince voiced interest in being a private lender and after my explaining
the process he offered to loan Nasser money instead of Nasser using
another private lender.

Vivian Bishop
Branch Manager
Capital Title Agency
850 Cove Parkway, #A
Cottonwood, AZ 86326
(928) 634-9561
email: vbishop@capitaltitle.com

This information may be legally privileged and/or is confidential, and is intended
for the use of the addressee named above. Any other use is strictly prohibited. If
you have received this communication in error, please immediately notify me and
destroy the communication. Any wrongful interception of this transmission is
prohibited and punishable under federal law.

                    Download this as a file

**Attachments:**

| untitled-[1.2] | **4.9 k** | [ text/html ] | | Download | View |
| image001.jpg | **7.6 k** | [ image/x-citrix-jpeg ] | **image001.jpg** | Download | |

                    Delete & Prev | Delete & Next
            Move to: INBOX ▼   Move

INBOX          Compose          Addresses

# nasserbashiri@cablelynx.com

Folders       Options

Current Folder: **INBOX**

**Welcome:** nasserbashiri@cablelynx.com

Calendar

✉ Message List | ✂ Delete          ◀ ▶          ↩ Forward | ↩ Reply | ↩ Reply All | ↩

| | |
|---|---|
| **Subject:** | Vince |
| **From:** | "Vivian Bishop" <vbishop@capitaltitle.com> |
| **Date:** | Thu, April 26, 2007 12:12 pm |
| **To:** | nasserbashiri@cablelynx.com |
| **Priority:** | Normal |
| **Read receipt:** | requested [Send read receipt now] |
| **Options:** | View Full Header | View Printable Version | View as HTML | Allow Sender | Block Sender| Add to Addressbook |

I recall that Vince or probably Debbie called me a while back and asked
if they could call for a Note to be paid before the all due date.  I
checked with our Account Servicing Department who said that they didn't
think so.  The Beneficiary could ask for it to be paid sooner, but could
not force it.

Vivian Bishop
Branch Manager
Capital Title Agency
850 Cove Parkway, #A
Cottonwood, AZ  86326
(928) 634-9561
email: vbishop@capitaltitle.com

This information may be legally privileged and/or is confidential, and is intended
for the use of the addressee named above.  Any other use is strictly prohibited.  If
you have received this communication in error, please immediately notify me and
destroy the communication.  Any wrongful interception of this transmission is
prohibited and punishable under federal law.

Download this as a file

**Attachments:**

| | | | |
|---|---|---|---|
| untitled-[1.2] | **5.1 k** | [ text/html ] | Download  |  View |
| image001.jpg | **7.6 k** | [ image/x-citrix-jpeg ]     **image001.jpg** | Download |

Delete & Prev |  Delete & Next

Move to: [INBOX ▼]  Move

the loan unless Nasser was in default. Nasser's payments have all been on time and he has not missed any payments. We will be happy to provide proof. The loan is not due until July of 2008.

Although I realize that this may not all have to do with the current contract, I believe it demonstrates several things:

- Vince approached Nasser about lending him money, although he had a lender, promising a lower interest rate because he wanted to make money on his money.

- The money he lent had nothing to do with their partnership as there were separate contracts, which means that Vince knew that Nasser would continue with his own business ventures.

- Nasser has more than followed through on both loans, even allowing himself to be wronged by paying the $200K within 3 months when that was not the term of the contract nor had he ever been late in making a payment. Vince kept 3 months prepayment penalty he was not entitled to.

- Vince never followed through with getting the signed contracts to Vivian for the properties he demanded Nasser get financing for in 90 days. Lot loans take up to 60 days to get financing. As a result of his actions, he is now trying to back-charge Nasser for 14%.

- Vince claimed he did not agree to the original contract because he did not want me involved in the listing or purchasing of properties. This is a falsehood as is proven by the documentation on the next fax.

While I realize that you brothers are being inundated by information, we have no choice. We have continually been harassed, slandered and cheated by Vince Sadler. No matter what we prove is a lie, he makes another accusation and we are back at square one.

The reason I am sending you this paperwork today is because Nasser is sick. His immune system finally crashed under the stress and he can barely talk and is coughing continually. He will still make the meeting with the brothers, as he is not contagious, but he asked me to take care of this as he is just too tired. He doesn't have much left to give and I am hoping this will be dealt with in a timely manner. Thank you for your patience as I will have several more faxes to send as I continue to get documentation.

Sincerely,

Nancy K. Bashiri

*Nasser Bashiri*
*451 Lakeland Dr.*
*Unit G6*
*Hot Springs, AR  71913*
*501-762-2828*

| | | |
|---|---|---|
| **DATE:** | **April 24, 2007** | |
| **TO:** | **Br. Robert Haight** | **Fax:  501-624-1649** |
| | **Br. Joel Wall** | **Fax:  810-885-4657** |
| **FROM:** | **Nasser Bashiri** | **Fax:  501-520-0239** |
| **RE:** | **Rent Check for H2 dated 7/31/06** | |

Dear Brothers:

During our meeting with the elders in Chicago during October, Br. Franklin Bullock (Nancy was there during that portion of the meeting) told me that Vince had told him that I had received the rent for H2.  I produced the attached copy which I received from Hot Springs Property Management Co. showing that the rent check had gone directly to Vince at ARC Investments in Chicago.

The false information that Vince gave the brothers, was again, never addressed.  I have never received an apology for either the $200K loan he said I did not pay, or the fact that he was the one that received the rent check.

Please note that this was around the time that Farhad and Farzaneh Panahi were visiting. This is why I told them that Vince had said he would not give me any of the rent or apply it to the mortgage.

*I am faxing only to Br. Wall as there are numerous amounts of documentation and I do not want to take all of Br. Haight's paper and ink as these go directly to Br. Wall's efax and do not require printing. Much of this documentation was provided to Br. Haight previously.*



13050

Hot Springs Property Mgmt Co. • Hot Springs Homeowner Trust Acct.

Check To : ARC INVESTMENTS INC

Check for Property: H2LKLDHRB, H2 LAKELAND HARBOR

| | |
|---|---|
| Date : 31-Jul-06 | Check Amount : 6812.00 |
| Check payment for Period: 07/2006 | Check Number : 013050 |
| | SDW# : 000575 |

*Nasser Bashiri*
*451 Lakeland Dr.*
*Unit G6*
*Hot Springs, AR  71913*
*501-762-2828*

**DATE:**  **April 24, 2007**

**TO:**  **Br. Robert Haight**  **Fax: 501-624-1649**
**Br. Joel Wall**  **Fax: 810-885-4657**

**FROM:**  **Nasser Bashiri**  **Fax: 501-520-0239**

**RE:**  **Documentation for $185,868.63 that Vince Sadler Owes Nasser**

Dear Brothers:

Attached is the documentation that was sent to the elders in Chicago on December 17, 2006 after I had informed them I would not follow through with the agreement if Vince did not provide what he was supposed within 48 hours.  This is in regards to the money I was owed that the brothers encouraged me to allow myself to be wronged for prior to the October written agreement.  I just wanted you to see that I have not taken anything from Vince nor have I made any money off of him.  The opposite is true.  He made money off of me, as I have continually proven and he refuses to acknowledge that he owes me anything, although his own spreadsheet shows I paid him.

When Alex Alridge and Rudy Zarate contacted me regarding this, Alex angrily asked me, "Will you be happy if you get your money!"  I said, "Yes, I would."  Alex responded, "You'll get your money".

I have repeatedly been asked by elders from both the Chicago congregation and the Hot Springs congregation what I feel it would take to resolve this.  I have told them that I want him to give me my money and I will give him his.  "His" refers to the down payments that he put on Heritage Bay, Aviano and Quartz Cove (The Quarry).  He already has a lien against my property in Palmira and will get his money when it is sold.

That money includes all the properties I paid for in his name, including the lots in Sedona, which I already informed the brothers as of November 20th I would not be purchasing, since Vince made no attempt to follow through with signing and returning the contracts.

*I am faxing only to Br. Wall as there are numerous amounts of documentation and I do not want to take all of Br. Haight's paper and ink as these go directly to Br. Wall's efax and do not require printing. Much of this documentation was provided to Br. Haight previously.*

*Nasser Bashiri*
*451 Lakeland Dr.*
*Unit G6*
*Hot Springs, AR  71913*
*501-762-2828*

**DATE:**    **April 24, 2007**

**TO:**    **Br. Robert Haight**          **Fax:  501-624-1649**
           **Br. Joel Wall**            **Fax:  810-885-4657**

**FROM:**   **Nasser Bashiri**           **Fax:  501-520-0239**

**RE:**    **Certified Letter from Vince Sadler and Faxes to Vince Sadler**

Dear Brothers:

Attached is the only certified letter we received from Vince Sadler.  Elizabeth picked it up for us from the post office while we were out of town.

Although it says that Vince has completed getting everything I required (please note the date of November 27th), neither Br. Aldridge nor Br. Zarate ever produced this information.  As I've proven in previous faxes, Vivian Bishop never received either signed contract from Vince.

This letter was produced after my repeated attempts to get Vince to follow through with his end of the agreement and then ultimately, I stopped paying him because he was in default.  It was only when I stopped paying him that he responded.

Per the faxed letters I have attached, please note the one dated November 20, 2006 where after repeated attempts, I gave Vince a 48 hour deadline.  Also please see the email he sent to Vivian Bishop regarding the contracts for the lots on November 18, 2006 where he refuses to sign as agreed and where I am accused of "creative financing".  I have attached the other faxes I sent showing repeated attempts on my part.

*I am faxing only to Br. Wall as there are numerous amounts of documentation and I do not want to take all of Br. Haight's paper and ink as these go directly to Br. Wall's efax and do not require printing. Much of this documentation was provided to Br. Haight previously.*

**Vincent Sadler**
**1902 N. Kenmore Ave**
**Chicago, IL 60614**
**773-744-4766**


**<u>VIA CERTIFIED MAIL</u>**
**<u>Letter plus attached = 4 pages</u>**

November 27, 2006

Nasser Bashiri
451 Lakeland Dr., G6
Hot Springs, AR 71913

Dear Nasser,

I have completed getting everything you required from our agreement.

*no proof any existed of this at the time*

    a.    Sales Contract for 28658 San Lucas Ln
    b.    Articles of Incorporation (paperwork)
    c.    A check for $20,000 for Morphew Road
    d.    A check for $40,000 for 28677 San Lucas Ln purchase
    e.    The proposed other adjustments (previously faxed, but also included with this letter, 3 pages)

I have given all this paperwork to Brother Zarate and Brother Aldridge.

I am now awaiting the things you need to provide:

    a.    Sales Contract for 28677 San Lucas Ln *(not necessary if Quit Claiming property)*
    b.    Quit Claim Deed for 14630 Meravi Dr
    c.    Provide the actual plans for 60 LaBarranca (not faxed copy)
    d.    A check for $10,000 for J4 sales proceeds
    e.    A check for $50,000 for Back 'O Beyond property
    f.    Any information on Aviano at Desert Ridge financing
    g.    Please sign and return the proposed other adjustments (included with this letter, 3 pages)

Once you have these things, please forward to the Body of Elders at North Congregation. They agreed to make this a smooth transition.

Thank you in advance for your cooperation. If you have any further questions, feel free to email me.

Sincerely,


Vincent Sadler

*Nasser Bashiri*
*451 Lakeland Dr.*
*Unit G6*
*Hot Springs, AR  71913*
*501-762-2828*

---

**DATE:**    April 24, 2007

**TO:**    **Br. Robert Haight**          **Fax:  501-624-1649**
             **Br. Joel Wall**            **Fax:  810-885-4657**

**FROM:**   **Nasser Bashiri**            **Fax:  501-520-0239**

**RE:**    **ARC Investments vs. Vincent Sadler**

---

Dear Brothers:

As you know, the properties which were under Vince's name only but which I was paying for was supposed to be under ARC Investments.  Vince wanted them in ARC Investments, supposedly, so that we would be protected.

As you also are aware, per the tax records I showed, the properties continued to be solely in Vince Sadler's name.  However, I was required to make my payments for the properties directly payable to ARC Investments.

The rents from the properties that he received were also made out to ARC Investments and not Vincent Sadler.  I brought this to the Body of Elders attention in Chicago before signing the contract dated October 2006.  I also mentioned that the spreadsheet Vince provided me does not show ARC Investment letterhead, or tax number, or Vince's social security number.  Therefore, this sheet is not acceptable by the IRS.  Because of that I cannot claim the interest I paid for the properties as a deduction for my income tax.  The brothers did not respond to this concern.  They only had interest in Vince's concern as the contract shows.

I would like to know the reason for this, since ARC Investments does not own the properties that he demanded the payments be made to the corporation.  I have asked over and over again to be provided with documentation that he claimed the interest that he received from me to ARC Investments.  If the IRS audits ARC Investments, I will be in danger of answering the IRS regarding the income that ARC Investments received in 2006.  I cannot connect ARC Investments to the properties because the properties are under Vince's name only.

Even though Vince provided copies of the ARC Investments bank statements which show "c/o Vincent Sadler", this does not provide any evidence of what the funds were for that went in and out of the account. On the bank statements, there are funds that cannot be accounted for as part of our partnership. I have asked for bookkeeping or a General Ledger repeatedly before the contract, during the contract and after the contract. This has not been produced. Since there is a problem if someone "commingles funds" and since Vince has claimed that I am an officer of ARC Investments, while he is the President, I could be liable to the IRS and the Federal Government for his actions which I am not able to determine as I have no records regarding ARC Investments, nor any authority or signatory authorization on the ARC Investments account.

I am sure you can appreciate the seriousness of this situation, especially after checking on the Illinois website for corporations and seeing that ARC Investments was "not in good standing".

Sincerely,

Nasser Bashiri

Nasser Bashiri

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR 71913**

DATE:        April 27, 2007

TO:          Br. Joel Wall                              FAX: 810-885-4657
             Br. Robert Haight                          FAX: 501-624-1649

FROM:        Nancy Bashiri

RE:          Vince's Claim that Nancy promised him half of her referrals

This is a follow up to the fax I sent to Br. Wall with all of the Purchase Contracts, Listing Contracts and correspondence regarding the Sedona properties. I had included an email sent to Gina Tartamella from Vince Sadler in which he clearly stated that he had never said that I promised him half of my referrals. I also included the letter that my broker in Arizona sent to the broker that Vince called in Arkansas.

This was in regards to properties that Nasser and Vince were purchasing through Donna Meadows. I was getting a referral from her for bringing her clients. There was an agreement between my broker in Arizona and hers in Arkansas. This does not have anything to do with the client as it is a referral given from broker to broker in appreciation for business. According to both Arizona and Arkansas Real Estate Laws and Regulations, a non-licensed person is never to receive 'any compensation" in a real estate transaction.

If any agent is found guilty of promising someone money that is not a licensed real estate agent, they can either lose their license or have it suspended.

I spoke with Bob Benscoter, Broker for Crye-Leike Realtors this morning and he confirmed that Vince Sadler had spoken to him about that and that he had told Donna as she was the agent for Vince and Nasser on the Lakeland and Lighthouse Condominiums. He does not want to put anything in writing, but said that he will be happy to confirm the conversation verbally, as long as I give him a "heads up" as to who will be calling and when. He does not know we are Witnesses and he does not know Vince is a Witness. He believes that Nasser and Vince are just mediating some stuff having to do with their partnership.

I have attached an email from Donna Meadows with her account of what happened. Vince had also told Nasser that he wanted half my referrals from the properties in Florida and said that is why he told Glenn Ginsburg/A Delta Realty that he didn't want me getting any referrals. Again, not his decision to make as it does not affect him nor does it come out of his pocket.

Since I have had to face this accusation more than once and informed the brothers in Chicago of this situation, copying them on the letter from my broker and this was not addressed, I feel it is necessary as this accusation could have destroyed my employment and reputation in two states. It is important to show that he has lied regarding business matters.

INBOX        Compose        Addresses

**nancybashiri@cablelynx.com**

Folders        Options

Current Folder: **INBOX**

**Welcome:** nancybashiri@cablelynx.com

Calendar

✉ Message List | 🗑 Delete                   ⬅ ➡          ↩ Forward | ↩ Reply | ↩ Reply All | ↪

| | |
|---|---|
| **Subject:** | Crye-Leike Realtors |
| **From:** | "Donna Meadows" <dialdonna@sbcglobal.net> |
| **Date:** | Fri, April 27, 2007 10:34 am |
| **To:** | nancybashiri@cablelynx.com |
| **Priority:** | Normal |
| **Options:** | View Full Header | View Printable Version | View as HTML | Allow Sender | Block Sender| Add to Addressbook |

To Whom: My broker Bob Benscoter, approached me Aug. 26, 2006, for information in
re. to a discussion, he had with Vince Sadler, and was told by him that he had more
than usual interest in what transpaired with Crye-Leike because Nancy Bashiri has
promised him half of her referal fee. Commission checks are made to Brokers
referrals are handled by Brokers only. Donna Meadows @Crye Leike Principle Broker
is Bob Benscoter

From: Donn Meadows

                    Download this as a file

**Attachments:**

untitled-[2]              **0.5 k**              [ text/html ]              Download | View

                    Delete & Prev | Delete & Next

              Move to: INBOX ▼  Move

**Nasser Bashiri**
**451 Lakeland Dr.**
**Unit G6**
**Hot Springs, AR  71913**

DATE:        April 30, 2007

TO:          Br. Joel Wall                          FAX:  810-885-4657
             Br. Robert Haight                      FAX:  501-624-1649

FROM:        Nancy Bashiri

RE:          Vince's Claim that  Nancy promised him half of her referrals

Dear Brothers:

Please see the following attached documents:

1.  Note for $200,000 between Nasser Bashiri and Vincent Sadler. Please see date loan was
    due and the fact it was "6 months guaranteed interest". Vince insisted Nasser give him the
    money within a month or two after the Note was initiated. He said that he needed the
    money. Nasser already had a loan with a private lender in Sedona for 10%. As you will
    recall from previous email from Vivian Bishop of Capital Title Agency, Vince wanted to
    lend money. He told Nasser he would give him the money for 8%. This loan was for
    Nasser's personal real estate projects. The loan he had with the private lender would have
    been long enough for the project he was involved in. Please see the date that Vince agreed
    to loan the money until. After Vince received the money from Nasser, he put $360,000
    down payments for the H units at Lakeland Harbor. He then charged Nasser 10.5% for half
    of that. Vince was not required to put down 30% on the properties, only 10%. It clearly
    shows that he was not happy with the interest of 8% on the $200,000 he loaned Nasser and
    that he found a way to get a higher interest rate. This relates to the current contract as proof
    that he never intended on following through with the contract for the $200K and didn't. It
    also shows that getting the most interest he can on his money is important enough for him
    to manipulate things. He then claimed that Nasser did not pay the $200K back to the
    Brothers in Chicago. Even after Nasser showed them proof that he had and not only had
    paid it back but had to pay a pre-payment penalty, which Vince kept...even though Vince
    was the one who called the loan. Please see the payment schedule and see that Nasser did
    not default on the loan and out of kindness gave Vince his money, even though he was not
    required to according to the contract.

2.  Note for $100,000 between Nasser Bashiri and Vincent Sadler. Please see date loan is due
    and payments that have been made on time. Nasser is still paying this loan and has not
    missed a payment or been late. Even so, Vince or Debbie called Vivian Bishop and tried to
    call the note which is not due until July of 2008. Please see email from Vivian Bishop
    explaining that they cannot call the Note unless Nasser is in default.

3.    These are two contracts Nasser had with Vince Sadler, at Vince's request to lend money for interest that had nothing to do with their partnership. What it does prove, however, is that although Vince expects Nasser to follow through with whatever Vince wants, he does not feel it is incumbent upon him to do anything.

If Vince has –

- lied about the original agreement saying he didn't agree because he didn't want me to be involved in the purchase/sale of any of their properties,

- called a Note that was not due in order to get a higher interest rate from Nasser (even though Nasser already had the loan with someone else and it cost him his project) and kept the pre-payment penalty Nasser was charged because he paid it early,

- tried to call another Note for $100,000 almost a year and a half early, even though Nasser has never missed or been late on a payment,

- lied about the fact that I promised him half of my referrals and then lied about the fact he said it,

- accused Nasser of making money off him even though he received $104,000 of profit in 2006,

- required that Nasser give up the $185,000 he got from Nasser for properties in his name only without Nasser receiving anything from his month, although he expected to receive money back and charge any interest rate he wanted,

- told Nasser to get financing for both Sedona lots in 90 days or he'd half to pay 14% and then did not provide signed contracts,

- slandered Nasser about "creative financing" to Vivian at Capital Title Agency,

- never provided Articles of Corporation or General Ledger or any proof of where the funds had gone for ARC Investments….etc., etc., etc……

Why is he able to continue to make false accusations and charges against Nasser no matter how many times we have proven with documents that those accusations had no basis? We dropped all charges against him at the brothers' advice that it was the "wise and scriptural course" according to Matthew 18.

It was after that that he re-initiated the charge of slander that Br. Haight had told us he was willing to drop and that Farhad Panahi told Nasser; Vince had called him 3 months ago and told him he had dropped. Although we spoke about the situation with Vince to the Panahi's, we never lied about him. As we found out (I forwarded a copy of the email I sent on July 30, 2006), Farhad was angry at Nasser because of the situation we had with them, not Vince. He was angry that I had called their elders (at Farzaneh's numerous requests because she was supposedly afraid of him and wanted them to come meet without Farhad's knowing it was at her request). I can prove all of this, if necessary.

Farzaneh never told Farhad that she was the one that requested I call....Nasser and Elizabeth can verify her phone calls...and he still believes that I just called their elders out of the blue telling them they had marital problems. The call I followed up with after they left was so that their elders would have the whole picture as I felt I had been lied to by Farzaneh, per other conversations we had and her attitude and dealing with Farhad in front of us. Nasser never brought any of that up and apologized to Farhad for talking about the situation with Vince.

As you are aware, Farhad claims he remembers nothing (not a single word or phrase) he told Vince or the elders....strange that he would have remembered everything that Nasser said in detail several months after they'd been here. Farhad claimed he saw Vince a few days after they returned from Arkansas. That would have been in August. I believe it was several months after, otherwise the accusation would have come up before and during our meetings with the brothers in Chicago, particularly at the two 5 hour meetings in October.

Nasser has not contacted Vince as he can barely talk without coughing. I took him to the doctor today and they put him on medication.

Just so that you are aware, we have a tape of the phone conversation that Vince accidentally left on our Voice Mail of him speaking to Alex Aldridge of North Congregation before anything ever went to elders where he says he wants all the properties in his name so that Nasser can't take any loans out, etc. Alex is chuckling in the background. This is the conversation that Vince vehemently denied he had when Nasser questioned him about it in front of the elders, raising his voice. When Nasser turned and asked Alex, Alex would not answer. Alex Aldridge became a part of the Committee after that phone conversation and was a personal friend of Vince's.

Why would Vince feel he had to say anything about putting properties in his name only because he was afraid Nasser would take out loans, if he had never agreed to the original contract stating that the properties would be put in both of their names?

Sincerely,


Nancy Bashiri

# EXHIBIT Q



SERVICES     PROGRAMS     PRESS     PUBLICATIONS     DEPARTMENTS     CONTACT

## CORPORATION FILE DETAIL REPORT

| | | | |
|---|---|---|---|
| **Entity Name** | ARC INVESTMENTS, INC. | **File Number** | 64383205 |
| **Status** | NOT GOOD STANDING | | |
| **Entity Type** | CORPORATION | **Type of Corp** | DOMESTIC BCA |
| **Incorporation Date (Domestic)** | 08/04/2005 | **State** | ILLINOIS |
| **Agent Name** | VINCENT SADLER | **Agent Change Date** | 06/08/2006 |
| **Agent Street Address** | 1902 N KENMORE | **President Name & Address** | |
| **Agent City** | CHICAGO | **Secretary Name & Address** | |
| **Agent Zip** | 60614 | **Duration Date** | PERPETUAL |
| **Annual Report Filing Date** | 00/00/0000 | **For Year** | 2006 |

**Return to the Search Screen**

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE



SERVICES     PROGRAMS     PRESS     PUBLICATIONS     DEPARTMENTS     CONTACT

## CORPORATION FILE DETAIL REPORT

| | | | |
|---|---|---|---|
| **Entity Name** | ARC INVESTMENTS, INC. | **File Number** | 64383205 |
| **Status** | DISSOLVED | | |
| **Entity Type** | CORPORATION | **Type of Corp** | DOMESTIC BCA |
| **Incorporation Date (Domestic)** | 08/04/2005 | **State** | ILLINOIS |
| **Agent Name** | VINCENT SADLER | **Agent Change Date** | 06/08/2006 |
| **Agent Street Address** | 1902 N KENMORE | **President Name & Address** | |
| **Agent City** | CHICAGO | **Secretary Name & Address** | INVOLUNTARY DISSOLUTION 01 02 07 |
| **Agent Zip** | 60614 | **Duration Date** | PERPETUAL |
| **Annual Report Filing Date** | 00/00/0000 | **For Year** | 2006 |

**Return to the Search Screen**

BACK TO CYBERDRIVEILLINOIS.COM HOME PAGE

Attached is the sheet for billing for February 2006 for ARC Investments.

Please let me know if you have any questions. Your checks should be made payable to ARC Investments and be mailed to Debra MacDonald, 4219 N. Pulaski Rd., #3F, Chicago, IL 60641.

Nasser - the amount of your check should be $7,594.58

Vincent - the amount of your check should be $4,506.99

Debra L. MacDonald

_____

Download today's top songs at MSN Music from artists like U2, Eminem, & Kelly Clarkson

not showing the Interest Rate and
balance or any Information

Debra L. MacDonald
4219 N. Pulaski Rd., #3F
Chicago, IL 60641


July 19, 2006

Nasser Bashiri
451 Lakeland Drive, G6
Hot Springs, AR  71913

Dear Nasser,

In response to your letters dated July 17, 2006, I spoke to Vincent about your request for
a 1099 for tax year 2005. He said there was no conversation about a 1099. First, because
as your accountant should be informing you, this is not the way this works. The interest
you and Vincent pay is split, equally, you are to state your interest paid to your
accountant. The monthly sheet I provided you lists the totals each month. I knew this but
I called the accountant to check, and he confirmed this, and that you both report your
interest to your personal accountant. No 1099 is implied here.

All of the ARC Investment bank statements are in the files here in Chicago and are
available to you. Your request for copies of all the statements will be handled when I
have some time to get them copied and mailed. I do hope this will be okay, as I handle
requests from both you and Vince and try to in a timely manner.

Also, just wanted to remind you of our previous conversations about sending a "set
amount" each month, so it can arrive here in Chicago before I mail all the property
mortgage payments, etc. An amount of $15,000 would be good for the August 1, 2006
payments. This should alleviate getting your payment check late. If the amount if more or
less, this can be easily adjusted for each month accordingly. The majority of our
payments are due on the first of each month.

Though I wish for there to be a smooth flow of transactions between you and Vincent and
I understand the stressful nature you both must be under, I want to do everything I can to
help.

I just wanted to remind you of the importance of all the transactions being consistent
(done the same way each time). This means any income (rent, etc) must come to the
account set up for ARC Investments and be deposited. This makes it very easy to find
and account for.

Sincerely,

Debra MacDonald

**Fifth Third Bank**

(CHICAGO)
P.O. BOX 630900 CINCINNATI OH 45263-0900

ARC INVESTMENTS
C/O VINCENT SADLER
4219 N PULASKI RD
CHICAGO IL 60641-2337

20

1764

Statement Period Date: 6/1/2006 - 6/30/2006
Account Type: Totally Free Bus Ckg
Account Number: 7232363510

Relationship Manager Name: William Dean
Phone: 312-756-5545
Commercial Client Services: 1-800-589-5355
www.53.com

---

## Account Summary - 7232363510

| Date | | Amount | | |
|------|------|--------|---|---|
| 06/01 | Beginning Balance | $8,335.87 | Number of Days in Period | 30 |
| 20 | Checks | $(45,511.91) | | |
| 1 | Withdrawals / Debits | $(36.00) | | |
| 7 | Deposits / Credits | $57,467.85 | | |
| 06/30 | Ending Balance | $20,255.81 | | |

---

### Checks

20 checks totaling 45,511.91

* indicates gap in check sequence    i = Electronic image    s = Substitute Check

| Number | Date Paid | Amount | Number | Date Paid | Amount | Number | Date Paid | Amount |
|--------|-----------|--------|--------|-----------|--------|--------|-----------|--------|
| 1029 | 06/06 | 1,569.00 | 1042 | 06/14 | 355.00 | 1051 | 06/12 | 3,986.94 |
| 1035* | 06/06 | 1,985.16 | 1043 | 06/09 | 333.00 | 1052 s | 06/22 | 3,560.00 |
| 1036 | 06/06 | 3,223.36 | 1045* | 06/09 | 1,780.00 | 1053 | 06/14 | 1,476.25 |
| 1037 s | 06/06 | 2,705.38 | 1046 | 06/08 | 1,075.95 | 1054 s | 06/21 | 964.60 |
| 1038 | 06/12 | 1,302.54 | 1047 | 06/07 | 719.00 | 1064* | 06/30 | 2,809.46 |
| 1039 | 06/12 | 1,265.03 | 1048 | 06/06 | 1,319.99 | 1069* | 06/30 | 10,000.00 |
| 1041* | 06/01 | 1,569.00 | 1050*s | 06/14 | 3,512.25 | | | |

---

### Withdrawals / Debits

1 item totaling $36.00

| Date | Amount | Description |
|------|--------|-------------|
| 06/26 | 36.00 | DAILY OVERDRAFT FEE |

---

### Deposits / Credits

7 items totaling $57,467.85

| Date | Amount | Description |
|------|--------|-------------|
| 06/02 | 6,456.88 | DEPOSIT |
| 06/12 | 12,128.12 | DEPOSIT |
| 06/13 | 1,800.00 | Florida Homes RENT 345-S4-8845 061306 |
| 06/27 | 9,282.85 | DEPOSIT |
| 06/28 | 1,800.00 | DEPOSIT |
| 06/28 | 10,000.00 | DEPOSIT |
| 06/28 | 16,000.00 | DEPOSIT |

---

### Daily Balance Summary

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 06/01 | 6,766.87 | 06/09 | (1,487.09) | 06/22 | (3,981.58) |
| 06/02 | 13,223.75 | 06/12 | 4,086.52 | 06/26 | (4,017.58) |
| 06/06 | 2,420.86 | 06/13 | 5,886.52 | 06/27 | 5,265.27 |
| 06/07 | 1,701.86 | 06/14 | 543.02 | 06/28 | 33,065.27 |
| 06/08 | 625.91 | 06/21 | (421.58) | 06/30 | 20,255.81 |

---

NEW! PURCHASES MADE WITH YOUR DEBIT CARD BEFORE 6 PM CENTRAL TIME ON BUSINESS DAYS WILL BE DEDUCTED FROM YOUR ACCOUNT THAT EVENING. PURCHASES MADE AFTER 6 PM OR ON WEEKENDS AND HOLIDAYS WILL BE DEDUCTED THE FOLLOWING BUSINESS DAY. USE YOUR DEBIT CARD ANYWHERE JEANIE(R) OR MASTERCARD(R) IS ACCEPTED. IT'S EASY TO USE!

**Page 1 of 2**

# Fifth Third Bank

(CHICAGO)
346 WEST CAROL LANE ELMHURST IL 60126

ARC INVESTMENTS
1902 N KENMORE
CHICAGO IL 60614-4918

0

16854

Statement Period Date: 9/22/2005 - 9/30/2005
Account Type: Totally Free Bus Ckg
Account Number: 7232363510

Relationship Manager Name: William Dean
Phone: 312-756-5545
Commercial Client Services: 1-800-589-5355
www.53.com

||.|..||..|..||.|..||.|..||.|..||..||.||.||..||.||..||.||.||.|||

## Account Summary - 7232363510

| Date | Description | Amount | | |
|------|-------------|--------|---|---|
| 09/22 | Beginning Balance | $0.00 | Number of Days in Period | 9 |
| | Checks | | | |
| | Withdrawals / Debits | | | |
| | Deposits / Credits | | | |
| 09/30 | Ending Balance | $0.00 | | |

CHECK FRAUD IS A RISK THAT BUSINESSES CAN NO LONGER IGNORE. HELP PROTECT YOUR COMPANY AGAINST UNAUTHORIZED OR FRAUDULENT CHECK ACTIVITY WITH FIFTH THIRD POSITIVE PAY. FOR MORE INFORMATION CONTACT YOUR RELATIONSHIP MANAGER OR TREASURY MANAGEMENT SPECIALIST. MEMBER FDIC.

Suggested instructions for balancing either your checking or savings account.

1. Enter Ending Balance from statement.                    (1) $ _____

2. List Deposits / Credits made after statement date:

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| | | | |
| | | | |
| | | | |

Enter total of above Deposits/Credits.                     (2) $ _____

3. Compute sub-total (#1 plus #2).                         (3) $ _____

4. List Checks and Withdrawals / Debits not yet paid by bank:

| Check #/Date | Amount | Check #/Date | Amount |
|--------------|--------|--------------|--------|
| | | | |
| | | | |
| | | | |

Enter total of above Checks and Withdrawals / Debits.      (4) $ _____

5. Subtract line 4 from line 3. This should be your present account balance. (5) $ _____

### Having trouble balancing your statement?

If revised bank balance is MORE than your checkbook balance:

a) Have you verified your addition and subtraction above and in your checkbook?
b) Does the above list include all of your outstanding checks, withdrawals and debits?
c) Have you added all ATM deposits in your checkbook?
d) Have you added all credits and advances in your checkbook?

If revised bank balance is LESS than your checkbook balance:

a) Have you verified your addition and subtraction above and in your checkbook?
b) Have you deducted service and other bank charges in your checkbook?
c) Have you deducted all ATM withdrawals in your checkbook?
d) Have you deducted all credit line and preauthorized payments in your checkbook?

### ERROR RESOLUTION PROCEDURE FOR ELECTRONIC TRANSACTIONS

If you believe there is an error on your statement or receipt, or if you need more information about a transaction, please contact us as soon as you can. You can call us at 1-800-972-3030, or write us at Fifth Third Bank Customer Service; Madisonville Operations Center; Mail Drop 1MOC3A; Cincinnati, OH 45263, or visit your nearest Fifth Third Banking Center. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. (1) Tell us your name and account number. (2) Describe the error or the transaction you are unsure about and explain as clearly as you can why you believe there is an error or why you need more information. (3) Tell us the dollar amount of the suspected error. We will investigate your complaint and will correct any error promptly. If we take more than 10 business days (or 20 business days for a new account) to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

00A0N / FTCH / 20050930 / 5051 / 16854

**Page 1 of 2**

## Fifth Third Bank

(CHICAGO)
P.O. BOX 630900 CINCINNATI OH 45263-0900

ARC INVESTMENTS
1902 N KENMORE
CHICAGO IL 60614-4918

**0**

17072

ılıllıllıllıll

Statement Period Date: 10/1/2005 - 10/31/2005
Account Type: Totally Free Bus Ckg
Account Number: 7232363510

Relationship Manager Name: William Dean
Phone: 312-756-5545
Commercial Client Services: 1-800-589-5355
www.53.com

### Account Summary - 7232363510

| Date | | Amount | | |
|---|---|---|---|---|
| 10/01 | Beginning Balance | $0.00 | Number of Days in Period | 31 |
| | Checks | | | |
| | Withdrawals / Debits | | | |
| 1 | Deposits / Credits | $1,219.06 | | |
| 10/31 | Ending Balance | $1,219.06 | | |

### Deposits / Credits

**1 item totaling $1,219.06**

| Date | Amount | Description |
|---|---|---|
| 10/13 | 1,219.06 | DEPOSIT |

### Daily Balance Summary

| Date | Amount |
|---|---|
| 10/13 | 1,219.06 |

CHECK FRAUD IS A RISK THAT BUSINESSES CAN NO LONGER IGNORE. HELP PROTECT YOUR COMPANY AGAINST UNAUTHORIZED OR FRAUDULENT CHECK ACTIVITY WITH FIFTH THIRD POSITIVE PAY. FOR MORE INFORMATION CONTACT YOUR RELATIONSHIP MANAGER OR TREASURY MANAGEMENT SPECIALIST. MEMBER FDIC.

00AR1 / FICH / 20051031 / 5051 / :7072

**Page 1 of 2**

**Fifth Third Bank**

(CHICAGO)
P.O. BOX 630900 CINCINNATI OH 45263-0900

ARC INVESTMENTS
1902 N KENMORE
CHICAGO IL 60614-4918

Statement Period Date: 11/1/2005 - 11/30/2005
Account Type: Totally Free Bus Ckg
Account Number: 7232363510

Relationship Manager Name: William Dean
Phone: 312-756-5545
Commercial Client Services: 1-800-589-5355
www.53.com

0

16817

## Account Summary - 7232363510

| | | | | |
|------|------------------|-----------|---------------------------|-----|
| 11/01 | Beginning Balance | $1,219.06 | Number of Days in Period | 30 |
| | Checks | | | |
| | Withdrawals / Debits | | | |
| 2 | Deposits / Credits | $3,346.44 | | |
| 11/30 | Ending Balance | $4,565.50 | | |

### Deposits / Credits

2 items totaling $3,346.44

| Date | Amount | Description |
|-------|----------|-------------|
| 11/16 | 739.67 | DEPOSIT |
| 11/28 | 2,606.77 | DEPOSIT |

### Daily Balance Summary

| Date | Amount | Date | Amount |
|-------|----------|-------|----------|
| 11/16 | 1,958.73 | 11/28 | 4,565.50 |

CHECK FRAUD IS A RISK THAT BUSINESSES CAN NO LONGER IGNORE. HELP PROTECT YOUR COMPANY AGAINST UNAUTHORIZED OR FRAUDULENT CHECK ACTIVITY WITH FIFTH THIRD POSITIVE PAY. FOR MORE INFORMATION CONTACT YOUR RELATIONSHIP MANAGER OR TREASURY MANAGEMENT SPECIALIST. MEMBER FDIC.

# Fifth Third Bank

(CHICAGO)
P.O. BOX 630900 CINCINNATI OH 45263-0900

ARC INVESTMENTS
1902 N KENMORE
CHICAGO IL 60614-4918

2

1955

Statement Period Date: 12/1/2005 - 12/30/2005
Account Type: Totally Free Bus Ckg
Account Number: 7232363510

Relationship Manager Name: William Dean
Phone: 312-756-5545
Commercial Client Services: 1-800-589-5355
www.53.com

---

## Account Summary - 7232363510

| 12/01 | Beginning Balance | $4,565.50 | Number of Days in Period | 30 |
|---|---|---|---|---|
| 2 | Checks | $(2,606.77) | | |
| 2 | Withdrawals / Debits | $(411.68) | | |
| 1 | Deposits / Credits | $1,400.00 | | |
| 12/30 | Ending Balance | $2,947.05 | | |

---

### Checks

2 checks totaling 2,606.77

\* Indicates gap in check sequence    i = Electronic Image    s = Substitute Check

| Number | Date Paid | Amount | Number | Date Paid | Amount |
|---|---|---|---|---|---|
| 0000 | 12/01 | 661.00 | 0000* | 12/01 | 1,945.77 |

---

### Withdrawals / Debits

2 items totaling $411.68

| Date | Amount | Description |
|---|---|---|
| 12/20 | 350.00 | TELEPHONE INITIATED PAYMENT AT WESTMINSTER MORT PAYMENT 004548A00005801 122005 |
| 12/21 | 61.68 | DELUXE BUS SYS. BUS PRODS 19473475 VINCENT SADLER 122105 |

---

### Deposits / Credits

1 item totaling $1,400.00

| Date | Amount | Description |
|---|---|---|
| 12/14 | 1,400.00 | DEPOSIT |

---

### Daily Balance Summary

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 12/01 | 1,958.73 | 12/20 | 3,008.73 | 12/21 | 2,947.05 |
| 12/14 | 3,358.73 | | | | |

---

CHECK FRAUD IS A RISK THAT BUSINESSES CAN NO LONGER IGNORE. HELP PROTECT YOUR COMPANY AGAINST UNAUTHORIZED OR FRAUDULENT CHECK ACTIVITY WITH FIFTH THIRD POSITIVE PAY. FOR MORE INFORMATION CONTACT YOUR RELATIONSHIP MANAGER OR TREASURY MANAGEMENT SPECIALIST. MEMBER FDIC.

DDA001 / PPCH / 20051230 / 7081 / 1955

SEP 29, 2005 22:58     7732678982     page 4

 **Fifth Third Bank**
(CHICAGO)
P.O. BOX 630900 CINCINNATI OH 45263-0900



ARC INVESTMENTS
C/O VINCENT SADLER
4219 N PULASKI RD
CHICAGO IL 60641-2337                                        8

1910

Statement Period Date: 3/1/2006 - 3/31/2006
Account Type: Totally Free Bus Ckg
Account Number: 7232363510

Relationship Manager Name: William Dean
Phone: 312-756-5545
Commercial Client Services: 1-800-589-5355
www.53.com

## Account Summary - 7232363510

| 03/01 | Beginning Balance | $3,842.60 | Number of Days in Period | 31 |
|---|---|---|---|---|
| 7 | Checks | $(28,446.93) | | |
| 4 | Withdrawals / Debits | $(9,813.95) | | |
| 6 | Deposits / Credits | $42,907.89 | | |
| 03/31 | Ending Balance | $8,489.61 | | |

## Checks

7 checks totaling 28,446.93

\* indicates gap in check sequence    i = Electronic Image    s = Substitute Check

| Number | Date Paid | Amount | Number | Date Paid | Amount | Number | Date Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| 1008 s | 03/10 | 2,527.37 | 1012* | 03/07 | 1,985.16 | 1018*s | 03/16 | 16,760.57 |
| 1009 | 03/13 | 960.99 | 1014*s | 03/07 | 3,223.36 | 1019 | 03/31 | 284.10 |
| 1010 | 03/14 | 2,705.38 | | | | | | |

## Withdrawals / Debits

4 items totaling $9,813.95

| Date | Amount | Description |
|---|---|---|
| 03/02 | 1,458.72 | FUNDS TRANSFER TO CL: 0090537036700026 REF # 00054237034 |
| 03/15 | 6,500.00 | DEBIT MEMO |
| 03/15 | 25.00 | SERVICE CHARGE |
| 03/27 | 1,830.23 | FUNDS TRANSFER TO IL: 008516B3748 REF # 00202991307 |

## Deposits / Credits

6 items totaling $42,907.89

| Date | Amount | Description |
|---|---|---|
| 03/03 | 7,585.61 | DEPOSIT |
| 03/08 | 16,760.57 | DEPOSIT |
| 03/14 | 671.51 | DEPOSIT |
| 03/14 | 10,673.20 | DEPOSIT |
| 03/15 | 6,500.00 | DEPOSIT |
| 03/27 | 717.00 | DEPOSIT |

## Daily Balance Summary

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 03/02 | 2,383.88 | 03/10 | 18,994.17 | 03/16 | 9,886.94 |
| 03/03 | 9,969.49 | 03/13 | 18,033.18 | 03/27 | 8,773.71 |
| 03/07 | 4,760.97 | 03/14 | 26,672.51 | 03/31 | 8,489.61 |
| 03/08 | 21,521.54 | 03/15 | 26,647.51 | | |

CHECK FRAUD IS A RISK THAT BUSINESSES CAN NO LONGER IGNORE. HELP PROTECT YOUR COMPANY AGAINST UNAUTHORIZED OR FRAUDULENT CHECK ACTIVITY WITH FIFTH THIRD POSITIVE PAY. FOR MORE INFORMATION CONTACT YOUR RELATIONSHIP MANAGER OR TREASURY MANAGEMENT SPECIALIST. MEMBER FDIC.

**Fifth Third Bank**

(CHICAGO)
P.O. BOX 630900 CINCINNATI OH 45263-0900

ARC INVESTMENTS
C/O VINCENT SADLER
4219 N PULASKI RD
CHICAGO IL 60641-2337

10

1B58

Statement Period Date: 4/1/2006 - 4/28/2006
Account Type: Totally Free Bus Ckg
Account Number: 7232363510

Relationship Manager Name: William Dean
Phone: 312-756-5545
Commercial Client Services: 1-800-589-5355
www.53.com

ldldllllllllllldllldldllldlldllldlldlllldllldlllldllldll

## Account Summary - 7232363510

| 04/01 | Beginning Balance | $8,489.61 | Number of Days in Period | 28 |
|---|---|---|---|---|
| 10 | Checks | $(14,155.36) | | |
| 1 | Withdrawals / Debits | $(2,155.34) | | |
| 6 | Deposits / Credits | $28,695.46 | | |
| 04/28 | Ending Balance | $20,874.37 | | |

### Checks

**10 checks totaling 14,155.36**

* Indicates gap in check sequence   i = Electronic Image   s = Substitute Check

| Number | Date Paid | Amount | Number | Date Paid | Amount | Number | Date Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| 1016 | 04/07 | 562.00 | 1023 | 04/04 | 2,705.38 | 1026 | 04/07 | 285.00 |
| 1020* | 04/10 | 204.75 | 1024 | 04/07 | 1,985.16 | 1027 | 04/25 | 1,627.37 |
| 1021 | 04/10 | 204.75 | 1025 | 04/04 | 3,223.36 | 1028 | 04/25 | 3,087.59 |
| 1022 | 04/14 | 270.00 | | | | | | |

### Withdrawals / Debits

**1 item totaling $2,155.34**

| Date | Amount | Description |
|---|---|---|
| 04/03 | 2,155.34 | FUNDS TRANSFER TO CL: 0090537036700026 REF # 00203053612 |

### Deposits / Credits

**6 items totaling $28,695.46**

| Date | Amount | Description |
|---|---|---|
| 04/04 | 6,570.49 | DEPOSIT |
| 04/06 | 9,523.08 | DEPOSIT |
| 04/18 | 1,800.00 | Florida Homes RENT 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 041806 |
| 04/25 | 651.89 | DEPOSIT |
| 04/26 | 150.00 | DEPOSIT |
| 04/26 | 10,000.00 | DEPOSIT |

### Daily Balance Summary

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 04/03 | 6,334.27 | 04/07 | 13,666.94 | 04/18 | 14,787.44 |
| 04/04 | 6,976.02 | 04/10 | 13,257.44 | 04/25 | 10,724.37 |
| 04/06 | 16,499.10 | 04/14 | 12,987.44 | 04/26 | 20,874.37 |

CHECK FRAUD IS A RISK THAT BUSINESSES CAN NO LONGER IGNORE. HELP PROTECT YOUR COMPANY AGAINST UNAUTHORIZED OR FRAUDULENT CHECK ACTIVITY WITH FIFTH THIRD POSITIVE PAY. FOR MORE INFORMATION CONTACT YOUR RELATIONSHIP MANAGER OR TREASURY MANAGEMENT SPECIALIST. MEMBER FDIC.

D04001 / FTCH / ZC08D428 / 7051 / 1B58

Page 1 of 2

## Fifth Third Bank

(CHICAGO)
P.O. BOX 630900 CINCINNATI OH 45263-0900

ARC INVESTMENTS
C/O VINCENT SADLER
4219 N PULASKI RD
CHICAGO IL 60641-2337

5

1762

Statement Period Date: 5/1/2006 - 5/31/2006
Account Type: Totally Free Bus Ckg
Account Number: 7232363510

Relationship Manager Name: William Dean
Phone: 312-756-5545
Commercial Client Services: 1-800-589-5355
www.53.com

---

## Account Summary - 7232363510

| | | | | |
|---|---|---|---|---|
| 05/01 | Beginning Balance | $20,874.37 | Number of Days in Period | 31 |
| 5 | Checks | $(13,313.90) | | |
| 1 | Withdrawals / Debits | $(1,024.60) | | |
| 1 | Deposits / Credits | $1,800.00 | | |
| 05/31 | Ending Balance | $8,335.87 | | |

---

### Checks

5 checks totaling 13,313.90

* Indicates gap in check sequence    i = Electronic Image    s = Substitute Check

| Number | Date Paid | Amount | Number | Date Paid | Amount | Number | Date Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| 1030 | 05/01 | 1,985.16 | 1032 | 05/02 | 3,223.36 | 1034 | 05/10 | 2,312.41 |
| 1031 s | 05/02 | 2,705.38 | 1033 | 05/09 | 3,087.59 | | | |

---

### Withdrawals / Debits

1 item totaling $1,024.60

| Date | Amount | Description |
|---|---|---|
| 05/26 | 1,024.60 | TELEPHONE INITIATED PAYMENT AT CHASE EPAY 000000249203228 052606 |

---

### Deposits / Credits

1 item totaling $1,800.00

| Date | Amount | Description |
|---|---|---|
| 05/11 | 1,800.00 | Florida Homes RENT 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 051106 |

---

### Daily Balance Summary

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 05/01 | 18,889.21 | 05/09 | 9,872.88 | 05/11 | 9,360.47 |
| 05/02 | 12,960.47 | 05/10 | 7,560.47 | 05/26 | 8,335.87 |

---

CHECK FRAUD IS A RISK THAT BUSINESSES CAN NO LONGER IGNORE. HELP PROTECT YOUR COMPANY AGAINST UNAUTHORIZED OR FRAUDULENT CHECK ACTIVITY WITH FIFTH THIRD POSITIVE PAY. FOR MORE INFORMATION CONTACT YOUR RELATIONSHIP MANAGER OR TREASURY MANAGEMENT SPECIALIST. MEMBER FDIC.

**Page 1 of 2**

000A00LI / FITCH / 20080531 / 7851 / 1762

## Fifth Third Bank

(CHICAGO)
P.O. BOX 630900 CINCINNATI OH 45263-0900



ARC INVESTMENTS
1902 N KENMORE                     7
CHICAGO IL 60614-4918

1959

Statement Period Date: 2/1/2006 - 2/28/2006
Account Type: Totally Free Bus Ckg
Account Number: 7232363510

Relationship Manager Name: William Dean
Phone: 312-756-5545
Commercial Client Services: 1-800-589-5355
www.53.com

Illdllandlandllllddllldlbandllllllllandlllll

---

## Account Summary - 7232363510

| 02/01 | Beginning Balance | $5,327.24 | Number of Days in Period | 28 |
|---|---|---|---|---|
| 7 | Checks | $(11,786.98) | | |
| 3 | Withdrawals / Debits | $(53,989.91) | | |
| 6 | Deposits / Credits | $64,292.25 | | |
| 02/28 | Ending Balance | $3,842.60 | | |

---

## Checks

7 checks totaling 11,786.98

* Indicates gap in check sequence   i = Electronic Image   s = Substitute Check

| Number | Date Paid | Amount | Number | Date Paid | Amount | Number | Date Paid | Amount |
|---|---|---|---|---|---|---|---|---|
| 1001 | 02/06 | 204.75 | 1004 | 02/02 | 2,705.38 | 1007 s | 02/15 | 1,945.77 |
| 1002 | 02/06 | 204.75 | 1006* | 02/24 | 661.00 | 1013* | 02/28 | 4,080.17 |
| 1003 | 02/01 | 1,985.16 | | | | | | |

---

## Withdrawals / Debits

3 items totaling $53,989.91

| Date | Amount | Description |
|---|---|---|
| 02/14 | 1,979.91 | FUNDS TRANSFER TO CL: 0090537036700026 REF # 00054097824 |
| 02/27 | 2,010.00 | FUNDS TRANSFER TO IL: 00851683748 REF # 00202748619 |
| 02/28 | 50,000.00 | OUTGOING WIRE TRANS 022806 |

---

## Deposits / Credits

6 items totaling $64,292.25

| Date | Amount | Description |
|---|---|---|
| 02/07 | ✓ 1,800.00 | DEPOSIT |
| 02/07 | 7,594.58 | DEPOSIT |
| 02/22 | 590.90 | DEPOSIT |
| 02/22 | 2,506.77 | DEPOSIT |
| 02/27 | ✓ 1,800.00 | DEPOSIT |
| 02/28 | 50,000.00 | FUNDS TRANSFER FROM CL: 0090537036700026 REF # 00202763402 |

---

## Daily Balance Summary

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 02/01 | 3,342.08 | 02/14 | 7,641.87 | 02/24 | 8,132.77 |
| 02/02 | 636.70 | 02/15 | 5,696.10 | 02/27 | 7,922.77 |
| 02/06 | 227.20 | 02/22 | 8,793.77 | 02/28 | 3,842.60 |
| 02/07 | 9,621.78 | | | | |

---

CHECK FRAUD IS A RISK THAT BUSINESSES CAN NO LONGER IGNORE. HELP PROTECT YOUR COMPANY AGAINST UNAUTHORIZED OR FRAUDULENT CHECK ACTIVITY WITH FIFTH THIRD POSITIVE PAY. FOR MORE INFORMATION CONTACT YOUR RELATIONSHIP MANAGER OR TREASURY MANAGEMENT SPECIALIST. MEMBER FDIC.

0DA001J PT14I / 20060228 / JG51 / 1959

**Page 1 of 2**

Payments to be made by Nasser Bashiri to Vincent Sadler
as of Agreement signed 10/05/06

1st payment due 11/1/06

| Property | Amount | Prime* | Monthly Payment | Term | After Term | Due Date |
|---|---|---|---|---|---|---|
| Back O'Beyond | $570,000.00 | 8.25% | $3,918.75 | 90 days | 14% | 1st of month |
| 15 Granite Mtn | $349,600.00 | 8.25% | $2,399.38 | 90 days | 14% | 1st of month |
| Quartz Cove | $56,600.00 | 8.25% | $389.13 | 3/1/2007 | 14% | 1st of month |
| Aviano | $25,635.50 | 8.25% | $176.24 | 3/1/2007 | 14% | 1st of month |
| Heritage Bay | $40,787.00 | 8.25% | $280.41 | 3/1/2007 | 14% | 1st of month |
| 28658 San Lucas | $498,968.00 | 8.25% | $3,430.40 | 2/1/2007 | 14% | 1st of month |
| | **$1,540,990.50** | | **$10,594.31** | | | |

**\*over the 90 day term, this rate may vary**

Rudy has already sent this to you.
But here is another copy for your file.

Dear Br. Zarate —
    This is the statement for the amount
due monthly that we did not receive until
this morning. Per the above they claimed
you faxed this to us. Please see Bullet #3
of the agreement you gave. There was no
amount nor any breakdown for the agreement.
When we got it we immediately wrote a check
which you should have a faxed copy of.

We also just received the "breakdown" of
the $3 7K+ amount. These were the "statement
breakdowns" we received that we've waited for.

Please let me know if you have copies of
    both statement breakdowns.

TO: Nasser Bashiri    Thanks

501  520-0239

Due 1st. of each month — $10,594.31

Send to Vincent Sadler
4219 N. Pulaski Rd.
Chicago, IL 60641

sent from
Desire american
American
Bar assn.

**ARC Investments**
**1-Aug-06**

$10800 From his bank
statement plus several
month I paid him
+ murphew Lane.

Florida check is $1800 Permonth
and it has been collected since Jan/06
$1800 For H2 is not
shown here.

Income for 300 murphew Ln
it is not show here

| | |
|---|---|
| Balance - all checks cleared | $ 5,724.15 |
| H2 Rent | $ 6,812.00 |
| Total | $12,536.15 |
| Divided by 2 | $ 6,268.08 |

| | |
|---|---|
| NB 8/1/06 payment | $ 13,489.03 |
| minus | $ (6,268.08) |
| Revised 8/1/06 payment | $ 7,220.95 |

Payment due from NB after net against ARC account

| | |
|---|---|
| VS 8/1/06 payment | $ 9,502.09 |
| minus | $ (6,268.08) |
| Revised 8/1/06 payment | $ 3,234.01 |

Payment due from VS after net against ARC account

**ARC account is now zeroed out**

BASHIRI / NASSER PROPERTY
28677 SAN LUCAS LANE #101
BONITA SPRINGS, FL  34135


TOTAL RENTAL IN THE SUM OF          $22,020.00

MANAGEMENT FEE (15%)                $ 3,303.00

TOTAL INCOME 11/18/05 – 11/30/06    $18,717.00


NOVEMBER 18 – 30, 2005 TENANT PAID      420.00
DECEMBER 1 – 31, 2005  TENANT PAID    1,800.00
JANUARY 1 – 31, 2006   TENANT PAID    1,800.00
FEBRUARY 1 – 28, 2006  TENANT PAID    1,800.00

MGMT FEES SHOULD HAVE BEEN:

      NOVEMBER RENT                 420.00
      DECEMBER RENT               1,800.00
      JANUARY RENT                1,083.00
          TOTAL MGMT FEES         3,303.00

UNFORTUNATELY, DUE TO CHANGE IN STAFF, YOU WERE PAID
$1,800.00 IN JANUARY INSTEAD OF $1,083.00 WHICH LEAVES US A
BALANCE OF $717.00 DUE FROM YOU.

ONCE THE $717.00 IS PAID, $1800.00 WILL BE SENT TO YOU ON A
MONTHLY BASIS.

**2006**
**Payment Summary**

| N | AR Lakeland H2, H6 Entergy | FL Meravi Nassau Pool | FL Meravi Bonita Sp Utilities | FL Meravi HOA | FL Meravi Dr | AR-H2 Lakeland Resort Cable | AR-H2 Lakeland HS Utilities H2, H6 | AR-H2 Lakeland 1st Magnus now Homecomings Equity 8/4/06 | AR-H2 10.50% $122,468.82 Pd back to Equity 8/4/06 | AR-H6 Lakeland 1st Magnus now WAMU | AR-H6 10.50% $121,562.56 Pd back to Equity 8/4/06 | AR-H7 Lakeland Homecomings Financial | AR-H7 10.50% $124,223.86 | H2, 6,7 Property Insurance Partners | 28658 FPL Electric | 28658 Property Flood $355/Partial $719/Annual | Page 2 Payment Totals | Page 1 Payment Totals | (Total, handwritten) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-06 | | | | | | | | | | | | | | | | | | | |
| Feb-06 | | | | | | | | | | | | | | | | | | | |
| Mar-06 | | | | | | | | | | | | | | | | | | | |
| Apr-06 | | | | | | | | | | | | | | | | | | | |
| May-06 | | | | | | | | $651.27 | $178.60 | $632.52 | $177.28 | $537.98 | $543.47 | | | $537.00 | $3,258.12 | $10,011.67 | $13,269 |
| Jun-06 | | | | | | | | $989.60 | $178.60 | $917.17 | $177.28 | $880.68 | $543.47 | | | | $4,466.80 | $11,133.01 | $15,599 |
| Jul-06 | | | | | | | | $989.60 | $178.60 | $917.17 | $177.28 | $837.39 | $543.47 | $780.00 | | $71.72 | $3,715.23 | $9,773.80 | $13,489 |
| Aug-06 | | | | | | | | $1,004.52 | $535.80 | $989.66 | $531.84 | $819.91 | $543.47 | | | | $7,009.69 | $7,999.31 | $11,509 |
| Sep-06 | $318.11 | | | | $2,268.38 | | | $1,094.52 | $535.80 | $1,004.10 | $531.84 | $819.91 | $543.47 | | | | $7,776.63 | $8,732.95 | $16,509 |
| Oct-06 | $101.74 | $40.00 | $103.88 | $661.00 | $2,268.38 | $56.99 | $10.94 | | | | | | | | $20.84 | $73.22 | $0.00 | $0 |
| Nov-06 | | | | | | | | | | | | | | | | | $0.00 | | $0 |
| Dec-06 | | | | | | | | | | | | | | | | | | | |
| | | | | | $4,536.76 | | | $4,639.51 | $1,607.40 | $4,460.62 | $1,595.52 | $3,895.87 | $2,717.35 | | | | | | |

Vince decided to keep Meravi Dr (House in Palmira) Florida

1- I paid interest for 1/2 down payment for almost a year

2- I paid #5341.64 for mortgage and other expenses for this house

**006 Payment Summary**

Please explain those Figures

May equity Line = 0
Apr shows 915.12
and how did you come up with that Number

| Month | AZ-BOB 150 Scenic Dr Pd-MB 2 VS $1,518.75 | AZ-LaBarr Granite Mtn Pd-NB 2 VS $873.28 | AR Lake Hoo 300 Morphew Pd-NB 2 VS $695.56 | AR-H7 10.50% $124,223.88 | LaBarr 60 LaBarr M&L Bank $992.58 | Fifth Third Equity | Fifth Third Commer | Assoc Line of Credit | Assoc Equity Line | BOB HOA | LaBarr HOA $61=$204.75 $71=$204.75 | BOB Taxes | LaBarr Taxes | Morphew Taxes | Morphew Insurance | Palmira 28677 Fifth Third Mortgage | Palmira 28677 Dues or Golf Member | Palmira 28658 Country Wide | Palmira 28658 Dues | Payment Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| an-05 | $1,518.75 | $873.28 | $695.56 | | $992.58 | $978.73 | $1,334.24 | | | $135.00 | | | | | | | | | | $6,526.14 |
| eb-06 | $1,518.75 | $873.28 | $695.56 | | $992.58 | $967.00 | $989.96 | | | $102.38 | $102.38 | | | | | $1,352.89 | | | | $7,594.58 |
| ar-06 | $1,518.75 | $873.28 | $695.56 | | $992.58 | $1,005.11 | $729.36 | | | | | $1,263.69 | $480.50 | $150.00 | | $1,352.89 | | $1,611.68 | | $10,673.20 |
| pr-06 | $1,518.75 | $873.28 | $695.56 | | $992.58 | $915.12 | $1,077.67 | $1,156.21 | | $135.00 | $204.75 | | | | $281.00 | $1,352.89 | $813.69 | $1,611.68 | | $9,658.08 |
| ay-06 | $1,518.76 | $873.28 | $695.56 | $543.47 | $992.58 | $0.00 | $530.03 | $738.13 | | | | | | | | $1,352.89 | $813.69 | $1,611.68 | $784.50 | $9,544.47 |
| un-06 | $1,518.75 | $873.28 | $695.56 | $543.47 | $992.58 | | | | $660.00 | | | | | | | $1,352.89 | $784.50 | $1,611.68 | $784.50 | $10,555.14 |
| Jul-06 | $1,518.75 | $873.28 | $695.56 | $543.47 | $992.58 | | | $774.99 | $1,404.73 | $135.00 | $204.75 | | | | | $1,352.89 | $784.50 | $1,611.68 | $784.50 | $11,576.48 |
| ug-06 | | | | | | | | | | | | | | | | | | | | |
| ep-06 | | | | | | | | | | | | | | | | | | | | |
| ct-06 | | | | | | | | | | | | | | | | | | | | |
| nov-06 | | | | | | | | | | | | | | | | | | | | |
| ec-06 | | | | | | | | | | | | | | | | | | | | |
| **V** | $10,631.25 | $6,112.96 | $4,868.92 | | $6,948.06 | | | | | | | | | | | | | | | |
| an-06 | | | | | $992.58 | $978.73 | $1,334.24 | | | $135.00 | | | | | | | | | | $3,440.55 |
| eb-06 | | | | | $992.58 | $967.00 | $989.96 | | | $102.38 | $102.38 | | | | | $1,352.89 | | | | $4,506.99 |
| Mar-06 | | | | | $992.58 | $1,005.11 | $729.36 | | | | | $1,263.69 | $480.50 | $150.00 | | $1,352.89 | | $1,611.68 | | $7,585.51 |
| pr-06 | | | | | $992.58 | $915.12 | $1,077.67 | $1,156.21 | | $135.00 | $204.75 | | | | $281.00 | $1,352.89 | | $1,611.68 | | $5,570.49 |
| may-06 | | | | | $992.58 | $0.00 | $530.03 | $738.13 | | | | | | | | $1,352.89 | $813.69 | $1,611.68 | | $5,455.88 |
| jun-06 | | | | | $992.58 | | | | $660.00 | | | | | | | $1,352.89 | $784.50 | $1,611.68 | $784.50 | $6,924.08 |
| Jul-06 | | | | | $992.58 | | | $774.99 | $1,404.73 | $135.00 | $204.75 | | | | | $1,352.89 | $784.50 | $1,611.68 | $784.50 | $8,045.42 |
| ug-06 | | | | | | | | | | | | | | | | | | | | |
| ep-06 | | | | | | | | | | | | | | | | | | | | |
| ct-06 | | | | | | | | | | | | | | | | | | | | |
| nov-06 | | | | | | | | | | | | | | | | | | | | |
| Dec-06 | | | | | $6,948.06 | | | | | | | | | | | | | | | |

**2006**
**Payment Summary**

| N | AZ BOB 150 Scenic D15 Granite Mnt Pdct-NB 2 VS | AZ-LaBar 300 Morphew Pdct-NB 2 VS | AR Lake Hse 60 LaBarr Pdct-NB 2 VS | LaBarr 601 LaBarr M&I Bank | 5th 3rd Equity | 5th 3rd Commer | Assoc Line of Credit | Assoc Equity Line | BOB HOA | LaBarr HOA #61=$204.75 #71=$204.75 | BOB Taxes | LaBarr Taxes | Morphew Taxes | Morphew Insurance | Palmira 28677 Fifth Third Mortgage | Palmira 28677 Dues or Golf Member | Palmira 28658 Country Wide | Palmira 28658 Dues | Payment Totals | Rec'd |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jan-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | $978.73 | $1,334.24 | | | $135.00 | | | | | | | | | | $6,528.14 | 1/13/2006 |
| Feb-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | $967.00 | $989.96 | | | $102.38 | $102.38 | | | | | $1,352.69 | | | | $7,594.58 | 2/7/2006 |
| Mar-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | $1,005.11 | $729.36 | | | | | $1,263.69 | $480.50 | $150.00 | | $1,352.69 | | $1,611.68 | | $10,673.20 | 3/14/2006 |
| Apr-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | $915.12 | $1,077.67 | | | $135.00 | $204.75 | | | | $281.00 | $1,352.69 | | $1,611.68 | | $9,658.08 | 4/6/2006 |
| May-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | $0.00 | $530.03 | $1,156.21 | | | | | | | | $1,352.69 | $813.69 | $1,611.68 | | $9,544.47 | 4/26/2006 |
| Jun-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | | | $738.13 | $660.00 | | | | | | | $1,352.69 | $784.50 | $1,611.68 | $784.50 | $10,011.67 | |
| Jul-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | | | $774.99 | $1,404.73 | $135.00 | $204.75 | | | | | $1,352.69 | $784.50 | $1,611.68 | $784.50 | $11,133.01 | |
| Aug-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | | | $869.21 | $1,420.72 | | | | | | | $1,352.69 | $439.33 | $1,611.68 | | $9,773.80 | |
| Sep-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | | | $869.21 | $1,438.25 | | | | | | | | | $1,611.68 | | $7,999.31 | |
| Oct-06 | $1,518.75 | $873.28 | $695.56 | $992.58 | | | $869.21 | $1,047.64 | $135.00 | $204.75 | | | | | | $784.50 | $1,611.68 | | $8,732.95 | |
| Nov-06 | | | | | | | | | | | | | | | | | | | $0.00 | |
| Dec-06 | | | | | | | | | | | | | | | | | | | $0.00 | |
| TOTALS | $15,187.50 | $8,732.80 | | $9,925.80 | $3,865.96 | $4,661.26 | $5,276.96 | $5,971.34 | | | $1,263.69 | $480.50 | $150.00 | | $9,468.83 | | $12,893.44 | | | |

From Jan to Oct Payments are same for all Properties;

Buck & beyond   $3037.50   Nov $3918.75   up by $881.25

La Bronca   $1746.56   "   $2,399.38   "   $652.82

Palmira (Vince's unit) $3223.36   "   $3430.40   "   $207.04

Palmira (Nasser's unit) $1352 + 1352 = $2704   Nov $2704   -0-

Just few example.

INBOX        Compose        Addresses                **_nasserbashiri@cablelynx.com_**

Folders        Options

Current Folder: **real-estate**

Calendar

**Welcome:** nasserbashiri@cablelynx.com

✉ Message List | 🗑 Delete                ⊙ ⊙            ↩ Forward | Reply | Reply All ↪

Subject: ARC Investments - Welcome to 2006
From: "Debra MacDonald" <debra_macdonald@hotmail.com>
Date: Fri, February 10, 2006 8:06 pm
To: nasserbashiri@cablelynx.com (more)
Priority: Normal
Options: View Full Header | View Printable Version | View as HTML | Allow Sender | Block Sender| Add to
         Addressbook

Good Evening Bashiri's!

Just wanted to let you know that I received the checks for ARC Investments for
January '06. Thanks!

Typically between the 22nd-26th of each month most of the bills have been received
and I will work on getting the monthly sheet completed in a more timely manner.
Emailing this sheet to both you and Vince will be what I do each month, so we all
are looking at the same thing. Just as a recap, the check or checks you make should
be made payable to ARC Investments. Please mail to;

        Debra MacDonald, 4219 N. Pulaski Rd., #3F, Chicago, IL 60641

Also, I deposited into ARC Investments the check you sent for $1,800.00 for rent at
28677 San Lucas Ln. I thought the rent was going to be less or did you combine? Can
you let me know how this is calculated? We should be depositing a rent check for
each month into ARC Investments.

It would really be to our benefit to have one central location that receives the
income as well as making our payments so we have accurate records.

Have a great weekend everyone!

Debra L. MacDonald Find just what you're after with the new, more precise MSN Search
- try it now!

                Download this as a file

                Delete & Prev | Delete & Next

        Move to:  INBOX          [ Move ]

*(handwritten, diagonal):* All rent was by ARC Investments. Although Mr. Bashiri was the "true owner", all rent was kept by Vincent Sadler and ARC Investments

**CLOSED**

## U.S. Bankruptcy Court
## Northern District of Illinois (Chicago)
### Bankruptcy Petition #: 05-18975

*Assigned to:* Honorable Judge Bruce W. Black
Chapter 7
Voluntary
No asset

Date Filed: 05/12/2005
Date Terminated: 08/18/2005
Date Discharged: 08/15/2005

*Debtor*
**Debra L MacDonald**
206 Honeytree Dr.
Romeoville, IL 60446
SSN: xxx-xx-8109
*fka*
**Debra L Casino**

represented by **Andrew W. Partridge**
Macey & Aleman
20 West Kinzie
Suite 1300
Chicago, IL 60610
312 467-0004
Fax : 312 467-1832
Email:
andrew@atbankruptcy.com

*Trustee*
**Bradley J Waller**
Klein Stoddard Buck Waller & Lewis LLC
2045 Aberdeen Court
Sycamore, IL 60178
815 748-0380

*U.S. Trustee*
**Ira Bodenstein**
Office of the U. S. Trustee, Region 11
227 W Monroe St
Suite 3350
Chicago, IL 60606
312 886-5785

# There are proceedings for case 05-18975 but none satisfy the selection criteria.

| PACER Service Center |
| --- |

# EXHIBIT R

- o Agrees to return deposit of $25,635(Aviano)-NB will pay monthly payments of prime until March 1, 2007 at which time the rate goes to 14% until the balance is paid in full
- o Agrees to pay $56,600 to VS for deposit of Quartz Cove NB will pay monthly payments of prime until March 1, 2007 at which time the rate goes to 14% until the balance is paid in full
- o Heritage Bay Ashbury 834 3rd Fl.-NB will pay VS $40,787 for deposit/down payment
  - • NB will pay monthly payments of prime until March 1, 2007 at which time the rate goes to 14% until the balance is paid in full
- o Palmira-28658, NB will be refinancing this property in his name by March 1, 2007, until he receive financing he will pay VS interest at the rate of prime for November 2006-January 2007; if not finance by February 1, 2007 interest rate goes to 14%
- o Palmira 28677-NB agrees to "quit claim" the property into VS name and each party will pay their own cost to related to this transaction (any damages cause by current renters will be absorb by NB)
  - • Agrees to pay NB $40K for property


- • VS:
  - o Meravi Dr.-NB will quit claim his interest in this property to VS; VS will then have sole possession of Meravi Dr.

Parties agreeable to outline conditions above:

_Nasser Bashiri_
Nasser Bashiri

_[signature]_
Vince Sadler

Witnesses:

_[signature]_
A. Aldridge

_[signature]_
A. Holmes

_[signature]_
T.J. Bullock

_____
D. Micah

_[signature]_
R. Zarate

_original_

10/5/2006 11:36:09 PM     2

Oct 24 06 06:41p    Dun-Well Services

Nasser - This is the agreement with Bro. Micah's signature. I wanted to be sure you had a copy. Also please give Bro. Sadler copies of the paperwork from Joe so he can follow up with that accurately. Just fax to the office if possible. Also let me know if there is anything you need from Debbie or Vince.

Thank You.

Rudy Zarate

includ sign contract

DEC 25, 2005 22:32

Below are the agreed upon conditions regarding properties associated in Arkansas Arizona and Florida for Vince Sadler (VS) and Nasser Bashiri (NB). The following conditions were agreed on October 5, 2006.

General Terms
- Aviano (1 Property)-property will be sold and split 50/50-all expenses and profit will be spilt equally (Decision regarding the sale and price will be agree by both when it becomes saleable)
  - Nancy Bashiri will not have anything to do with the sale of this property and will receive no fees of any sort (Both agree)
- NB will pay the balance ($37,652.59) within 30 days from the date this agreement is signed if he does not NB will pay VS interest at the rate of 50%
- NB will pay his portion of the mortgage monthly
- VS will provide the articles of corp. to NB for ARC Investments

### Arkansas
- NB:
  - Agrees that VS will take Morphew Rd
  - Will have possession of following properties: G6, J6
  - Agrees to pay 10K for sell of J4 property
    - Agrees to pay 3K deposit for each properties (J4 & J6-return to equity line-within a week)

- VS
  - Agrees to pay NB 20K for Morphew Rd.
  - Will have possession of following properties H2, H6, H7, H8
  - Agrees to cancel out 2 months of deposit interest for J6

### Arizona
- NB :
  - Agrees to pay VS 50K for "BOB"
  - Agrees to bring payments up to date, for "Back-O-Beyond (BOB)" & "15 Granite" (August – October 2006)
  - Provide VS building plans for 60 La Barranca

- VS:
  - Agrees to charge NB interest rate of prime for "BOB" & 15 Granite Rd. until NB finances BOB &15 Granite if not financed within 90 days NB will have to pay interest at rate of 14%

### Florida
- NB:
  - Quartz Cove-NB to have possession of property/will finance property by February 2007. NB will pay interest to VS at the rate of prime until March 1, 2007
    - Penalty if not financed by March 1, 2007 will be to pay interest at rate of 14%
  - Aviano-NB will get financing in his name

1

10/5/2006 11:36:09 PM

- o Agrees to return deposit of $25,635(Aviano)-NB will pay monthly payments of prime until March 1, 2007 at which time the rate goes to 14% until the balance is paid in full
- o Agrees to pay $56,600 to VS for deposit of Quartz Cove NB will pay monthly payments of prime until March 1, 2007 at which time the rate goes to 14% until the balance is paid in full
- o Heritage Bay Ashbury 834 3rd Fl.-NB will pay VS $40,787 for deposit/down payment
  - NB will pay monthly payments of prime until March 1, 2007 at which time the rate goes to 14% until the balance is paid in full
- o Palmira-28658, NB will be refinancing this property in his name by March 1, 2007, until he receive financing he will pay VS interest at the rate of prime for November 2006-January 2007; if not finance by February 1, 2007 interest rate goes to 14%
- o Palmira 28677-NB agrees to "quit claim" the property into VS name and each party will pay their own cost to related to this transaction (any damages cause by current renters will be absorb by NB)
  - Agrees to pay NB $40K for property

- VS:
  - o Meravi Dr.-NB will quit claim his interest in this property to VS; VS will then have sole possession of Meravi Dr.

Parties agreeable to outline conditions above:


_Nasser Bashiri_                                    _Vince Sadler_
Nasser Bashiri                                       Vince Sadler


Witnesses:

A. Aldridge                                          D. Micah


A. Holmes                                            R. Zarate


T.J. Bullock

# EXHIBIT S

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| VINCENT SADLER, | ) |
| | ) |
| Plaintiff and Counter-Defendant, | ) |
| | ) |
| v. | ) No. 07 C 5464 |
| | ) |
| NASSER BASHIRI and NANCY | ) |
| BASHIRI, husband and wife | ) |
| | ) |
| Defendants and Counter-Plaintiffs. | ) |

## RESPONSE TO DECLARATION OF DEFENDANT NASSER BASHIRI

Plaintiff Vincent Sadler, by attorneys, hereby responds to Defendant's Nasser Bashiri's Declaration in support of his Response to Plaintiff's Motion for Summary Judgment as if said Declaration were a statement of additional facts:

1.    I am the named defendant in the above entitled and numbered lawsuit.

ANSWER:    Admit.

2.    The plaintiff's motion and affidavits at least leave the impression that at the time of the church meeting in October of 2006, my wife and I lived in Chicago and were members of the same congregation. The truth is that we had moved from the Chicago area in October of 2005 and were called by the church in Chicago and told we had to return to Chicago for the meeting with the elders in October of 2006. Even though we are from the same religion, we belonged to different churches in different states. I was told by one of the elders of my church, Robert Haight, to go to Chicago to settle the matter, after I proved to him with documents that Vince Sadler lied and had breached the first agreement of May 2005.

ANSWER:    Deny. (Plaintiff's Statement of Material Facts[1], ¶¶10-17)

3.    The five other members that Plaintiff refers to were a Committee of elders that were selected by The Body of Elders in Chicago to handle this investigation. I had no knowledge of who had been selected until I arrived at the first meeting at the church on October 4, 2006. As this was a church matter, the meeting was conducted in the church. I was not given a choice as to who was on that Committee. I had no power to change the Committee members. This was the decision of the church, not mine.

ANSWER:    Admit the two parties and the mediators were all members of the same church, but deny that the mediation had any religious content or concerned any matter affecting the church. (SMF, ¶15). Deny that Defendant "had no knowledge" of who the mediators were.

---

[1] Hereinafter, "SMF, ¶_____"

(Sadler Supplemental Declaration[2], ¶13).    Deny the remaining allegations to the extent Defendant characterizes the process as something in which he had no "choice" and no "power." (SMF, ¶17).

4.    Both nights involved prayer, we were told to address each other as "brother" since it was a meeting arranged by the church. Throughout both meetings there was Scriptural counsel given and all Committee members arrived in suits and ties. On the meeting on the first night, when I questioned Vince regarding the truthfulness of his statement that my name was the one on the "Lighthouse condominiums" in Hot Springs, AR which were later cancelled, Alex Aldridge rebuked me saying that I cannot ask these questions. Also, on the first night, Alex Aldridge, when we were trying to split the properties, firmly said, "Either you choose or we'll choose for you. The elders had already considered all of the information ahead of time and had come up with what they felt would be the best way to separate the properties, however, we became involved in discussions and did not hear their version.

ANSWER:    Deny. (SMF, ¶¶ 10-17).

5.    After the separation of the properties on October 4, 2006, mortgage payments for certain properties for October 2006 were demanded of me by Vince and when I told the elders I was not responsible for October's payments, the elders decided that I had to pay for that. These properties had been under solely Vince's name from purchase and I had been making my half of the payments for them since their purchase (both LaBarranca lots, Back-O-Beyond lot, Vince's Palmira, 300 Morphew Lane, three H unit condominiums in Lakeland Harbor).

ANSWER:    Admit the properties were "separated" by agreement at the conclusion of the mediation in October 2006.  Admit that Defendant was obligated to make various payments pursuant to the Settlement Agreement but deny the mediators "decided" who had to pay what because this was a mediation, not an arbitration. (SMF, ¶¶10, 17).  Admit that some properties were in Plaintiff's name.  Deny that Defendant had made all payments required of him on the subject properties prior to the mediation on October 4-5, 2006. (SMF, ¶9).

6.    These October 2006 payments were then included in the approximately $37,000 of what the church said that I had to pay Vince October, November and December association payments for Meravi Dr. were included although he was keeping the property at Meravi Dr. as of October 5, 2006. Vince claims that this approximately $37,000 were "delinquent payments". They were not. Vince gave Rudy Zarate a statement for the approximately $37,000, which amounts had not been verified, and Rudy Zarate held the statement up in the air and said, "You have to pay for this."

ANSWER:    Regarding the first three sentences, Plaintiff denies that Defendant paid anything after October 5, 2006, other than his initial payments required under the Settlement Agreement. Defendant's delinquent payments were discussed and proved and agreed on to the penny at the meetings on October 4-5, 2006 and then written into the Settlement Agreement as the second

---

[2] Hereinafter, "Sadler Supp. Decl., ¶_____"

point ("NB will pay the balance $37,652.59 within 30 days...") (SMF, ¶26; Sadler Supp. Decl.,

¶15). Deny the fourth sentence. (SMF, ¶9). Regarding the last sentence, admit that Plaintiff

provided expense sheets to the Defendant and the mediators and these were reviewed together,

deny that Defendant was ordered to do anything by anyone (SMF, ¶17), but admit that Defendant

agreed in writing to pay certain amounts.

7.    Deborah MacDonald was Vince Sadler's assistant, not mine. At the meeting
Sadler claimed he was paying 8 1/4% (prime) for all the properties I was going to be charged for.
Deborah MacDonald and Sadler both knew this was false because their own monthly statement
to me that Deborah MacDonald prepared reflected a lower interest rate for all of the properties.
Vince Sadler had paid cash for his Palmira, one of the LaBarranca lots, Back-O-Beyond lot and
300 Morphew Lane). Deborah MacDonald had the knowledge of this information as she was
Sadler's bookkeeper. After I came to Hot Springs, Arkansas and looked at Deborah MacDonald's
spreadsheet, it showed that they both falsely claimed that. I brought this to the attention of Rudy
Zarate but he said since I signed the contract, whether or not it was based on false information, I
had to follow through. I also brought this to the attention of T.J. Bullock and I faxed the
statement to him at his request which showed that the interest rate was not 8 ¼%. I did not hear
anything from him regarding this.

ANSWER:    Deny the first sentence. (SMF ¶18). Deny the second sentence. (Sadler Supp.

Decl., ¶1). Deny the third sentence. (Sadler Supp. Decl., ¶¶2, 4). Admit the fourth sentence.

Admit the fifth sentence. Plaintiff lacks information to admit or deny whether Defendant

brought his complaint to the attention of any the mediators or how they responded to his

complaints. Plaintiff objects on the grounds of hearsay under FRE 802 to Defendant's

statements of how the mediators responded to him.

8.    At the time, Vince Sadler, Deborah MacDonald and Alex Aldridge were close
friends. I recently came to find out that Alex Aldridge and his wife were involved in a real estate
business deal during the time Alex was supposed to be "impartial". His name appears with Vince
on the deed to one of the 2 Heritage Bay properties that Vince decided to purchase pre-
construction months before the October meetings and which closed on November 30,2006. One
of these he made the Defendant purchase and is part of this complaint. In September of this year,
Vince granted the property to Alex and Meri Aldridge.

ANSWER:    Admit the first sentence. Deny the second sentence. (Sadler Supp. Decl., ¶5).

Admit the third sentence. Deny the property that was the subject of a transaction between

Plaintiff and Aldridge was related in any way to any property that is the subject of the

Complaint. (Id.). Admit that in the end of November, 2006, Plaintiff transferred his rights in a

certain piece of property and made a loan to Aldridge. Deny the second-to-last sentence as

Defendant was not forced to purchase anything; he agreed to and in any event the property he

refers to has nothing to do with the Aldridge transaction. (Sadler Supp. Decl., ¶5).

9.     Vincent Sadler's Motion for Summary Judgment claims that the plaintiff and the defendant reached a preliminary agreement and that Antoine Holmes, typed up the understanding of the parties and everyone agreed to return the next day for the purpose of fine-tuning the written agreement and confirming that it accurately set forth what had been agreed upon during the mediation. (SMF, ~ 19). He then claims that Plaintiff, Defendant, the five mediators, and bookkeeper MacDonald all re-convened on October 5, 2006, when Plaintiff and Defendant reviewed and discussed the written settlement agreement confirming the settlement terms at which time the terms were finalized. (SMF, ~20). Lastly they state that when the so called Settlement Agreement was finalized Plaintiff and Defendant signed it and the five mediators signed as witnesses. (SMF, ~21).

ANSWER:    Admit.

10.     The factual characterization of what happened as described by the plaintiff s motion is not accurate to the extent that it is thoroughly misleading. The intention of returning the next day to review what Antoine Holmes had prepared was NOT to confirm that "it accurately set forth what had been agreed to during the mediation." Instead, it was an attempt by Sadler and Deborah MacDonald to purposely distort what had occurred the day before in a transparent attempt to obtain legitimacy by getting Nasser's signature on a document that showed what Sadler wished the agreement would have been the day before. Nasser Bashiri signed the false document not knowing that portions were either inaccurate or had been removed according to the agreement originally typed on October 4, 2006.

ANSWER:    Deny. (SMF, ¶20).

11.     More specifically, on October 4,2006 we separated the properties, except for 21911 N. 36th St. (Aviano) and an agreement was reached. A key issue arose regarding 28677 San Lucas (my Palmira) which Vince wanted to have. I repeatedly refused that because he expected me to sell my property to him for $426,000 (original purchase price was $406,000 + $20,000 in upgrades) while he wanted to sell me his identical Palmira property for $495,000. I had purchased my property a year earlier. He insisted that he wanted my Palmira. He said he would give me $20,000 more for my Palmira which I would still lose $50,000. Then T.J. Bullock told him to give me, in addition to the purchase price, $40,000, which still will only make it $466,000. I would lose $30,000, plus I would have to pay $15,000 closing costs for purchasing his on top of the $495,000 purchase price.

ANSWER:    Admit that at the conclusion of the settlement discussions in October 2006, the parties agreed how they would separate the properties. Admit there was discussion over two properties located on San Lucas Lane in Bonita Springs, Florida. Admit the parties agreed that Plaintiff would buy one of the San Lucas Lane properties from Defendant, while Defendant would buy the other property from Plaintiff. Deny Defendant's characterization of the financial issues and specifically respond that while Defendant identifies several specific prices or amounts, he intentionally omits any mention of the fact that Plaintiff paid the earnest money deposit of approximately $116,900, and is therefore intentionally deceiving the Court as to the

facts on this property. (Sadler Supp. Decl., ¶12). Plaintiff objects to Defendant's statement of what T.J. Bullock said as hearsay under FRE 802.

12.     Also, I took Vince at his word regarding the 8¼% interest rate, as his bookkeeper Deborah MacDonald was present and did not say anything to the contrary. They were supposed to provide me the bank statements showing the interest rates being paid on the mortgages. Neither Vince nor Deborah MacDonald ever provided that to me. On October 5, 2006, the agreement of October 4, 2006 was revised enough times to fill a wastepaper basket because Vince Sadler continuously changed to wording. I had already signed once and then Vince insisted on revising it again, and they discarded the previous one that I had signed. By this time, it was almost midnight and we had been in the meeting for several hours. Vince insisted that the paper he had prepared be signed that night, even though one of the "5 witnesses" that the Plaintiff and Duraid Micah's own declaration falsely states was present for both nights of meetings and witnessed the signing of the contract, was indeed not present for any of the October 5th meetings, nor did he witness the signatures which all of the Plaintiffs 6 witnesses and Plaintiff himself are fully aware. Duraid Micah's signature was added at later date.

ANSWER:    Deny that Defendant believed the 8¼% interest rate was anything other than a negotiated term of the Settlement Agreement. (Sadler Supp. Decl., ¶¶2, 4). Deny that Defendant was unaware of the financial situation relative to the subject properties. (Sadler Supp. Decl., ¶8). Admit the fourth, fifth and sixth sentences to the extent there was extensive negotiation as to how the properties should be divided and what financial obligations the parties owed to each other. Deny the remaining allegations. (Sadler Supp. Decl., ¶6).

13.     Vince insisted on the paper being signed that night and the elders did not advise either party to go home and review it, even though it had significant financial implications, or seek the advice of an attorney. The disputed paper had been revised many times and had been signed after hours of meetings at almost midnight. I was exhausted and my wife had been sitting in the car since the beginning of the meetings for over 2.5 hours. When I had entered the meeting, I thought we were just going to be signing the paper showing what had occurred on October 4, 2006, but because of Vince's continual revisions it dragged on until midnight.

ANSWER:    Admit that all parties wanted to enter into the Settlement Agreement and sign it, and admit that the mediators did not give advice to anyone whether or not they should or should not enter into the Settlement Agreement. Deny that Plaintiff insisted it be signed before the parties had finished negotiating. (Sadler Supp. Decl., ¶7). Admit the second sentence insofar as there was extensive negotiation. Plaintiff denies the remaining allegations. (Id.).

14.     I owed approximately $330,000 on 28677 San Lucas. Vince and Deborah MacDonald were well aware of that. On the disputed October 5 paperwork, I did not realize that the wording had been changed so that in effect it showed I had to give him (quit claim) the property for only $40,000 instead of the $40,000 to be added to my original purchase price.

5

ANSWER:    Admit that Defendant had a mortgage on 28677 San Lucas lane.    Deny that any wording was changed in the Settlement Agreement (Sadler Supp. Decl., ¶12), but further respond that Defendant has intentionally mischaracterized the facts to the Court as explained in Paragraph 12 of my Supplemental Declaration.

15.    Sadler's Motion for Summary Judgment states as follows:

"A true and correct copy of the settlement agreement (the "Settlement Agreement") is attached to the Sadler Declaration as Exhibit A. (SMF, -22). Of note, the introductory paragraph of the Settlement Agreement provides,

"Below are the agreed upon conditions regarding properties located in... Arizona and Florida... The following conditions were agreed on October 2006. (SMF, -23) (italics added)."

ANSWER:    Admit. (Arkansas properties were also divided but they are not the subject of this case.

16.    Immediately after the Settlement Agreement was signed, Defendant made certain initial payments to Plaintiff as provided by the Settlement Agreement, including (a) $37,652.59 (to cure delinquent payments), $10,594.31 (the first payment due under the Settlement Agreement), and (c) $6,000 (to reimburse Plaintiff for deposits he had made on properties in Arkansas that the parties merely refer to units J4 and J6). These were not the only payments Defendant was required to make to Plaintiff; they were the initial payments. (SMF, -25)."

ANSWER:    Admit.

17.    Again, what Sadler's motion states is misleading, to say the least. The disputed paperwork that is attached to Sadler Declaration as Exhibit A was not a "true and correct" agreement as agreed upon and written on October 4, 2006. The Plaintiff was to have purchased my Palmira for the original price I purchased it for and give me an additional $40,000. This did not appear in the attached settlement agreement. Instead it shows that I would be giving him my property by "quit claim" for a mere $40,000.

ANSWER:    Deny the first two sentences. (SMF, ¶¶21-22). Deny the third sentence (Sadler Supp. Decl., ¶12).

18.    Regarding the "initial payments" Plaintiff refers to, once I had returned home and had access to documentation, particularly Plaintiffs own spreadsheet prepared by Plaintiff's bookkeeper, I realized I had been had. As I previously have mentioned, I contacted both Rudy Zarate and T.J. Bullock to make them aware of the discrepancies. I was told by Rudy Zarate that even though the agreement was based on some false information, I was still obligated to pay. Out of respect for the authority of the "elder arrangement", I made these payments even though they were based on false information, not because I thought we had a new agreement but because I was being compelled to do so by the church.

ANSWER:    Deny that Defendant ever believed he "had been had." (Sadler Supp. Decl., ¶8). Plaintiff lacks sufficient information to admit or deny what Defendant stated to the mediators

after the mediation, other than the Defendant would no longer perform his obligations under the Settlement Agreement because he thought the prime interest rate he agreed to was too high (Aldridge Declaration ¶10; Zarate Declaration, ¶11). Objection under FRE 802 as hearsay to any allegations regarding what the mediators told Defendant. Admit that Defendant made certain payments he was obligated to make, but deny it was because anyone "compelled" Defendant to do it.

19.     The $37,652.59 was mortgage payments for the property that Vince tried to take as of the October 5, 2006 date. These properties had been solely under his name since purchase and he was collecting not only my mortgage payments and expenses but rent for these properties as well. He also put several properties on the market for sale showing I had no rights in the properties nor could I expect the profits he had promised me. Yet, he demanded the mortgage payments for these properties from July, August, September and October of 2006 which added up to be approximately $37,000. He demanded that money on October 4, 2006 even though he took these properties as part of the agreement.

ANSWER:     Admit that Defendant was delinquent on his payments to Plaintiff prior to October 2006 and that Defendant's cure of these delinquencies was part of his obligations under the Settlement Agreement. Deny that Plaintiff ever listed for sale any property allocated to Defendant under the Settlement Agreement. (Sadler Supp. Decl., ¶14).

20.     I paid the amounts that the Plaintiff refers to because the elders, specifically Rudy Zarate, told me that I had to. From October 30, 2006 until November 20, 2006 I repeatedly faxed letters to The North Congregation Body of Elders in care of Rudy Zarate and faxed to Vincent Sadler asking for the items he was to have provided me according to the agreement. I issued a 48 hour ultimatum for him to provide his portion of items from the agreement on November 20, 2006. 1 have still not received those items.

ANSWER:     Object to the first sentence as hearsay under FRE 802. Further responding, admit that Defendant paid certain amounts, but deny he did it because a mediator told him that he "had to." (SMF, ¶17). Admit Defendant sent certain letters to the mediators and Plaintiff. Admit Defendant never received Plaintiff's deliveries (because Defendant refused to accept them). (SMF, ¶29). Plaintiff has no recollection of Defendant unilaterally issuing a "48 hour ultimatum" and therefore neither admits nor denies same and further answers that the Settlement Agreement gave him no right to do so.

21.     The Sadler Motion for Summary Judgment goes on to state that I had other obligations to Plaintiff under the so called Settlement Agreement, including (but not limited to) delivery of deeds to two properties. (SMF, ~26). He states that he assembled the various documentation and funds due from him to Defendant under the Settlement Agreement. (SMF ~27) and that he delivered the documentation and funds to Rudy Zarate, one of the mediators, this, according to him, "completing his deliveries". (SMF, ~28).

7

ANSWER:   Admit.

22.   Regarding the deed for Meravi Drive that I was supposed to "quit claim", since Sadler worded the agreement and I had no knowledge of my limitation, I had contacted an attorney in Florida who told me I could not legally "quit claim" the property as my name was on the mortgage and the bank would not allow it. I reported this to Sadler and he contacted the same attorney in Florida.

ANSWER:   Admit Defendant was "supposed to 'quit claim' the Meravi Drive property, and that he never did so. Object to what an unnamed "attorney in Florida" told Defendant as hearsay under FRE 802, and in any event deny that there was ever any impediment to Defendant delivering a quit-claim deed of his interest in the property. (Sadler Supp. Decl., ¶10).

23.   In regards to the deed for my Palmira property, I was not supposed to quit claim it according to what the church told me on October 4, 2006 as all of Plaintiffs witnesses and Plaintiff himself were aware. Vince Sadler and all of his witnesses knew that his obligation was to purchase the property from me and pay an additional $40,000.

ANSWER:   Deny that Defendant was "not supposed to quit claim" the "Palmira property" and deny that Defendant has accurately informed the Court as to the facts on this property. (SMF, ¶31; Sadler Supp. Decl., ¶12).

24.   According to Rudy Zarate's own Declaration, it was agreed that the Plaintiff and I would give each other any checks or documents relating to the agreement. I followed through giving the checks totaling approximately $54,000 directly to the Plaintiff. On November 1, 2006 at 9:00 a.m., Deborah MacDonald phoned me and demanded payment of the approximately $37,000 which was not due until November 5, 2006. 5 minutes later she called again and asked me if I had mailed the check. I responded that I was looking for the envelope and I would mail it that day. Again, 5 minutes, later she called again, asking me if I'd mailed the check yet. I was very angry at her "harassment". She hung up on me.

ANSWER:   Admit the parties were supposed to exchange documents and checks (and that the mediators were facilitating it). Deny that Defendant accurately or fully describes Zarate's Declaration. Admit the Defendant paid approximately $54,000 to Plaintiff, which was partial performance under the Settlement Agreement. Admit that MacDonald made an effort to contact Defendant and obtain his compliance with the terms of the Settlement Agreement. Plaintiff lacks information specific enough to admit or deny how many calls were made, whether Defendant was angry or whether MacDonald "hung up on" him.

25.   I was upset is because I had requested by a faxed letter to both the elders and Vince on October 30, 2006 requesting a statement of the breakdown of the $37,000 and had not received it for that entire month. Nevertheless, I mailed it on November 1, 2006.

ANSWER:   Plaintiff lacks sufficient knowledge to admit or deny whether Defendant was upset, but admits that Defendant did voluntarily pay the $37,652.59. Deny that Defendant was

not provided with a breakdown of all of his delinquent payments both in advance of October 4, 2006 and during the mediation as well. (Sadler Supp. Decl., ¶15).

26.    Vincent Sadler's Motion for Summary Judgment goes on to state that after the so called "mediators" had possession of Sadler s deliveries, two of them, Rudy Zarate and Alex Aldridge, phoned Defendant in a three-way call on November 29, 2006. They state that they told me that Vince had had delivered the documents and funds he was required to deliver. They say that in that call, I stated that I would not accept the deliveries claiming that I had decided not to honor my obligations in the Settlement Agreement. (SMF ~29).

ANSWER:    Admit.

27.    According to both Rudy Zarate's and Alex Aldridge's declaration, Plaintiff had submitted all checks and documents to Rudy Zarate on or before November 26, 2006. This is a false statement as they could not have possession of all documents at that time. We received an email from Capital Title Agency on November 27, 2006 stating that Vince Sadler was still refusing to sign the purchase contract. Earlier in November, he had emailed Capital Title Agency that he was not going to sign the purchase contract and insinuated that by means of "creative financing" I was trying to purchase the lots. Also, the statement that Rudy Zarate mentioned is false as he does not remember the exact date, the amount of the checks or the exact documents received. He said he compared the check amounts and documents with the agreement and they were correct. How is it that he does not remember anything he received and yet he remembers exactly what I said in response to their phone call? Neither does Alex Aldridge remember the exact check amounts or the documents received. How could he say that Rudy Zarate received all of the checks and documents required of the Plaintiff by the agreement? Yet he also remembers exactly what I said on the phone call with him and Rudy Zarate. Neither do they seem to remember the many letters sent from October 30th - November 20th of 2006 repeatedly requesting plaintiff to comply and informing them of discrepancies. The November 20th letter clearly stated both to the entire elder body and Vince Sadler that they had 48 hours to comply or I would consider him in breach of the agreement.

ANSWER:    Admit the first sentence and deny the second sentence. (SMF, ¶¶28-29). Object to the alleged email from the title company as hearsay under FRE 802. Admit that Plaintiff had emailed the title company to the effect that Defendant was not following through on his obligations under the Settlement Agreement.  Deny that the Declarations of Rudy Zarate or Alex Aldridge are false.  Plaintiff lacks information to admit or deny whether Defendant unilaterally issued a 48 hour deadline for compliance with the Settlement Agreement (and therefore denies same), but if Defendant issued such a deadline, he did knowing it was not possible without his own cooperation and he also did it even though the Settlement Agreement did not authorize it. Deny that it was Plaintiff who breached the Settlement Agreement. (Sadler Supp. Decl., ¶¶28-30).

28.    Prior to the final 48 hour notice I gave them, I called Rudy Zarate. It was a Thursday at 6:15 p.m. His wife said that he just finished showering and he would be with us in 2

minutes. I waited a few minutes and he answered the phone. I put my phone on speaker so that my wife could hear the conversation. I asked him if he could please help me by enforcing the agreement and having him Vince sign the purchase contracts. Rudy told me that he could not. Later on, when I mentioned that phone conversation to him, he said he supposedly doesn't recall that conversation. If he has a problem with his memory, how is it that he remembers checks and documents he received from the plaintiff being everything exactly according to what was required by the agreement, even though he is no longer in possession of these.

ANSWER:    Object to allegations regarding what the mediator or the mediator's wife said as hearsay under FRE 802. Plaintiff lacks sufficient information to admit or deny what Defendant said to the mediator or to the mediator's wife.

29.    Mr. Sadler claims in his motion that he "remains ready, willing and able to perform his obligations under the Settlement Agreement, but Defendant has never accepted performance. (SMF, ~30).

ANSWER:    Admit.

30.    Plaintiff has never been ready and willing to perform his obligations following the October church meeting, even though the outcome of that meeting provided virtually nothing for the defendant's benefit. Defendant has never received from Vincent Sadler any of the documents or checks that Rudy Zarate claims exist. Purchase contracts for lots to be purchased by Defendant were never signed and returned to the Title Agency as is general practice in a real estate transaction and Plaintiffs communication with the Title Company indicates he was aware they would be the ones handling the purchase contracts. Purchase contract for his Palmira was never received, as it is the buyer's responsibility to provide such purchase contract. Articles of Incorporation were never received. Checks were never received. As Plaintiff did not perform in the original May 2005 contract and had not done what he was supposed to do following the October church meeting, which he had what turned out to be his associates dictate and revise at will, Defendant feels that any claim that Sadler makes that he remains ready to perform his obligations is patently false.

ANSWER:    Deny the first sentence. (SMF, ¶30). Admit the second sentence, but only insofar as Defendant did not receive the documents or checks because he refused to accept the tender of performance. (SMF, ¶29). Deny the remaining allegations. (SMF, ¶28).

31.    Plaintiff claims that Defendant has not performed the remainder of his obligations under the purported Settlement Agreement ~~31-48). He states that there are eight properties for which Plaintiff seeks relief. Five properties are in Florida, and three are in Arizona. Plaintiff's motion states that in each instance, Defendant has either failed to convey to Plaintiff title to the real estate, or Defendant has failed to pay amounts owed to Plaintiff.

ANSWER:    Admit.

32.    Defendant was first to perform on the October 5, 2006 agreement by paying $6,000, $10,000 and $37,000, closing on the Aviano property, providing Purchase contracts for lots, closing on The Quarry and Heritage Bay. Preliminary plans for Vince's LaBarranca lot were provided him.

ANSWER:    Admit Defendant paid the stated amounts but failed to pay other amounts, deny that Defendant performed his obligations on the Aviano property (SMF, ¶¶34-35), deny that Defendant tendered contracts accurately reflecting the obligations in the Settlement Agreement (Plaintiff's memorandum of Law at footnote 5; Sadler Supp. Decl., ¶16), and deny that Defendant delivered the plans for LaBarranca (other than a single faxed page). (Sadler Supp. Decl., ¶11).

33.    Plaintiff never performed any of his obligations after the October church meeting.

ANSWER:    Deny. (SMF, ¶¶28, 30).

34.    Specifically referring to the property located at 28677 San Lucas Lane in the Bonita Springs, Florida (the Palmira property referred to at Count I of the Complaint, plaintiff's motion states that Defendant is the owner of record of Palmira 28677, but the Settlement Agreement obligated Defendant to convey title via quit-claim deed to Plaintiff.

ANSWER:    Admit.

35.    On October 4, 2006 in front of all present including Plaintiffs witnesses, Vincent Sadler was supposed to purchase 28677 San Lucas for the original purchase price plus $40,000. Vince was ordered to do so by T.J. Bullock. This was omitted from the October 5, 2006 paperwork.

ANSWER:    Denied.  (Sadler Supp. Decl., ¶12).  Plaintiff further denies that anyone was "ordered" to do anything during the settlement negotiations. (SMF, ¶¶16-17).

36.    I cannot "quit claim" a property which is mortgaged and would not have agreed to such.

ANSWER:    Denied. (Sadler Supp. Decl., ¶10).

37.    As for the property located at 14630 Meravi Drive in Bonita Springs, Florida (which is the subject of Count II of the Complaint), Plaintiffs Motion for Summary Judgment states that Defendant is the co-owner of record of 14630 Meravi Drive (the other owner is Plaintiff), but the Settlement Agreement obligated Defendant to convey title of his interest via quit-claim deed to Plaintiff. The Settlement Agreement provides: "Meravi Dr.-NB will quit claim his interest in this property to VS; VS will then have sole possession of Meravi Dr. Defendant has never quit-claimed his interest in Meravi Drive to Plaintiff. (SMF, ~32).

ANSWER:    Admit.

38.    I was told by an attorney that I contacted, whom Vince also had contact with, that I cannot quit claim a property on which my name is on the mortgage. At that time, both of our names were on a mortgage.

ANSWER:    Object to the first sentence under FRE 802 as hearsay, and in any event, deny the allegation. (Sadler Supp. Decl., ¶10).  Admit that Defendant's name was on a mortgage (but,

further responding, deny that Defendant had any personal liability on the note secured by the mortgage. (Sadler Supp. Decl., ¶9).

39.    As for the Aviano property located at 21911 N. 36th Street in Phoenix, Plaintiffs motion states that he paid the down payment of $51,271.00 for its purchase. He states that under the terms of the Settlement Agreement, I was obligated to pay Plaintiff the sum of $25,635.00 (representing half of the down payment). In addition, until the property is sold, he states that the Settlement Agreement required me to pay interest on $25,635.00 (a) at the prime rate from October 6, 2006 until March 1, 2007 and (b) at the fixed rate of 14% until Aviano is sold. He specifically states as follows:

"The Settlement Agreement provides,

"NB Agrees to return deposit of $25,635 (Aviano) - NB will pay monthly payments of prime until March 1 , 2007 at which time the rate goes to 14% until the balance is paid in full." (SMF, ~33).

The Settlement Agreement also provides that Aviano "will be sold and split 50/50...However, following execution of the Settlement Agreement, Defendant stated that he wanted to reside at Aviano. Defendant said that if Plaintiff would agree, Defendant would keep Aviano his own property and pay Plaintiff the entire down payment of $51,271, rather than half of the down payment as set forth in the Settlement Agreement. Plaintiff agreed. Defendant moved into Aviano but then refused to return the down payment to Plaintiff or pay any of the interest. (SMF ~34)."

ANSWER:    Admit.

40.    He states that I violated Settlement Agreement, as amended, because I failed to pay $51,271.00 to Plaintiff, and because I did not pay any of the interest accruing after November 30, 2006 on $51,271.00. He states that interest due as of December 31, 2007 is $537.44, and that interest continues to accrue from and after January 1, 2008 through the date of judgment at the per diem rate of $19.66. (SMF, ~35).

This is a false statement. Robert Haight, an elder from South Congregation in Hot Springs contacted me telling me that Vince was willing to come to an agreement. I sent him a letter which Plaintiff has attached along with his response. I did not hear from him for over 2 weeks, even though I asked Robert Haight to have him respond immediately since the mover's were getting ready to move the furniture to Arizona and I had to know which address to move it to. As I did not hear from him, we moved our furniture to our property in Sedona. We did not move to Aviano. Plaintiff has not paid anything towards his half of the closing costs, mortgage and expenses for this property which is now totals upwards of $80,000.

ANSWER:    Admit the first paragraph of Paragraph 40 except deny that interest due as of December 31, 2007 is accurately stated (SMF, ¶35).  Deny the second paragraph of Paragraph 40.  Further answering, not only did Defendant moved into Aviano, he was served with process there and he asked that pleadings in this case be served upon him at that address. (Sadler Supp. Decl., ¶17).

41.     Referring to the litigation involving the "Back O'Beyond" property located at 150 Scenic Drive in Sedona, Arizona, plaintiff states in his Motion for Summary Judgment that I agreed to buy from plaintiff that property for the original cost of $575,836.75 plus $50,000.00. (SMF, ~36); and that pending my obtaining financing for the purchase, Defendant was obligated to pay interest on $575,836.75 at the "prime rate" from October 6, 2006 through January 3, 2007 and (b) at the fixed rate of 14% thereafter until purchased the property from the plaintiff. In support of this, the Plaintiff s Motion for Summary Judgment quotes the purported Settlement Agreement that states,

> "NB agrees to pay VS 50k for I BOB'" and that (VS) agrees to charge NB interest rate of prime for 'BOB' ... until NB finances BOB... if not financed within 90 days. NB will have to pay interest at rate of 14%." (SMF, ~37).

ANSWER:     Admit.

42.     According to the plaintiff, I breached the "Settlement Agreement" because I failed to purchase property from Plaintiff and because I failed to pay any of the interest accruing after November 30, 2006. Interest due as of December 31, 2007 is $83,834.75. (SMF, ~38).

ANSWER:     Admit.

43.     What actually happened was that the Plaintiff repeatedly refused to sign the purchase contract showing original purchase price plus $50,000 profit he'd requested even though he'd given me a 90 day deadline to close.

ANSWER:     Deny. (SMF, ¶¶28-30).

44.     As for the La Barranca property referred to at Count V of the Plaintiff s Complaint, Plaintiff claims in his Motion for Summary Judgment that] agreed to buy that property from the Plaintiff for the original cost of $348,267.54. (SMF, ~39); and that pending my obtaining financing for the purchase, ] was obligated to pay interest to Plaintiff on $348,267.54 at (a) the "prime rate" from October 6, 2006 through January 3, 2007 and (b) at the fixed rate of 14% thereafter until] purchased La Barranca from Plaintiff.

ANSWER:     Admit.

45.     Plaintiffs motion admits that the purported Settlement Agreement does not expressly state that] shall "purchase" La Barranca from Plaintiff, but he attempts to get around that by saying that "that is what the Settlement Agreement means when it requires Defendant to pay interest to Plaintiff until Defendant refinances the property: (VS) Agrees to charge NB interest rate of prime for...Granite Rd. until NB finances... 15 Granite (sic) if not financed within 90 days NB will have to pay interest at rate of 14%". (SMF, -40)."

ANSWER:     Admit.

46.     He goes on to state in his motion that I breached the Settlement Agreement because I failed to purchase La Barranca from Plaintiff, and because I have not paid any of the interest accruing after November, 2006. (SMF ~41).

ANSWER:     Admit.

47.     Plaintiff never signed and returned purchased contract to Title Company after repeated requests even though Plaintiff had given me a 90 day deadline to close on said lot.

ANSWER:   Admit Plaintiff did not send contracts to the title company and further answer that all documents and checks were compiled and given to the mediators to confirm fulfillment of Plaintiff's obligations.

48.   Count VI of the Plaintiffs Complaint refers to the property designated as the "Palmira 28658" property. Plaintiffs Motion for Summary Judgment states that I agreed to buy that property from Plaintiff for the original cost of $498,968.00. (SMF, ~42); and that pending my obtaining financing for the purchase, I was obligated to pay interest on $498,968.00 at (a) the "prime rate" from November 1, 2006 through January 31, 2007 and (b) at the fixed rate 14% thereafter until I purchased Palmira 28658 from Plaintiff. (SMF, ~44).

ANSWER:   Admit.

49.   I was never provided with a purchase contract by the Plaintiff, as is buyer's responsibility even after I requested him to do so. Plaintiff also did not purchase the Defendant's Palmira and reworded October paperwork that had not even been discussed by the parties when the met with the church leaders.

ANSWER:   Deny the first sentence. (SMF, ¶28; Sadler Supp. Decl., ¶18). Admit Plaintiff could not purchase "Defendant's Palmira" because Defendant refused to honor his obligation under the Settlement Agreement. Deny Plaintiff "reworded" the "October paperwork." (Sadler Supp. Decl., ¶12).

50.   Count VII of the Plaintiffs Complaint refers to the "Quartz Cove" property. Plaintiffs Motion for Summary Judgment states that I agreed to reimburse Plaintiff for what he says was his down payment of $56,600; that pending reimbursement, I was obligated to pay interest on $56,600.00 at (a) the "prime rate from October 6 2006 through March 1, 2007 and (b) at the fixed rate of 14% thereafter until the time of reimbursement. (SMF -46).

ANSWER:   Admit.

51.   Plaintiff did not perform any obligations according to the October 5, 2006, paperwork even after repeated requests and having received 3 checks in the amount of approximately $54,000 from Defendant "piece meal". As a result of the 48 hour ultimatum which was issued Plaintiff by Defendant, I was entitled to all interest and payments that he had previously made Plaintiff on the first contract, which Plaintiff had also breached and had led to the elder's meeting in the first place.

ANSWER:   Deny. (SMF, ¶¶28-30). Further deny that Defendant had any right to issue any "ultimatum" especially when Defendant caused his own breach. (See ¶27 infra).

52.   Count VIII of the Plaintiff s Complaint refers to the property described as "Heritage Bay." Plaintiffs Motion for Summary Judgment states that under the Settlement Agreement, I agreed to reimburse Plaintiff for the sum of $40,787, representing Plaintiffs down payment; and that pending reimbursement I was obligated to pay interest on $40,787.00 at (a) the "prime rate" from October 62006 through March 1, 2007, and (b) at the fixed rate of 14% thereafter until the time reimbursement. Plaintiff claims that I "breached the Settlement

467243.1 050669-38762

Agreement because [I] failed to reimburse Plaintiff for his down payment, and because [I] failed to pay any interest accruing after November 30, 2006. (SMF, -48).

ANSWER:    Admit.

53.    Plaintiff did not perform any of his obligations even after repeated requests and having received 3 checks in the amount of approximately $54,000 from Defendant "piece meal". As a result of the 48 hour ultimatum which was issued Plaintiff by Defendant, I am entitled to all interest and payments that he had previously made Plaintiff on the first contract, which Plaintiff had also breached and had led to the elder's meeting in the first place.

ANSWER:    Deny. (SMF, ¶¶28-30).

Dated:    1-31-08                                Respectfully submitted,

                                                **VINCENT SADLER**


                                                By:  /s/ Richard T. Reibman
                                                        One of his Attorneys

Patrick T. Stanton (ARDC #6216899)
Richard T. Reibman (ARDC #3122849)
Schwartz Cooper Chartered
180 North La Salle, Suite 2700
Chicago, IL  60601
(312) 346-1300

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

VINCENT SADLER,                              )
                                             )
    Plaintiff and Counter-Defendant,     )
                                             )
v.                                           ) No. 07 C 5464
                                             )
NASSER BASHIRI and NANCY                     )
BASHIRI, husband and wife                    )
                                             )
    Defendants and Counter-Plaintiffs.   )

## SUPPLEMENTAL DECLARATION OF VINCENT SADLER

Vincent Sadler declares as follows:

1.    I never told Defendant that I was paying interest at the prime rate on the properties I had financed that were the subject of our dispute. In fact, some of the properties were purchased without financing. Defendant had actual knowledge of which properties had been financed (and the rate) and which properties were not financed.

2.    On October 4-5, 2006, we negotiated two interest rates in the Settlement Agreement. One rate was intended to cover my implied cost of carrying the properties for approximately ninety days, within which time he was supposed to buy them. As explained below, we negotiated this rate as the "prime rate," which was 8.25% at all relevant times.

3.    The other interest rate we negotiated was the 14% interest rate that became effective if Defendant did not perform buy the properties within the stated time, typically ninety days. So interest would be calculated at 8.25% for approximately 90 days and then would jump to 14%. This was intended to provide an incentive for Defendant to do what he was required to do.

4.    As for the first rate (see paragraph 2 above), when we negotiated this in our settlement meetings on October 4-5, 2006, Defendant initially offered to pay 9% interest. However, I wanted a floating interest rate such as prime, which adjusts to the market. I knew that if I had to borrow against any of the properties, I would be able to borrow at the prime rate. I did not want a fixed rate from Defendant and end up borrowing at a higher rate if interest rates increased. As a result, we ended up with a rate lower than the rate which Defendant originally proposed.

5.     On November 18, 2006, several weeks after the Settlement Agreement was signed, I agreed to transfer my rights under a pending real estate contract to Alex Aldridge and also agreed to make a loan to him to cover approximately $8,000 in closing costs. None of my dealings with Aldridge occurred while the mediation was conducted on October 4-5, 2006. The property that was the subject of the transaction was not one of the properties that is the subject of the Complaint in this case or any of my dealings with Defendant.

6.     Duraid Micah was present on October 4 and October 5, 2006 during the mediation sessions. His declaration in support of the Motion for Summary Judgment is accurate.

7.     Defendant actively participated in the negotiations on October 4-5, 2006. He was alert at all times and very vocal in advocating for himself. If Defendant asked his wife to sit in a car for 2.5 hours, this was of his own doing and he never told anyone this. His wife would have been welcome to come inside the building and relax there. I never insisted the Settlement Agreement be signed before everyone was ready to sign it.

8.     There is nothing that Defendant learned about the properties after the Settlement Agreement that he didn't know at the time of the Settlement Agreement was signed. Defendant is not being truthful when he says he learned he "had been had" when he returned home in paragraph 18 of his declaration.   All information about the properties was transparent to him. Both prior to and during the mediation, various financial information, spreadsheets and the like were distributed among the parties and the mediators so that we could discuss the properties in detail.

9.     I originally financed 14630 Meravi Drive through TBI Mortgage Company in July 2006. In August 2006 (i.e. the next month), I paid off the entire mortgage balance. There was no debt against the property. The reason Defendant was on the title was because his name was on the contract with the developer, even though my money was used for the downpayment. The developer would not allow me to substitute my name for Defendant's name on the Contract, so both of us were on the title. There was no reason in October 2006 and no reason now why Defendant cannot transfer his interest in 14630 Meravi to me, as he agreed to do).

10.     No lawyer or any other person ever told me that Defendant could not transfer his quit claim his interest in 14630 Meravi Drive.  No lawyer or any other person ever told me that Defendant could not quit claim his interest in 28677 San Lucas Lane.

2

11.    Under the Settlement Agreement, Defendant was supposed to transfer the building plans for LaBarranca to me. I received a 1-page fax from Defendant containing a line drawing and nothing more. This 1-page drawing was not what Defendant was supposed to give me.

12.    In Paragraph 11 of his Declaration, Defendant refers to 28677 San Lucas Lane as "[his] property" and lists very specific prices for the purchase. He fails to tell the Court, however, that I paid the $116,900.00 for the earnest money deposit, which made it possible for Defendant to obtain financing. Defendant obtained $330,000.00 in financing. He did not finance the entire purchase price. That the Settlement Agreement states that I would pay $40,000 in consideration for a quit claim deed makes perfect sense when one realizes that Defendant had no equity in the property, while I had already invested $116,900.00. Put another way, in exchange for investing zero, Defendant was going to receive a $40,000.00 windfall. No wording was ever changed in the Settlement Agreement after it was signed.

13.    Defendant knew who at least three of the mediators were before even coming to Chicago for the mediation. Prior to the mediation, Defendant asked me in writing to give one of the mediators, Rudy Zarate certain paperwork regarding the properties that were the subject of our dispute. He sent copies of that letter to Zarate and to Alex Aldridge, another mediator. Also, another mediator, T.J. Bullock called Defendant to coordinate the dates and times of the settlement discussions.

14.    I never listed for sale any property allocated to Defendant under the Settlement Agreement.

15.    Defendant was aware and had documentation regarding his own delinquent payments before October 4, 2006 and Defendant's delinquent payments were discussed, proved and agreed upon at the October 4-5, 2006 meetings and then written into the Settlement Agreement as the second point ("NB will pay the balance $37,652.59 w/in 30 days..."). Other than his initial payment under the Settlement Agreement, which are described in Paragraph 26 of Plaintiff's Statement of Material Facts, Defendant paid no other amounts owed to Plaintiff under the Settlement Agreement.

16.    After the Settlement Agreement was signed, Defendant sent me two real estate contracts (for 15 Granite Mtn. Rd. and for Back O'Beyond) purportedly for the purpose of transferring title. One contract, however, had the wrong price. I signed the contract, but

3

corrected the price and initialed the correction, and gave it to the mediators along with my other deliveries. I signed the other contract, which was correct. Defendant refused to accept the contracts, just like he refused to accept the other deliveries from the mediators.

17.     Attached as Exhibit A is a copy of the return of service of process in this case, showing that Defendants were served at 21911 N. 36th St., Phoenix, AZ. This is the house referred to as "Aviano" in the pleadings. After being served with the Complaint, Defendant filed an appearance form using a different street address. However, on January 10, 2008, Defendant filed a "Notice of Change of Address" to request that all filings be sent to him at the Aviano address. See Exhibit B.

18.     Attached as Exhibit C is a copy of a certified letter I sent Defendant on November 26, 2006.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed on this _31st_ day of _January_, 2008.

_____
VINCENT SADLER

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| VINCENT SADLER, | ) |
| | ) |
| Plaintiff and Counter-Defendant, | ) |
| | ) |
| v. | ) No. 07 C 5464 |
| | ) |
| NASSER BASHIRI and NANCY | ) |
| BASHIRI, husband and wife | ) |
| | ) |
| Defendants and Counter-Plaintiffs. | ) |

## DECLARATION OF RUDY ZARATE

Rudy Zarate declares as follows:

1.     I have personal knowledge of the matters set forth in this Declaration.  I am over 21 years of age and am competent to testify at trial regarding these matters.  I reside in the City of Chicago.

2.     On October 4 and October 5, 2006, I participated in two days of mediation concerning a business dispute between Vincent Sadler and Nasser Bashiri.   I, along with four other individuals, acted as mediators.  The mediation took place at 4572 N. Elston Ave. in Chicago, Illinois.

3.     The substance of the mediation concerned various real estate properties that had been acquired by Sadler and Bashiri, and which had become the subject of a somewhat bitter dispute.

4.     Sadler, Bashiri, and all five mediators are members of the same church.  The dispute between Sadler and Bashiri did not concern religious matters, nor did it involve church property.  The dispute was not religious in nature and did not relate to our church in any way.

5.     We five mediators have never said or implied (and we do not claim) that we had any "power" to decide how the dispute should be resolved. The mediation was not a formal process and was not subject to a particular set of rule or procedures. We were not assisting in any official capacity as elders of the church, nor representing the church in these meetings. Our purpose was solely to aid Sadler and Bashiri to a peaceful solution and agreement.  I am not an attorney.

6.      After the first day of meetings, October 4, 2006, Sadler and Bashiri reached an agreement. At that point, Antoine Holmes, one of the mediators, typed up the agreement on a computer. Everyone left for the day. We all returned the next day, October 5, 2006. Sadler and Bashiri reviewed the written settlement document and fine-tuned it to make sure it was consistent with what Sadler and Bashiri has agreed upon. Once they confirmed the agreement reflected their understandings, Sadler and Bashiri signed it. All of the mediators then signed it as witnesses.

7.      Regarding the property known as 28658 San Lucas Lane in Bonita Springs, Florida, the Settlement Agreement provides that, "Palmira - 28658, NB will be refinancing this property in his name by March 1, 2007, until he receives financing he will pay VS interest…" This provision means that Nasser Bashiri is required to buy (i.e., by refinancing into his own name) the property from Vincent Sadler for the original purchase price, and to pay interest on an amount equal to the original purchase price if the property was not purchased by March 1, 2007. Interest was charged at the prime rate from November 1, 2006 through January 31, 2007 and increased to 14% commencing February 1, 2007.

8.      Regarding the property at 15 Granite Mountain Road in Sedona, Arizona ("La Barranca"), the Settlement Agreement provides that "VS agrees to charge interest rate of prime for…15 Granite Rd until NB finances…15 Granite if not financed within 90 days NB will have to pay interest at rate of 14%." This provision means that Nasser Bashiri is required to buy (i.e. by refinancing into his own name) the property from Vincent Sadler for the original purchase price, and to pay interest on an amount equal to the original purchase if the property was not purchased within 90 days of October 5, 2006.

9.      Regarding the property at 150 Scenic Drive, Sedona, Arizona in the Back O'Beyond Subdivision ("BOB"), the Settlement Agreement provides that "VS agrees to charge NB interest rate of prime for 'BOB'…until NB finances BOB…if not financed within 90 days NB will have to pay interest at rate of 14%" This provision required Nasser Bashiri to buy (i.e. by refinancing into his own name) the property from Vincent Sadler for the original purchase price (plus $50,000, as stated in a separate provision of the Settlement Agreement, which provides, "[NB] to pay VS $50k for 'BOB'…."), and to pay interest on an amount equal to the original purchase price if the property was not purchased within 90 days of October 5, 2006.

2

10.     Both Sadler and Bashiri were obligated to deliver to each other certain documents and money.  On or before November 26, 2006, Sadler gave me all of the documents and funds he was required to give Bashiri under the Settlement Agreement.  This occurred more than a year ago and I do not remember the specific documents or funds that Sadler tendered.  I do, however, remember that I examined what he provided and compared it to the Settlement Agreement, and concluded that he had fully complied with his obligations under the Settlement Agreement. While I do not remember the amount of the two checks that Sadler gave me, I do remember confirming that the amounts were correct and I remember putting the checks in my safe.  In tendering to me his deliveries, Sadler honored the Settlement Agreement and fulfilled his obligations under it.

11.     On November 29, 2006, I and Alex Aldridge, another mediator, telephoned Bashiri on a three-way call and told Bashiri that we were holding Sadler's deliveries, and that we would deliver them to Bashiri when Bashiri tendered his deliveries for Sadler.  At that time, Bashiri told us that he was not going to accept the deliveries from Sadler.  Bashiri said that he would not honor the Settlement Agreement because he now believed the interest rate was too high.  He gave no other reason or explanation.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on this 3 day of DECEMBER, 2007.

_____
RUDY ZARATE

3

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| VINCENT SADLER, | ) | |
| | ) | |
| Plaintiff and Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 07 C 5464 |
| | ) | |
| NASSER BASHIRI and NANCY | ) | |
| BASHIRI, husband and wife | ) | |
| | ) | |
| Defendants and Counter-Plaintiffs. | ) | |

### DECLARATION OF ALEX ALDRIDGE

Alex Aldridge declares as follows:

1.    I have personal knowledge of the matters set forth in this Declaration.  I am over 21 years of age and am competent to testify at trial regarding these matters.  I reside in the City of Chicago.

2.    On October 4 and October 5, 2006, I participated in two days of mediation concerning a business dispute between Vincent Sadler and Nasser Bashiri.  I, along with four other individuals, acted as mediators.  The mediation took place at 4572 N. Elston Ave. in Chicago, Illinois.

3.    The substance of the mediation concerned various real estate properties that had been acquired by Sadler and Bashiri, and which had become the subject of a somewhat bitter dispute.

4.    Sadler, Bashiri, and all five mediators are members of the same church.  The dispute between Sadler and Bashiri did not concern religious matters, nor did it involve church property.  The dispute was not religious in nature and did not relate to our church in any way.

5.    We five mediators have never said or implied (and we do not claim) that we had any "power" to decide how the dispute should be resolved.  The mediation was not a formal process and was not subject to a particular set of Church rules or procedures.  We were not assisting in any official capacity as elders of the church, nor representing the church in these meetings. Our purpose was solely to aid Sadler and Bashiri to a peaceful solution and agreement. I am not an attorney.

6.    After the first day of meetings, October 4, 2006, Sadler and Bashiri reached an agreement. At that point, Antoine Holmes, one of the mediators, typed up the agreement on a computer. Everyone left for the day. We all returned the next day, October 5, 2006. Sadler and Bashiri reviewed the written settlement document and fine-tuned it to make sure it was consistent with what Sadler and Bashiri had agreed upon. Once they confirmed the agreement reflected their understandings, Sadler and Bashiri signed it. All of the mediators then signed it as witnesses.

7.    Regarding the property known as 28658 San Lucas Lane in Bonita Springs, Florida, the Settlement Agreement provides that, "Palmira - 28658, NB will be refinancing this property in his name by March 1, 2007, until he receives financing he will pay VS interest…" This provision means that Nasser Bashiri is required to buy (i.e., by refinancing into his own name) the property from Vincent Sadler for the original purchase price, and to pay interest on an amount equal to the original purchase price if the property was not purchased by March 1, 2007. Interest was charged at the prime rate from November 1, 2006 through January 31, 2007 and increased to 14% commencing February 1, 2007.

8.    Regarding the property at 15 Granite Mountain Road in Sedona, Arizona ("La Barranca"), the Settlement Agreement provides that "VS agrees to charge interest rate of prime for…15 Granite Rd until NB finances…15 Granite if not financed within 90 days NB will have to pay interest at rate of 14%." This provision means that Nasser Bashiri is required to buy (i.e. by refinancing into his own name) the property from Vincent Sadler for the original purchase price, and to pay interest on an amount equal to the original purchase if the property was not purchased within 90 days of October 5, 2006.

9.    Regarding the property at 150 Scenic Drive, Sedona, Arizona in the Back O'Beyond Subdivision ("BOB"), the Settlement Agreement provides that "VS agrees to charge NB interest rate of prime for 'BOB'…until NB finances BOB…if not financed within 90 days NB will have to pay interest at rate of 14%" This provision required Nasser Bashiri to buy (i.e. by refinancing into his own name) the property from Vincent Sadler for the original purchase price (plus $50,000, as stated in a separate provision of the Settlement Agreement, which provides, "[NB] to pay VS $50k for 'BOB'…."), and to pay interest on an amount equal to the original purchase price if the property was not purchased within 90 days of October 5, 2006.

2

10.    After the Settlement Agreement was signed, Sadler assembled the various documents and checks he was required to deliver to Bashiri under the Settlement Agreement. Sadler gave all the deliveries to Rudy Zarate, one of the mediators. On November 29, 2006, I and Rudy Zarate telephoned Bashiri on a three-way call and told Bashiri that we were holding Sadler's deliveries. We told him we would deliver them to Bashiri when Bashiri tendered his deliveries for Sadler. At that time, Bashiri told us that he was not going to accept the deliveries from Sadler. Bashiri said that he would not honor the Settlement Agreement because he now believed the interest rate was too high. He gave no other reason or explanation.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this _4th_ day of _December_, 2007.

ALEX ALDRIDGE

3

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

VINCENT SADLER,                          )
                                         )
    Plaintiff and Counter-Defendant.   )
                                         )
v.                                       )   No. 07 C 5464
                                         )
NASSER BASHIRI and NANCY                 )
BASHIRI, husband and wife                )
                                         )
    Defendants and Counter-Plaintiffs.  )

### JOINT DECLARATION OF
### ANTOINE HOLMES, T.J. BULLOCK, and DURAID MICAH

Antoine Holmes, T.J. Bullock, and Duraid Micah each declare as follows:

1.      I have personal knowledge of the matters set forth in this Declaration.  I am over 21 years of age and am competent to testify at trial regarding these matters.  I reside in the City of Chicago.

2.      On October 4 and October 5, 2006, I participated in two days of mediation concerning a business dispute between Vincent Sadler and Nasser Bashiri.  The three undersigned people, along with Rudy Zarate and Alex Aldridge, acted as mediators.  The mediation took place at 4572 N. Elston Ave. in Chicago, Illinois.

3.      The substance of the mediation concerned various real estate properties that had been acquired by Sadler and Bashiri, and which had become the subject of a somewhat bitter dispute.

4.      Sadler, Bashiri, and all five mediators are members of the same church.  The dispute between Sadler and Bashiri did not concern religious matters, nor did it involve church property.  The dispute was not religious in nature and did not relate to our church in any way.

5.      We five mediators have never said or implied (and we do not claim) that we had any "power" to decide how the dispute should be resolved.  The mediation was not a formal process and was not subject to a particular set of rule or procedures.  We were not assisting in any official capacity as elders of the church, nor representing the church in these meetings.  Our purpose was solely to aid Sadler and Bashiri to a peaceful solution and agreement.  None of the undersigned is an attorney.

6.    After the first day of meetings, October 4, 2006, Sadler and Bashiri reached an agreement. At that point, Antoine Holmes, one of the mediators, typed up the agreement on a computer. Everyone left for the day. We all returned the next day, October 5, 2006. Sadler and Bashiri reviewed the written settlement document and fine-tuned it to make sure it was consistent with what Sadler and Bashiri has agreed upon. Once they confirmed the agreement reflected their understandings, Sadler and Bashiri signed it. All of the mediators then signed it as witnesses.

7.    Regarding the property known as 28658 San Lucas Lane in Bonita Springs, Florida, the Settlement Agreement provides that, "Palmira - 28658, NB will be refinancing this property in his name by March 1, 2007, until he receives financing he will pay VS interest..." Our understanding is that this provision was intended to require Nasser Bashiri to buy (i.e., by refinancing into his own name) the property from Vincent Sadler for the original purchase price, and to pay interest on an amount equal to the original purchase price if the property was not purchased by March 1, 2007. Interest was charged at the prime rate from November 1, 2006 through January 31, 2007 and increased to 14% commencing February 1, 2007.

8.    Regarding the property at 15 Granite Mountain Road in Sedona, Arizona ("La Barranca"), the Settlement Agreement provides that "VS agrees to charge interest...for...15 Granite Rd until NB finances...15 Granite if not financed within 90 days NB will have to pay interest at 14%". Our understanding is that this provision was intended to require Nasser Bashiri to buy (i.e. by refinancing into his own name) the property from Vincent Sadler for the original purchase price, and to pay interest on an amount equal to the original purchase if the property was not purchased within 90 days of October 5, 2006.

9.    Regarding the property at 150 Scenic Drive, Sedona, Arizona in the Back O'Beyond Subdivision ("BOB"), the Settlement Agreement provides that "VS agrees to charge interest...for...BOB until NB finances...BOB if not financed within 90 days NB will have to pay interest at 14%". Our understanding is that this provision was intended to require Nasser Bashiri to buy (i.e. by refinancing into his own name) the property from Vincent Sadler for the original purchase price (plus $50,000, as stated in a separate provision of the Settlement Agreement, which provides, "[NB] to pay VS $50k for 'BOB'...."), and to pay interest on an amount equal to the original purchase price if the property was not purchased within 90 days of October 5, 2006.

2

10.    Following the mediation, mediators Rudy Zarate and Alex Aldridge were the "point men" and tried to work with Sadler and Bashiri in effectuating the terms of what they had agreed to.  We three undersigned individuals were not directly involved in that process.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on this 4th day of December , 2007.

_____
ANTOINE HOLMES

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on this 4 day of December , 2007.

_____
T.J. BULLOCK

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on this 4 day of December , 2007.

_____
DURAID MICAH

3

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| VINCENT SADLER, | ) | |
| | ) | |
| Plaintiff and Counter-Defendant, | ) | |
| | ) | |
| v. | ) | No. 07 C 5464 |
| | ) | |
| NASSER BASHIRI and NANCY | ) | |
| BASHIRI, husband and wife | ) | |
| | ) | |
| Defendants and Counter-Plaintiffs. | ) | |

## DECLARATION OF DEBRA MACDONALD

Debra MacDonald declares as follows:

1.      I have personal knowledge of the matters set forth in this Declaration. I am over 21 years of age and am competent to testify at trial regarding these matters. I reside in Glencoe, Illinois.

2.      For many years, I have used Excel and Word software programs and have experience in minor bookkeeping, typing, filing, and similar administrative tasks. In April 2005, I was asked by Vincent Sadler (the "Plaintiff") and Nasser Bashiri ("Defendant") to handle some simple office responsibilities for them, such as phone calls, typing and faxing. But as the Plaintiff's and Defendants' relationship continued, it became my responsibility to handle all the office responsibilities, such as sending monthly statements of payments due from the Plaintiff and Defendant. I was the one responsible for processing payments to lenders, insurance companies, condominium association dues, utility bills, pest control, etc., along with keeping monthly records of such payments along with filing. I was essentially the point person for all their real estate dealings. I generated and distributed numerous reconciliations and correspondence to the Plaintiff and Defendant as requested or needed.

3.      Intentionally deleted.

4.      The Plaintiff and Defendant made monthly payments and shared expenses equally until July 2006 (this relates only to the on-going monthly payments, not to downpayments on property, which were not equally made). In July 2006, Defendant stopped paying his share of monthly expenses. I made several phone calls encouraging the Defendant to make his monthly

payment with no response. The relationship between the Plaintiff and Defendant became strained.

5.    On October 4, and October 5, 2006 the Plaintiff and Defendant met in Chicago to try to resolve their dispute over the properties. I was present at both of these meetings. The Defendant was residing in Arkansas at the time and drove to Chicago to attend these meetings.

6.    I was present when Plaintiff and Defendant signed the written settlement agreement (the "Settlement Agreement") on October 5, 2006. I was given a copy of it and I was asked to continue to aid the Plaintiff and Defendant with any office work to help them fulfill the terms of the Settlement Agreement.

7.    Following execution of their Settlement Agreement on October 5, 2006, Defendant paid Plaintiff (a) $37,652.59 (to cure delinquent interest payments), (b) $10,594.31 (the first payment due under the Settlement Agreement), and (c) $6,000.00 (to reimburse Plaintiff for deposits he had made on properties in Arkansas that the parties commonly refer to units J4 and J6). These were not the only payments Defendant was required to make to Plaintiff; they were the initial payments. Defendant was also obligated under the Settlement Agreement to deliver quit claim deed to Plaintiff of the properties, namely 28677 San Lucas Lane, Bonita Springs, Florida and 14630 Meravi Drive, Bonita Springs, Florida.

8.    Defendant never made any further payments required by the Settlement Agreement.

9.    The Settlement Agreement imposed no obligations on either party to pay a share of the rents to each other.

10.    Relative to the property located at 21911 N. 36 St., Phoenix, Arizona in the Aviano Desert Ridge development ("Aviano"), Plaintiff paid the down payment of $51,271.00 when Aviano was acquired. Defendant has not reimbursed the Plaintiff for all or any part of the downpayment. In addition, Defendant has not made any payments for interest accruing after November 30, 2006. Interest due as of December 31, 2007 is $6,537.44 and continues to accrue from and after January 1, 2008 through the date of judgment at the per diem rate of $19.66.

11.    Relative to the property located at 150 Scenic Drive, Sedona, Arizona in the Back O'Beyond development ("BOB"), Defendant has not made any payments for interest accruing after November 30, 2006. Interest due as of December 31, 2007 is $83,834.75 and continues to

accrue from and after January 1, 2008 through the date of judgment at the per diem rate of $218.63.

12.     Relative to the property located at 15 Granite Mountain Road, Sedona, Arizona, ("La Barranca"), Defendant has not made any payments on interest accruing after November 30, 2006. Interest due as of December 31, 2007 is $51,299.15 and continues to accrue from and after January 1, 2008 through the date of judgment at the per diem rate of $133.86.

13.     Relative to the property located at 28658 San Lucas Lane, Bonita Springs, Florida, Defendant has not made any payments on interest accruing after November 30, 2006. Interest due as of December 31, 2007 is $70,913.30 and continues to accrue from and after January 1, 2008 through the date of judgment at the per diem rate of $191.38.

14.     Relative to the property located at 9213 Quartz Lane, Unit 101, Naples, Florida, ("Quartz Cove"), Plaintiff paid the down payment of $56,600.00 when the property was acquired. Defendant has never reimbursed Plaintiff for all or any part of the down payment of $56,600.00. Defendant has not made any payments on interest accruing after November 30, 2006. Interest due as of December 31, 2007 is $7,794.64 and continues to accrue from and after January 1, 2008 through the date of judgment at the per diem rate of $21.71.

15.     Relative to the property located at 10285 Heritage Bay Blvd., Unit 834, Naples, Florida, ("Heritage Bay"), Plaintiff paid the down payment of $40,787.00 when the property was acquired. Defendant has never reimbursed Plaintiff for all or any part of the down payment of $40,787.00. Defendant has not made any payments on interest accruing after November 30, 2006. Interest due as of December 31, 2007 is $5,615.54 and continues to accrue from and after January 1, 2008 through the date of judgment at the per diem rate of $15.64.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on this 17th day of December, 2007.

_____
**DEBRA MACDONALD**